218.	Quite to the contrary, the court held that:

> "......the statements were offered to show that [Petitioner's ] trial attorneys were on notice and had knowledge of the various witnesses account of Mr. Davis statements. Thus, the evidentiary significance of the statements lies in the indication that the trial Counsel knew of potentially exculpatory evidence... Therefore, the testimony was not hearsay for the purposes of the post-conviction hearing. The post-conviction court therefore erred in striking the testimony as hearsay, and in doing so, abused its discretion. ". (id. 870)

219.	Thus, Post Conviction Counsel Banks would have had ample legal cover and procedural justification under the **Tenn.Rules of Evidence 401** *Relevant Evidence*, and **Tenn.Rules of Evidence 803,** *Hearsay exceptions,* had he made an attempt to offer into the record of the post conviction hearing, the testimony of (i) Mr George White; and (ii) Jimmy Ballard.

220.	Furthermore, Post Conviction Counsel Banks would have also had ample legal cover and procedural justification under the **Rules of Evid. 401** and **803,** had he made an attempt to offer into the record of the post conviction hearing, the testimony of (i) Mrs. Lucille Miller; (ii) Dave C. Williams; (iii) James Priddy; (iv) Mary Loiuse Taylor; (v) Mrs. Sam Ethel Williams; (vi) former Assist .D.A. Ted Neuman; (vii) Clifford A Worden, (viii) Mr. T.T. Boyd; (ix) Marvin Grandberry; (x) Jennifer Praitt; (xi) Mose Comage; (xii) Harold Booker and (xiii) other witnesses with relevant exculpatory testimony.

221.	Likewise in the case sub judice, all of these potential defense witnesses' testimony, in turn could have been used to impeach all four (4) of the state's the witness (ie.

Clement Harris, Nina Champion, Shelia Bernile, and Kathy Blackwell), and severely undermine their credibility, so as to support Petitioner Miller's defense.

> ii. strategy of 3rd party guilt (ie the guilt of Mr. Clement Harris himself, along with his self professed imaginary accomplices who only he has ever sceen)

222. Therefore, Post Conviction Counsel Banks, should have subpoenaed, obtained utilized and introduced evidence and related exhibits, into the the record, so as to prove and demonstrate to the Jurors at Petitioner Millers August 2001 trial that there was sufficient evidence to find that State Star witness Clement Harris: (i), was not a credible witness; and (ii) he and his co-conspirators/accomplices Mr. Tryacey Taylor and Sloubh, were directly involved in the murder of Mr. Rice.

223. Indeed there was absolutely no reason for Counsel Houghton not to investigate and present to the jurors in a coherent pro-defensive format, a summary of facts in support of a theory 3rd party guilt and Petitioner Millers actual innocence, in the form of the following 33 *exculpatory fact points of Impeachment*:

> (i)    the fact that there is a confession and credible accusation of actual killer, who is not Petitioner Miller. (see **Exhibit# 21, supra, Mr. White's statement)**
>
> (ii)   the fact that the weapon- to wit 12 gauge shot gun that the allege perpetrator acknowledged hiding after the murder, and threatening physical attack people in order to retrieve it, is an exact make and model of the weapon used to murder Dono (see **Exhibit# 21, supra, Mr. White's statement)**
>
> (iii)  the fact that State Expert witnesses testified that Clement Harris testimony regarding the scenario of the crime was forensically impossible, due to the nature and scope of the gunshot wounds

produced by the fatal shots. (See Dr. O.C. Smith, TR-II. pp. 360-362)-[shooting had to have occurred from a distance of greater than 5 (five) feet-which would have prevented Mr. Miller, being seated in an adjacent vehicle parked driver-side window to driver-side window with the victims car])

(iv) Whereas the .12 gauge shotgun that Slough hid, and Mr. George White found, had a barrel that was short enough to have been the murder weapon, that fit within the forensic parameters of plausibility with regard to the Gun shot wound and power burn patterns established by the physical crime scene evidence, as explained by Dr. O.C. Smith.

(v) There was no forensic evidence found or recovered from the scene which in any way independently corroborated Clement Harris' testimony that a murder was actually committed in the Parking lot of Jelks Street at the south end of Fairgrounds street. (see testimony of Johnny Blackburn, (TR-II. pp. 274; L 9-12)

(vi) Pursuant to the testimony of Dr. O.C. Smith There's no credible forensic evidence which puts the time of Mr. Rices murder, around the 1am to 2 am time frame, as alleged my Mr. Harris. (TR-II. pp. 360-362 )

(vii) There were no accurate scientific tests , sch as Gun Shot residue, tests, performed on the Shotgun to determine whether or not it had been fired recently. See S.A. Brian Byrd, (TR-II. pp. 338, L 7-13)

(viii) the fact that eye witness testimony puts the alleged murderers Tracey Taylor and slough in the vicinity of Iola Street dropping off victims car after murder during the early morning hours of Thursday April 20th, 1995, (see **Exhibit# 28, supra; Mr. Jesse Jones and Jimmy Ballard**)

(ix) the fact that eye witness testimony puts a car matching alleged make and model owned by Slouch at scene abandoning the victims car, during the early morning hours of Thursday April 20th, 1995,. (see **Exhibit# 28, supra; Mr. Jesse Jones and Jimmy Ballard); see also Exhibit# 21, supra, Mr. White's statement**)

(x) the fact that there was a on going criminal drug enterprise based-business relationship established between state witness Clement Harris, Tracey Taylor, Slouch and the victim Dono Rice. (**Exhibit# 21, supra**)

(xi) the fact that there were multiple citings of Clement Harris in Dono's car purchasing and selling drugs, (see testimony of Chief J. Blackburn; see also Statement of Nina Champion(supra); and Mr. Curtis Johnson, *infra*

lement Harris accused Clement specifically perjured himself by lying

any such drug purchases from Victim Mr. Rice, prior to his murder (id.)

(xiii)    the fact that there was direct evidence that the victim "Dono" had an altercation/argument over drug money with Clement Harris' Associates, Tracey Taylor, and Slouch

(xiv)    the fact that there were unidentified finger and palm prints in the vehicle that very likely belonged to Tracey Taylor and and Slouch or Clement Harris (whose fingerprints were never compared to the latent recovered from the vehicle.)

(xv)    the fact that Mrs. Nina Champion who was close to both Clement Harris and Mr. Harris' associate Mr. Wright Palmer, went out to see the body in the morning of Thursday April 20th, 1995, and this could have only been possible if she were told it's location by Clement Harris.

(xvi)    the fact that witnesses completely debunk and disprove Clement Harris' statements regarding the events of the morning of Thursday April 20th, 1995, specifically during the alleged time frame of the murder (ie 1:00 am – 2:00 am Thursday April 20th, 1995), (see Lucille Miller; Tr. I, pp 230); who specifically impeaches and contradicts Clement Harris' testimony by stating Petitioner Millers was at home and she specifically remembers him snoring.)

(xvii)    the fact that witnesses testified that Clement Harris, had implicated himself as a suspect in the murder of the victim Mr. Donald Rice. (see Sam Ethel Williams, TR-I. pp. 298-300)

(xviii)    the fact that Clement Harris' finger prints, (as opposed to merely his palm prints) *were never excluded* as a potential match, to the unidentified prints found in Mr. Rice's vehicle.(see Hoty Phillip, TR-II. pp. 416, L 1-11)

(xix)    the fact that Constance Howard testified that Petitioner Millers clothes and car tested negative for any trace evidence, DNA or fibers in any way related to the murder of Mr. Rice. (see Hoyt Phillip, TR-II. pp. 341, L 17-22)

(xx)    the fact that witnesses placed the victim, a known Drug Dealer, in the vicinity of the allege crime scene, specifically looking for the State star witness, Clement Harris, *a known drug addict- with violent criminal history*, shortly before the time he was allegedly murdered (see Curtis Johnson; TR-II. pp. 495, L13-29)

(xxi)    the fact that witnesses that State star witness, Clement Harris, was a known drug addict, with an extensive criminal background, who on the evening in question was on a crack-cocaine smoking binge that lasted for several days, followed by a drinking binge

78

alcohol, *(while he was also taking the prescription medication, Dilatins for his epileptic seizures)*, immediately after the the time the victim was allegedly murdered. (see Curtis Johnson; TR-II. pp. 502, L 2-6)

(xxii)   the fact that witnesses placed Clement Harris in the vicinity of the victims car, at the alleged murder scene at a time when the murder could have occurred .(see Curtis Johnson;, TR-II. pp.497, L 2-22)

(xxiii)  the fact that State star witness, Clement Harris, had no alibi for the times that he alleged the victim was murdered (see Curtis Johnson, TR-II. pp. 497-498) that he was with Harris at 1-2, and the murder's did not happen as Mr. Harris alleged);

(xxiv)   the fact that James Priddy, TR-II. Vol 2. pp. 252) completely and utterly undermines, debunks and disproves Clement Harris' statements regarding the factual basis of his estimation of the time of the murder and the sequence of events and who was with him on the morning of Thursday April 20th, 1995)

(xxv)    the fact that witnesses completely debunk and disprove Clement Harris' statements regarding the events the morning of Thursday April 20th, 1995, in the Brownsville Projects, ( Mary Louis Taylor TR-I. Vol 2. pp. 256)) (who specifically impeaches and contradicts Clement Harris' testimony by stating : (i) she never heard any shot gun blasts as reported by Clement Harris, at the projects that evening; and (ii) she never stuck her head out of any door, on the Project housing tier, as Clement Harris alleged she did, at the time of the murders.)

(xxvi)   the fact that witnesses acknowledged that Clement Harris, had engaged in criminal conduct and attempted to hide/bury, destroy evidence of his crimes, on the very Rd. (Allen King rd.) wherein the victim's body was found in Brownsville.((see Sgt Anthony Rankin, Brownsville Police Dept, who took statements from Both Harris and Shelia Bernil, stating that they both had disposed of evidence of their crimes on Allen King Rd. in Brownsville Tennessee)

(xxvii)  the fact that State witnesses specifically contradicted and impeached Clement Harris' testimony regarding both the time and place of the murder of Mr. Rice. (see Curtis Johnson; (id); Mary Louis Taylor (id); James Priddy (id.) and Mose Comage (i.d)

(xxviii) the fact that Asst. Dist.Atty Ted Nueman and the Brownsville Police Department had information regarding men, from Memphis and who were known associates of Mr. Clement Harris,

over money and drugs. (see Attached Exhibit #1 Motion for Exculpatory Evidence -Dated 1999

(xxix)    the fact that on the afternoon of Thursday April 20th, 1995, when Brownsville Police Dept. picked up Petitioner Miller for questioning and detained him for questioning, the Police were actively looking for the victims body that was deposited along Allen King Rd, while Petitioner was in the custody of Police[6].

(xxx)    The fact that the call that was placed to the Brownsville Police Department alerting them to the location of the body was made by some one who had personal knowledge of the facts of the case, (and this persons' identity was withheld by the State) because the victims body was located in a truly isolated and difficult to reach location, and was made at a time while Petitioner Miller was was in physical custody of the B.P.D-*and therefore unable to make such a call.*(see Lt. Blackwell TR-II. pp. 85 L 1); see also Officer Shawn Williams; TR-II. pp. 156, L 15-18)

(xxxi)    The fact that the records of the Brownsville Police Department that revealed that victim was seen arguing with a group of men from Memphis who are known associates of State star witness Mr. Harris

(xxxii)    The fact that State star witness Mr. Harris committed perjury on the stand, when he testified hat he never was given a deal or preferential treatment by the state in exchange for his testimony;

(xxxiii)    State star witness Clement Harris at the very least should have been considered an accomplice in the murders, with the heretofore unidentified co-conspirators accomplices Mr. Tryacey Taylor and Slouch.

***Trial Counsel Houghton's ineffectiveness, in failing to present exculpatory impeachment evidence that was probative of Petitioner's actual innocence and 3rd party guilt—State v. Vazquez Standard:***

---

6    The victims, body was discovered wearing white slacks, that were completely dry, despite the fact that the grass, brush and immediate surrounding area was soaking wet due to heavy rain storm down pours, that occurred for almost several hours during the morning and afternoon of Thursday April 20th, 1995, that stopped only roughly 20 to 30 minutes before the victims body was located. Therefore, the victim's body was placed in the location where it was found, no more than a 30 minutes prior to being found by local law enforcement agents. Counsel should have homed in on this critical point that the body was moved while Petitioner was in custody of police. Petitioner Miller got the Brownsville Police Dept around 3:50 pm Thursday April 20th, 1995 (see Jonnny Blackburn, pp. 2

224. In determining the standard to be used in gauging the materiality and probative value of the exculpatory evidence that Trial counsel Houghton failed to present, this Court is necessarily guided by Tennessee State authority on the "*Probability of a different outcome*" standard used in evidentiary hearings on post-trial proceedings, which in turn is premised upon and guided by the analytical frame work established within the general *Brady*[7] analysis.

225. In other words, regardless of the specific's of the post-trial proceeding itself (i.e. a **T.C.A. § 40-26-105** *Wirt of Error Coram Nobis*; a **T.C.A. § 40-30-101** *Petition for Post Conviction Relief- et. Seq*; a **Tenn.R.Crim.Proc. Rule. 33** *Motion for New Trial-*, etc..) Tennessee State Court's subscribe to the view that " ...........a new trial was warranted only when there was "a probability sufficient to undermine confidence in the outcome." State v. Workman, 111 S.W.3d 10, 17-18 (Tenn. Crim. App. 2002).

226. For instance in **State v Vazquez, 221 S.W.3d 514(Tenn 2007)** the Tennessee State Supreme Court announced the standard of review applicable to determine the

---

7      Even though Brady v. Maryland, 373 U.S. 83, (1963), holds that a prosecutor violates due process when he (1) suppresses evidence,; (2) that is favorable to the defendant, when that evidence (3) is material to guilt or innocence (id) at 87   The significance of Brady, **is also found in the analytical frame work used to determine the value of the evidence**, based on the probability of a different outcome had it been introduced to the jury.

"reasonable probability of a different outcome" based on the probative[8]
evidentiary-value of the exculpatory and/or impeachment evidence.

227. In Vazquez, the Court wrote:

> "...we hold that ......the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense. In our view, this interpretation upholds the traditional, discretionary {221 S.W.3d 528} authority of our trial judges to consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome.
>
> Although not specifically addressed by the parties, it is our further view that whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling. Cf. State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984); State v. Arnold, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Impeachment evidence might be particularly compelling under the circumstances of a particular case. (id 527,528)

228. The Vasquez (supra) court then went on the use the "...may have standard" of
analysis in the case, to determine whether or not newly discovered evidence of
lead T.B.I. investigator S.A. Patrick Howell's, cocaine use, theft, possession and

---

8      Though offered in the context of newly discovered evidence in a Coram nobis procedure, the emphasis was on whether or not the evidence, was of such a high probative and impeachment value, that there existed "a probability sufficient to undermine confidence in the outcome." had this evidence been presented the jurors during the defendants trial. Likewise, in the case sub judice, due to Trial Counsel Houghton's ineffectiveness, in failing to properly present exculpatory impeachment evidence contained in the above-referenced **33 exculpatory fact points of Impeachment** (i.e. probative of Petitioner's actual innocence and 3rd party guilt) there too exists a "reasonable probability of a different outcome", had this evidence been properly presented the jurors during the Petitioner Miller's

<del>The Vazquez August 2001 Criminal Trial in the Haywood Circuit Court.</del>

patronizing of Prostitutes, was so significant as to "..may have effected the jurors

decision to find" the defendant's guilty:

> In applying this standard to the evidence in this case, it is our conclusion that the Court of Criminal Appeals correctly affirmed the coram nobis relief granted to Vasquez and Garza. Although Agent Howell, who led the TBI in the investigation, was not involved in the arrest of any of the defendants, his testimony directly implicated Vasquez and Garza in the conspiracy. For example, it was Agent Howell who claimed that while parked in a nearby Burger King lot, the occupants of the Firebird, Vasquez and Garza, "constantly" looked straight ahead in the direction of the carwash and, during the course of the transaction, neither entered the restaurant nor left the car. Although other officers saw the Firebird at the Walgreens and at the Antioch Pike addresses, Vasquez and Garza were not identified as occupants of the vehicle at these locations, were not apprehended at the carwash where the drug transaction occurred, and were never found in the possession of the marijuana or any other illegal drugs. A shotgun was in their car but they were not in possession of a walkie-talkie or other radio device which might have permitted direct contact with their co-conspirators. Neither attempted to flee when confronted by the arresting officers. In considering the relative strength of the testimony at trial and the newly discovered evidence offered at the coram nobis hearing, both the trial judge, who saw and heard the witnesses, and the Court of Criminal Appeals, after a careful review of the recorded testimony, granted new trials to these two defendants under the "may have" standard. <u>We likewise hold that there was a reasonable basis upon which to conclude that knowledge by the jury of Agent Howell's theft of confiscated drugs and his illegal use of cocaine was credible, relevant evidence of the kind and quality **that might have produced a different result as to Vasquez and Garza.**</u> Among all defendants, the State's case was least compelling as to these two individuals. T*he misconduct of the lead investigator for the TBI, had it been known at trial, may have affected the result.* "(id. 528)(emphasis added)

*Trial Counsel Houghton's ineffectiveness, in failing to present exculpatory impeachment evidence that was probative of Petitioner's actual innocence and 3rd party guilt—Brady Standards:*

229. As was just previously explained, in analyzing the probative value of the

exculpatory *impeachment evidence that was probative of a Petitioner's actual*

standard based on cases wherein the prosecution fails to disclose exculpatory evidence to the defense. see Brady v. Maryland, 373 U.S. 83, (1963); United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985),

230. Under this standard then-presiding Post Conviction Court Judge J Weber McCraw, would have been obligated to determine, in view of the totality of the evidence presented, whether or not there was a reasonable basis to conclude that its more probable than not that the results of Petitioner Miller's August 2001 trial would have been different, had Trial counsel Houghton incorporated and presented the above referenced evidence to the jury. (i.e. (i) whether or not Petitioner would have received a hung jury, in which case he would not have been convicted of the premeditated Murder of Donald Rice; or (ii) whether or not Petitioner would have been acquitted of the premeditated Murder of Donald Rice, for which he was indicted.; or (iii) whether or not perhaps the jury would have found Petitioner guilty of a lesser included offense., etc..)

231. Petitioner avers that the facts of his case are similar to those of *Johnathan Tears v State of Tennessee, 2013 Tenn.Crim.App. 1075, (April 16th, 2013)*, wherein petitioner Tears was granted Post Conviction Relief, due to the failure of his trial counsel to: (i) obtain and effectively utilize exculpatory testimony; and (ii) adequately prepare and execute a defense strategy[9].

In Tears, (supra) the defendant also argued that the cumulative

232. In explaining how Petitioner Johnathan Tears' had demonstrated that there was a reasonable probability that absent the deficiency of his trial counsel concerning a critical state witness' statement, the outcome of the trial would have been different, the Court of Criminal Appeals held:

> "....First, Petitioner contends that trial counsel and co-counsel were in effective for failing to request Jencks material concerning the victim's statement to Detective Oliver and to use that statement to cross-examine and impeach the victim's testimony at trial. *We agree*........Importantly, the post Conviction Court specifically stated that the statement that the victim gave to Detective Oliver was exculpatory evidence in that it could have been used to impeach the victim's testimony during cross-examination. The statement could have raised questions in the minds of the jurors concerning the victims credibility, specially as to whether Petitioner shot the victim in self-defense. *We find that Petitioner has demonstrated that there was a reasonable probability that absent the deficiency of trial counsel and co-counsel concerning this issue*, the out come of the trial would have been different. *Therefore, we reverse the judgment of the trial court denying post-conviction relief, vacate Petitioner's conviction* for attempted second degree murder and and employing a handgun during the commission of dangerous felony and remand this cause for a new trial.." (Tears, (id)

## AS A MATTER OF STATE LAW, TRIAL COUNSEL HOUGHTON'S STRATEGIC AND TACTICAL DECISIONS WOULD NOT HAVE BEEN ENTITLED TO JUDICIAL DEFERENCE, BY JUDGE MCCRAW AT THE AUGUST 19TH, 2014 POST CONVICTION EVIDENTIARY HEARING

233. Petitioner Miller of course, acknowledges that "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable; and strategic choices made after less than complete investigation

---

effect of the deficient performance of trial counsel abridged the constitutional rights of appellant; Under the cumulative error doctrine 'multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated have a cumulative effect on the the proceedings so great as to require a reversal in order to reverse a defendant's right to a fair trial.." State v. Hester, 324 S.W. 3D 1, 76-77 (Tenn. 2010) "..To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the the trial proceedings.." (id)

*are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.*" Id. at 690-91; see also Baxter, 523 S.W.2d at 935-36 (recognizing that counsel should investigate all apparently substantial defenses);

234. However, it's unquestionable that: (i) there was absolutely no reason for Counsel Houghton not to investigate, explore, develop, and present a line of defense at Petitioner Millers 2001 trial, that incorporated these exculpatory witnesses' testimony in support of a theory of third party guilt of Mr. Clement Harris, Tracey Taylor and Slouch; and (ii) that her decision not to investigate, explore, develop, and present such a line of defense was not a "........reasonable professional judgment" which "..support[ed] the limitations on [her] investigation.."(id).

235. Petitioner avers that no "reasonable professional judgment..." would support Counsel Houghton's limitations on her investigations of third party guilt, and Petitioner's actual innocence which failed to take into account the above mentioned **33 exculpatory factual points of impeachment**. ("...strategic choices made after less than complete investigation *are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.*" (id. At 690-91;)

236. During her representation of Petitioner Miller at his August 2001 trial, Counsel

Houghton was obligated "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and "what investigation decisions are reasonable depends critically on such information." Id. "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Id.

237. In the case at bar, Petitioner Miller was stead fast in his declarations of innocence and his insistence that he was not involved, and that Clement Harris was both a liar and a guilty party, trying to frame Petitioner Miller in order to protect himself, and get deals (i.e a plea agreement) from the state.

238. Thus, we can see that by failing to investigate and present to the jurors in a coherent pro-defensive format, the above-mentioned *33 exculpatory factual points of impeachment*, Trial Counsel Houghton "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," Strickland, 466 U.S. At 686.

239. When Counsel Houghton <u>failed</u> to properly investigate and present evidence which attested to and incorporated the above-referenced *33 exculpatory factual*

87

*points of impeachment* she, in effect, abandoned the only viable avenues which supported the defense theories of: (a) actual innocence; and (b) 3rd party guilt. Hellard, 629 S.W.2d at 9 (emphasizing that a reviewing court should not second guess counsel's strategic and tactical decisions, ___unless those decisions result form a lack of adequate preparation.___)

240. Petitioner Miller must reiterated the rank <u>incompetence and lack of adequate preparation on the part of trial Counsel Houghton</u>, by pointing out the fact that when specially asked, during the August 2014 Post conviction evidentiary hearing, whether she even knew about any exculpatory evidence, such as Ted Nueman's memo, *she responded "no"*. (See **P.C. Evidentiary hearing transcript, pp. 37 L 19-22**)

241. Compounding this egregious inadequacy of defense preparation and lack of pre-trial investigation, we need to look at the fact that when asked about the discovery of 3rd party guilt contained in the files of former investigator Clifford Worden, *Trial Counsel Houghton responded that she had no knowledge of his case file work or findings of 3rd party's guilt.* (id. Pp 41-44)

242. Thus, showing a complete and utter lack of preparation and tactical coherence on the part of trial Counsel Houghton. (Attorney's strategic and tactical choices are

adequate preparation...." **Cooper v. State, 847 S.W. 2d. 854, 874 (Tenn. Crim.App. 1992))**

243. In light of the foregoing, Counsel Houghton absolutely failed in her duty "to make reasonable investigations or to make a reasonable decision[s] .." (Strickland supra) based thereon, and because of that failure the jury was never exposed to evidence which attested to and supported the above-referenced *33 exculpatory fact points of Impeachment* which, in turn strengthened the defense theories of: (a) actual innocence; and (b) 3rd party guilt.

244. Furthermore, Petitioner Miller acknowledges that he is not entitled to the "...benefit of hindsight , [and] may not second guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision.."

245. Therefore, it's true that presiding Post Conviction Court Judge McCraw: (i) would have had to have been highly deferential to counsel Houghton's August 2001 trial performance, Burns, 6 S.W. 3D at 426,; and (ii) would not have been allowed to not second guess: "...the informed tactical decisions of trial Counsel [Houghton].."

246. This deference, however, would have only applied "if the choices [were] informed....[and]...based upon adequate preparation...." Cooper v. State, 847 S.W.

2d. 854, 874 (Tenn. Crim.App. 1992) To establish the prejudice prong, a petitioner, must show that "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different..."; Strickland (at 694) Failure to conduct a reasonable investigation constitutes deficient performance. See Austin v. Bell, 126 F.3d 843, 848 (6th Cir. 1997).

247. In other words, Judge McCraw was obligated to determine whether or not trial counsel Houghton's, choices were informed ones, based "upon adequate preparation.." Cooper (supra), and if not, whether or not there was "..a reasonable probability .." that but for Counsel's **_uninformed choices_** the outcome of the trial proceedings would have been different.; Pylant v St, , at 869 (Tenn.. 2008); Bryant v State, 2015 Tenn.Lexis 182 (May 29th, 2014)

248. Had Judge McCraw made this determination, it would have been clear that there was no basis for the series of **_uninformed tactical decisions_** which undercut the evidence of Petitioner Miller's actual innocence and third person guilt.

249. Or stated simply, it could not have been tactically sound for Trial Counsel Houghton, not to offer into the record, the **_33 exculpatory fact points of Impeachment_** , in part through, the testimony of (i) Mr. George White; (ii) Mr. Jimmy Ballard, or (iii) the expanded exculpatory version of Mr Jesse James Jones' testimony- during Petitioner Miller's August 2001 trial.

250. Likewise, it could not have been tactically sound for Trial Counsel Houghton, not to offer into the record, the ***33 exculpatory fact points of Impeachment***, in part through, the testimony of (i) Mrs. Lucille Miller; (ii) Dave C. Williams; (iii) James Priddy; (iv) Mary Loiuse Taylor; (v) Mrs. Sam Ethel Williams; (vi) former Assist .D.A. Ted Neuman; (vii) Clifford A Worden, (viii) Mr. T.T. Boyd; (ix) Marvin Grandberry; (x) Jennifer Praitt; (xi) Mose Comage; (xii) Harold Booker and (xiii) other witnesses with relevant exculpatory testimony- during Petitioner Millers August 2001 trial.

251. Indeed, had trial Counsel Houghton done this, she would have then been able to forcefully and cogently argue that Petitioner Miller was innocent, and that there were other perpetrators directly connected to the crime; to wit: Mr. Clement Harris, Tracey Taylor, and Slouch.

**UNDER THE *JACKSON (INFRA)*, AND *TEARS* (SUPRA) STANDARD JUDGE McCRAW WOULD HAVE BEEN OBLIGATED TO FIND THAT COUNSEL HOUGHTON, AS A MATTER OF STATE LAW RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

252. Petitioner avers that the review of the facts in his case, should be guided by the analytical framework established in *State of Tennessee v. Noura Jackson, 444 S.W.3d. 554 (November 6th, 2013);*, wherein the Court of addressed the significance of impeachment evidence, and it's impact on the defense, <u>**when**</u>

use statutes to us there's a failure to present such evidence to the jury

253. In *Jackson*, (supra) the Petitioner Noura Jackson, was granted a new trial because of a Brady violation committed by the State, which deprived her of the ability to Impeach a state witness, and present exculpatory evidence which impeached the State's prosecutorial theory.

254. Like here, the State of Tennessee (i.e. the prosecution) conceded that there was impeachment evidence that was never introduced or presented to the Jury in Jackson's trial, however, they argued that Defendant Jackson was not entitled to relief because the prosecution's timely production of the statement would not have affected the outcome of the trial.

255. The Tennessee Court of Criminal appeals however, categorically rejected these arguments, when the Court focused exclusively on the core principle of *"impeachment evidence" and it's significance to the defense during the fact finding process in a criminal trial.*

256. In explaining the paramount role of impeachment evidence, The Tennessee Court of Criminal appeals held:

> "[T]he Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness.'" State v. Ostein, 293 S.W.3d 519, 535 (Tenn. 2009) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)); see also State ex rel. Anglin v. Mitchell, 596 S.W.2d 779, 786 (Tenn. 1980) (recognizing that article I, section 8 of the Tennessee Constitution guarantees criminal defendants the right to a fair trial). "[T]his standard of fairness requires that criminal defendants 'be afforded a meaningful opportunity to present a complete defense.'" Ostein, 293 S.W.3d at 535 (quoting Trombetta, 467 U.S. at 485). To effectuate this right,

92

of constitutionally guaranteed access to evidence.'" Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982)). One of the foundational principles of this area of the law is that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.

"[E]vidence favorable to an accused," id., also encompasses evidence relevant to the impeachment of prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); Johnson v. State, 38 S.W.3d 52, 55-57 (Tenn. 2001); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the Brady disclosure requirement. Johnson, 38 S.W.3d at 56-57 (quoting Commonwealth v. Ellison, 376 Mass. 1, 379 N.E.2d 560, 571 (Mass. 1978)).

257. Moreover, "'any favorable evidence known", is relevant and required to be furnished to the defense, for the purposes of allowing them [to use said evidence to] impeach the states case. '" Strickler v. Greene, 527 U.S. 263, 275 n.12, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)); see also Sample v. State, 82 S.W.3d 267, 270-71 n.3 (Tenn. 2002); Johnson, 38 S.W.3d at 56

258. Despite the Fact that in the case sub judice Petitioner Miller, in addition to alleging a "Brady" violation, *is alleging that impeachment evidence, which was both favorable and material to the defense, was available and that Trial Counsel Houghton failed to obtain it **and use it** to impeach the state's start witnesses and disprove the states theory.*

259. Petitioner must reiterated that favorable evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 433, 435); see also Johnson, 38 S.W.3d at 58.

260. Just as the Tennessee Court of Criminal Appeals concluded:

> "...that Mr. Hammack's third statement [about Noura Jackson] was material because it "*could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict*." See Kyles, 514 U.S. at 435; see also Johnson, 38 S.W.3d at 58. Again, the third statement differed significantly from Mr. Hammack's first two statements and his trial testimony. .." Jackson (supra)

261. Likewise if at Petitioner Miller's trial, Counsel Houghton had introduced favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra), it's more probable than not that the results of the trial would have been different-due to:

(i) favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to wit: there was a confession and credible accusation of actual killer, who is not Petitioner Miller. (see **Exhibit# 21, supra, Mr. White's statement)**

(ii) favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to wit: the weapon- to wit 12 gauge shot gun that the allege perpetrator acknowledged hiding after the murder, and threatening physical attack people in order to retrieve it, is an exact make and model of the weapon used to murder Dono (see **Exhibit# 21,**

supra, Mr. White's statement)

(iii) <u>favorable and material impeachment evidence like that discussed in *Noura* *Jackson* (supra) and *Tears* (supra): to wit:</u> State Expert witnesses testified that Clement Harris testimony regarding the scenario of the crime was forensically impossible, due to the nature and scope of the gunshot wounds produced by the fatal shots. (See Dr. O.C. Smith, TR-II. pp. 360-362)-[shooting had to have occurred from a distance of greater than 5 (five) feet-which would have prevented Mr. Miller, being seated in an adjacent vehicle parked driver-side window to driver-side window with the victims car])

(iv) <u>favorable and material impeachment evidence like that discussed in *Noura* *Jackson* (supra) and *Tears* (supra): to wit:</u> the .12 gauge shotgun that Slough hid, and Mr. George White found, had a barrel that was short enough to have been the murder weapon, that fit within the forensic parameters of plausibility with regard to the Gun shot wound and power burn patterns established by the physical crime scene evidence, as explained by Dr. O.C. Smith.

(v) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra): to wit:</u> the fact that eye witness testimony puts the alleged murderers Tracey Taylor and slouch in the vicinity of Iola Street dropping off victims car after murder during the early morning hours of Thursday April 20th, 1995, (see **Exhibit# 28, supra; Mr. Jesse Jones and Jimmy Ballard**)

(vi) <u>favorable and material impeachment evidence like that discussed in *Noura* *Jackson* (supra) and *Tears* (supra): to wit:</u> the fact that eye witness testimony puts a car matching alleged make and model owned by Slouch at scene abandoning the victims car, during the early morning hours of Thursday April 20th, 1995,. (see **Exhibit# 28, supra; Mr. Jesse Jones**

**and Jimmy Ballard); see also Exhibit# 21, supra, Mr. White's statement)**

(vii) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to wit:</u>: there was a on going criminal drug enterprise based-business relationship established between state witness Clement Harris, Tracey Taylor, Slouch and the victim Dono Rice. **(Exhibit# 21, supra)**

(viii) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to </u>wit: there were multiple citings of Clement Harris in Dono's car purchasing and selling drugs, (see testimony of Chief J. Blackburn; see also Statement of Nina Champion(supra); and Mr. Curtis Johnson, *infra*

(ix) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to wit:</u> Clement Harris specifically perjured himself denying any such drug purchases from Victim Mr. Rice, prior to his murder (id.)

(x) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to </u>wit: there was direct evidence that the victim "Dono" had an altercation/argument over drug money with Clement Harris' Associates, Tracey Taylor, and Slouch

(xi) <u>favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Tears* (supra); to wit:</u> documented proof that there were uncharged third parties from Memphis, who were both: (i) known associates of State Star Witness Clement Harris, and (ii) seen arguing with the victim Mr. Rice, shortly before his murder (see Attached Exhibit #1 Motion for Exculpatory Evidence -Dated 1999 )-*disproving and undermining the credibility of both State Star Witness clement Harris and*

supporting Petitioner Miller's version;

(xii) <u>favorable and material impeachment evidence like that discussed in</u> <u>*Noura Jackson* (supra) and *Tears* (supra); to wit</u>: there were unidentified finger and palm prints in the vehicle that very likely belonged to Tracey Taylor and and Slouch or Clement Harris (whose fingerprints were never compared to the latent recovered from the vehicle.)

(xiii) <u>favorable and material impeachment evidence like that discussed in</u> <u>*Noura Jackson* (supra) and *Tears* (supra); to wit</u>: Mrs. Nina Champion who was close to both Clement Harris and Mr. Harris' associate Mr. Wright Palmer, went out to see the body in the morning of Thursday April 20th, 1995, and this could have only been possible if she were told it's location by Clement Harris.

(xiv) <u>favorable and material impeachment evidence like that discussed in</u> <u>*Noura Jackson* (supra) and *Tears* (supra); to wit</u>: Petitioner Miller was at home and specifically seen and heard snoring during the alleged time that the murder of Donald Rice occurred-(see Lucille Miller Tr. I, pp.230) -*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

(xv) <u>(iii) favorable and material impeachment evidence like that discussed in</u> <u>*Noura Jackson* (supra) and *Tears* (supra); to wit</u>: the fact that witnesses testified that Clement Harris, had implicated himself as a suspect in the murder of the victim Mr. Donald Rice. (see Sam Ethel Williams, TR-I. pp. 298-300)-*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

(xvi) <u>(iv) favorable and material impeachment evidence like that discussed in</u> and *Tears* (supra) to wit; *Noura Jackson* (supra) and *Tears* (supra) to wit: testimony of Lucille

Priddy, TR-II. Vol 2.;pp.252) [completely undermines, and totally debunks and disproves Clement Harris' statements regarding the sequence of events and who was with him on the morning of Thursday April 20th, 1995)]-*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

(xvii) <u>favorable and material impeachment evidence like that of *Noura Jackson* (supra) and *Tears* (supra)</u>; the fact that witnesses completely debunk and disprove Clement Harris' statements regarding the events the morning of Thursday April 20th, 1995, in the Brownsville Projects, [( Mary Loius Taylor TR-I. Vol. 2; pp. 256) (who specifically impeaches and contradicts Clement Harris' testimony by stating : (i) she never heard any shot gun blasts, reported by Clement Harris, at the projects that evening; and (ii) she never stuck her head out of any door, on the Project housing tier, **as** **Clement Harris alleged she did, at the time of the murders**.)-]*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

(xviii)<u>favorable and material impeachment evidence like that of *Noura Jackson* (supra) and *Tears* (supra)</u>; to wit: State star witness Clement Harris, flat out lied about being at the residence of Mr. Mose Comage, prior to the murder and immediately after it, as he testified, because Mose Comage would have flat out contradicted this perjurous testimony -*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

(xix) <u>favorable and material impeachment evidence like that of *Noura Jackson*</u>

the Brownsville Police Department alerting them to the location of the body was made by could only have been made only some one who had personal knowledge of the facts of the case, (and this persons' identity was withheld by the State) because the victims body was located in a truly isolated and difficult to reach location, and was made at a time while Petitioner Miller was was in physical custody of the B.P.D-*and therefore unable to make such a call.*(see Lt. Blackwell TR-II. pp. 85 L 1); see also Officer Shawn Williams; TR-II. pp. 156, L 15-18)-*disproving and undermining the credibility of both State Star Witness clement Harris and the State's version of the events on the evening in question, while supporting Petitioner Miller's version;*

262. Indeed our sixth Circuit has held that "Trial counsel has been found ineffective when he or she fails to present ....[exculpatory testimony]... Stewart, 486 F. 3d at 355-61. In fact, this Court has recognized that when trial counsel fails to present an alibi witness, 'the difference between the case that was and the case that should be is undeniable...(id 361)..". Long v Morrow, 2014 U.s. Dist Lexis 53685 , (April 16th, 2014)

263. Indeed under the *Tears(surpa)* standard, the failure of trial counsel to: (i) introduce the above referenced exculpatory/impeachment evidence; and (ii) make the proper defensive arguments based thereupon, constituted deficient performance under Tennessee State law, and had this line of argument been presented at Petitioner Miller's August 19th, 2014 Post conviction evidentiary

hearing, Judge McCraw would have granted petitioner relief as a matter of law.

264. Petitioner must remind this Honorable U.S. District Court that *Tears*, (supra) is controlling and directly on point with the facts of the case at bar, because in that case, even though THERE WAS NO BRADY VIOLATION, Tears' trial counsel nevertheless <u>failed to utilize and put on</u> *favorable and material impeachment evidence*, *even though it was in their possession*, and as a result the Tennessee Court of Criminal Appeals found this failure to be both ineffective and prejudicial.(id)

265. Indeed this Honorable U.S. District Court can not say beyond a reasonable doubt, that the Tennessee Post Conviction Court, (ie then-presiding Judge McCraw), ***would not*** have found that the out come of Petitioner Miller's trial, might have been different- (ie a jury would have found Petitioner guilty of a lesser attempted included offense; (ii) or ended up being hung; or (iii) acquitted the petitioner)-had Post Conviction Counsel Houghton: (a) properly, cogently and persuasively presented *favorable and material impeachment evidence* (i.e. the above referenced 33 exculpatory factual points of impeachment.)

266. With respect to facts of the case at bar, the circumstances are virtually indistinguishable from those in *State v. Tears* (supra), wherein, the Court of Criminal Appeals, in reversing Defendant Tear's conviction found that: " *trial*

*counsel and co-counsel were in effective for failing to request Jencks material concerning the victim's statement* to Detective Oliver <u>*and to use that statement to cross-examine and impeach the victim's testimony at trial*</u>. ***We agree.............We find that Petitioner has demonstrated that there was a reasonable probability that absent the deficiency of trial counsel and co-counsel concerning this issue,*** <u>***the out come of the trial would have been different***</u>*...*"(id)(emphasis added).

267. Just as in *Tears*, (supra) in Petitioner Miller's case, *it did not matter that there was considerable evidence of guilt* that a reasonable juror could have relied upon to sustain the conviction for First Degree Premeditated Murder, because that same reasonable juror could have looked at all of the <u>favorable and material impeachment evidence like that discussed, in *Noura Jackson* (supra) and *Tears* (supra);</u>) and just as easily concluded that Petitioner Miller was in fact telling the truth, and that he did not murder Mr. Donald Rice, as alleged by Mr. Clement Harris.

268. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9,

Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

269. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly subpoena and/or present the eyewitness testimony of: (i) Mr George White, (ii) Jimmy Ballard, and (iii) Jesse Jones in order to support the theory of 3rd party guilt of Clement Harris Tracey Taylor, Slouch* ].....the result of the proceeding *would* **have been different.....**" Tears, (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

270. In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly subpoena and/or present the eyewitness testimony of: (i) Mrs. Lucille Miller; (ii) Dave C. Williams; (iii) James Priddy; (iv) Mary Loiuse Taylor; (v) Mrs. Sam Ethel Williams; (vi) former Assist .D.A. Ted Neuman; (vii) Clifford A Worden, (viii) Mr. T.T. Boyd; (ix) Marvin Grandberry; (x) Jennifer Praitt; (xi) Mose Comage; (xii) Harold Booker and (xiii) other witnesses with relevant*

102

*exculpatory testimony, in order to: (a)   debunk and impeach the testimony of Clement Harris and support the theory of 3ʳᵈ party guilt* ].....the result of the proceeding *would* **have been different.....**" Tears, (id); see also   State v. Zimmerman,   823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8ᵗʰ. Cir. 1990)

271.  In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a <u>*reasonable probability*</u> that but for counsel's unprofessional errors [*in failing to properly supoena, follow up and obtain the evidence of 3ʳᵈ party guilt, gathered by the Brownsville Police Department, Haywood county district Attorney's office, and P.I. Clifford A. Worden, with respect to the identity of the Caller who was an alleged perpetrator in the crime..*].....**the result of the proceeding would have been different.....**" *Tears,* (id); see also   State v. Zimmerman,   823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8ᵗʰ. Cir. 1990)

272.  In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a <u>*reasonable probability*</u> that but for counsel's unprofessional errors [..*in failing to specifically ask Clement Harris during Cross examination if he killed*

*the victim or had anything to do with the murder of the victim Donald Rice, and them impeached him, and set the focus of the murder on him and co-conspirators/accomplices Tracy Taylor and Slouch.]*.....**the result of the proceeding would have been different.....**" *Tears,* (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

273. Petitioner avers that all of the above referenced evidence (i.e attached exhibits, arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (I) -(VIII)** in the instant **28 § U.S.C. 2254** Habeas petition, "would resolve a factual dispute". (ie. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of Tennessee state law, had Post conviction Counsel Banks properly presented this exculpatory evidence, in order to prove Trial Counsel Houghtons' ineffectiveness)

274. Thus, Petitioner Miller has clearly shown, in support of **claims (I) -(VIII)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Jackson* (supra), *Tears*, (supra), *Zimmerman* (supra); he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## II. SPECIFIC CLAIMS (IX)-(XVI) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:
### -Prosecutorial Misconduct and Conflict of Interest

275. The following facts and arguments are being offered in support of the substantial

Constitutional Claims, **(X), (XII), (XIV)** and **(XVI).**

> **(X)** Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly supoena and present the eyewitness testimony of:(i) Barbara Blade; (ii) Jimmy Jones; (iii) Scott Tucker, and (iv) Hollis Hunt in order to prove that there was a non-prosecutorial agreement entered into with state star witnesses clement Harris and Shelia Bernil.

> **(XII)** Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly to challenge the State's violation of Mooney v Holohan 294 U.S. 103 (1935) and Napue v Illinois, 360 U.S. 264, (1959), when they knowingly suborned perjury and/or presented the false testimony of state star witnesses Clement Harris and Shelia Bernil, with regard to their plea deals and non prosecution agreement with the state D.A. Office.

> **(XIV)** Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to diligently investigate, discover and then challenge the State's violations of the requirements of Brady v. Maryland, 373 U.S. 83, (1963) and Giglio v. United States, 405 U.S. 150, 153, 154 (1972) which entailed the D.A.'s office knowingly suppressing and concealing non-prosecution agreements with the state star witnesses Clement Harris and Shelia Bernil.

> **(XVI).**Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly argue that the Trial Judge Lafferty erred in denying the Motion to recuse the D.A's office for 28[th] judicial District due to an inherent conflict of interest.

276. The following facts and arguments are also being offered in support of the Procedural gateway Claims, **(IX)**, **(XI)**, **(XIII)** and **(XV)**.

**(IX)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly supoena and present the eyewitness testimony of: (i) Barbara Blade; (ii) Jimmy Jones; (iii) Scott Tucker, and (iv) Hollis Hunt in order to prove that there was a non-prosecutorial agreement entered into with state star witnesses clement Harris and Shelia Bernil.

**(XI)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly to challenge the State's violation of Mooney v Holohan 294 U.S. 103 (1935) and Napue v Illinois, 360 U.S. 264, (1959), when they knowingly suborned perjury and/or presented the false testimony of state star witnesses Clement Harris and Shelia Bernil, with regard to their plea deals and non prosecution agreement with the state D.A. Office.

**(XIII)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to diligently investigate, discover and then challenge the State's violations of the requirements of Brady v. Maryland, 373 U.S. 83, (1963) and Giglio v. United States, 405 U.S. 150, 153, 154 (1972). which entailed the D.A.'s office knowingly suppressing and concealing non-prosecution agreements with the state star witnesses Clement Harris and Shelia Bernil.

**(XV) Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel, Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly argue that the Trial Judge Lafferty erred in denying the Motion to recuse the D.A's office for 28th judicial District due to an inherent conflict of interest.**

*State star witnesses Clement Harris and his co-defendant Shelia Bernil: False and perjurous Testimony regarding their non-prosecution agreement:*

277. Petitioner avers that during his 2001 trial, Counsel Houghton should have thoroughly cross examined both Clement Harris and Sheila Bernil about their special treatment and non-prosecution agreement they received in exchange for their testimony, in order to reveal the inherent level of bias and motivation behind their perjured testimony; and this *in turn would have impeached their credibility and undermined the State's case against Petitioner.*

278. The Petitioner maintains there were at least three series of uncharged crimes committed by prosecution witnesses, Clement Harris and Sheila Bernil, and that these witnesses in turn received special consideration and lenient treatment (i.e. a *de facto* non-prosecution agreement) in exchange for their testimony against Petitioner Miller, and this arrangement was specifically withheld from, and purposefully not disclosed to, the defense.

279. Had the state disclosed this information such information would have been

exculpatory, and would have mitigated his culpability by revealing both the bias and motive of prosecution witnesses Clement Harris and Sheila Bernil, to lie and give perjurious testimony against Petitioner Miller. (see **Attached Exhibit # 2 Motions for disclosure of Exculpatory evidence, that had been granted in 1997.)**

280. Petitioner Miller avers that one of the State's main witnesses was a woman named Sheila Berneil who, as was previously discussed, gave important inculpatory testimony for the prosecution at trial by stating that the Petitioner had come to her house sometime between 2:00 a.m. and 6:00 a.m. on the alleged morning the decedent had been killed.(i.e. Thursday April 20th, 1995); and this testimony contradicted the defendant's testimony that he had not been in Brownsville during that time period. **(TR-II. pp. 310-321)**

281. More importantly, this state witness Shelia Berneil, also testified at the original 1996 trial that: (i) she had not been offered anything for her testimony; (ii) that she did not have a special relationship with the Brownsville Police; and (iii) that the police had not helped her with anything she had been in trouble over, nor had she been promised anything else in exchange for her testimony.

282. Indeed during Petitioner Miller's original Trial in August 1996 Mrs. Bernil testified as follows:

Q. Have you been offered anything for your testimony here today?
A. No. I have not.
Q. You don't have any special relationship with the police?
A. No I do not.
Q. They have never helped you with anything you had before if you had been in trouble?
A. No. sir. (**TR-I.** Trial Testimony of Shelia Bernil, page 33, line 25,

283. However, at the August 2001 Trial Counsel Houghton never asked Shelia Bernil or Clement Harris about this special and/or lenient treatment, (i.e. their defacto non-prosecution agreement), during either of their trial testimonies, and neither did Counsel Houghton inquire about or request from the state, any of the evidence or records which would have revealed the state's implicit or explicit arrangement with these two (2) witnesses.

284. The Petitioner would state and show that the witness Shelia Berneil, was both deceptive and untruthful not to mention outright perjurious in her testimony regarding any special relationship or favors being provided to her in exchange for her testimony against Petitioner Miller.

285. Petitioner Miller avers that it was particularly prejudicial for Counsel Houghton not to bring this information to the jurors attention because, there was absolutely overwhelming and incontrovertible proof that there was <u>special consideration and lenient treatment</u> (i.e. a defacto non-prosecution agreement) between these witnesses (i.e. Clement Harris and Sheila Bernil) and the Haywood County

testimony against Petitioner Miller.

*Criminal Episode involving victim Hollis Hunt:*

286. Subsequent to Petitioner Miller's first trial in August 1996, his then Trial counsel of record Mr. Tom Crider, first learned that state witness Shelia Bernil was facing potentially up to seventeen felony charges, when the Public Defender's office was appointed to represent her accomplice, Mrs. Babara Blade in September 1996.

287. Indeed Petitioner would show that in the mid part of 1996 during a period between June 28th, and July 11th, some blank checks were stolen from the home of a Mr. Hollis Hunt of Brownsville, Tennessee which were later forged and passed in and around Brownsville.

288. It was later discovered that two individuals were responsible for this criminal episode: (i) Mrs. Barbara Blade; and (ii) Mrs. Shelia Bernil

289. The District Public Defender's Office was never advised that Shelia Bernil was a potential subject of a multi-felony indictment or the fact that she was specifically not charged in exchange for her cooperation in Petitioner Miller's case.

290. No discovery information was given to the District Public Defender's office relating to these possible charges against Shelia Bernil which, if prosecuted, would have been pending at the time she gave her trial testimony, and while she was also on probation.

291. One woman, Barbara Blade, was arrested on this charge and told Investigator Johnny Blackburn of the Brownsville Police Department that Sheila Berneil had instigated this theft/forgery scheme by prompting her to steal the checks and assisting in the crime by taking her to the Hollis Hunt home.

292. Mrs. Blade told Officer Blackburn that both of them-(she and Mrs. Shelia Bernil)-participated in forging and/or passing the checks. This information was relayed to Investigator Blackburn, however only Blade was charged.(see Attached Exhibit #3, Statement of Barbara Blade.)

293. Officer Blackburn had even had another Brownsville policeman, Lewis Crider, continue the investigation of Blade on August 5th, 1996, the first day of the Miller's first trial, and Officer Crider took a statement that further implicated Sheila Berneil. (TE, Vol. 4, p 10)

294. At the hearing of Petitioner's original motion for a new trial on March 3, 1997, Officer Blackburn testified that he knew of Blade's confession and implication of Berneil's participation from a confession Blade gave him shortly after her arrest around the end of July. (TR, Vol. 4, p 14) (See Attached Exhibit # 3; Barbara Blades statement-directly implicating State Witness Shelia Bernil; Dated 4-8-97)

295. Also relating to this, one check (#245) was cashed at a business named E. W.

111

*James* by a gentleman named Jimmy Johns. After the check did not clear, Mr. Johns went to E. W. James and explained that he had cashed it for Mrs. Sheila Bernil who had told Mr. Johns that she was having physical problems of some kind that prevented her from taking the check to the store. Ms. Darnessa Johnson of E.W. James relayed this information to Investigator Blackburn in a written statement given in July 1996. **(see Attached Exhibit #4, Statement of Jimmy Johns.)**

296. Darnessa Johnson stated that while working as the night manger at E.W. James Grocery in Brownsville, a woman named Shelia Bernil called the store and "asked if Johnson would stop a check which had been cashed in the grocery earlier that day....[and] ...the check which she was referring was brought in by a Mr. [Jimmy]Johns. Johnson stated that the check was on the account of Hollis Hunt. .." **(See Attached Exhibit # 7; Darnessa Johnson statement-directly implicating State Witness Shelia Bernil; Dated 4-16 -97)**

297. Larry Washington, stated that while working as the manger of Kroger Grocery in Brownsville, a woman named Barbara Blade approached cashier Sharon Maclin and asked her to cash a check on the account of Hollis Hunt. Maclin "..asked Washington for approval to cash the check. Washington advised that upon seeing Blade, and viewing the check he refused to cash the check. Washington stated that

Blade left the store. Washington stated that shortly after Blade's departure, Shelia Bernil, entered the store. [Shelia] Bernie approached the cashier with a check on the account of Hollis Hunt. Washington refused to authorize the cashing the check......he is sure that the check was on the account of Hollis Hunt...." **(See Attached Exhibit # 8; Larry Washington statement-directly implicating State Witness Shelia Bernil; Dated 4-16 -9)**

298. Suffice it to say that Sheila Bernil has never been charged with any crime relating to the theft/forgery of the Mr. Hunt's checks although warrants were issued on July 16, 1996 for her accomplice Barbara Blade charging her with theft and forgery and she was indicted in September 1996 for seventeen counts of forgery and one count of theft.

299. Thus, with her criminal responsibility and complicity in the criminal episode involving the seventeen counts of forgery and one count of theft that Barbara Blade was indicted for in September 1996, _Mrs. Sherlia Bernil would have been looking at a maximum sentence of 108 years_[10].-had she been: (i) indicted; (ii) taken to trial; and (iii)convicted.

300. Original trial Counsel Tom Crider, had subpoenaed and secured the attendance of

---

10    In other words, each of the seventeen (17 ) counts of Forgery  and the one    count    of    theft,    were    all    Class    E    felonies    which carried 6 years a piece, for a maximum potential sentence of 108 years as a ~~was consecutive with eighteen counts, non  consecutive from the other  (i.e. 18~~ counts X 6 years/per count= 108 years.

113

Mrs. Barbara Blade, Mr. Jimmy Johns and Mrs. Darnessa Johnson to the original hearing on the 1997 motion for new trial, however before the defense could put on either of the witnesses then-presiding trial Judge Jerman stopped the proceedings for a Tennessee Bureau of Investigation (TBI) investigation. (**TE, Vol. 4, p 25**)

301. When the Court resumed the following week, March 10, 1997, the judge was distressed to learn that his requested TBI investigation had not been commenced and he granted the motion for a new trial. (**TE, Vol. 4, p 28**)

302. Because the proof was so over whelming that Mrs. Bernil was a co-conspirator in the June 28th – July 11th 1996 crime spree , in the early part of 1996, that involved some blank checks being stolen from Mr. Hollis Hunt of Brownsville, and later forged and passed in and around Brownsville Tennessee by both she and Barbara Blade.

303. Petitioner would state and show that, with regard to any special relationship or favors being provided to her, state witness Shelia Bernil was both deceptive and untruthful, not to mention outright perjurious in her original trial testimony when she testified that: (i) she had not been offered anything for her testimony; (ii) that she did not have a special relationship with the Brownsville Police; and (iii) that the police had not helped her with anything she had been in trouble over, nor had she been promised anything else in exchange for her testimony. (**TR-I.** Trial

Testimony of Berneil, page 33, line 25, page 34, lines 1-5 and pages 17-21.)

*Criminal Episode involving victim Scott Tucker:*

304. Continuing along this line of examination and analysis, the prosecutor's office provided Petitioner Miller, with additional "arrest history" information – this time on Sheila Berneil and state star witness Clement Harris together, in a criminal venture that took place in 1995 – a year before appellant's trial.

305. On August 23rd, 1995 Mrs. Shelia Bernil gave a written statement/confession to Sgt. Anthony Rankin of the Brownsville Police Department, wherein she stated that both she and her accomplice Mr. Clement Harris, basically burglarized the home of Mr. Scott Tucker, stole some of his checks, fraudulently cashed quite a few of these checks, and then drove along Allen King Rd. in Brownsville to dispose of the evidence of their crime. (see **Sgt. Anthony Rankin, B.P.D. TR-II. pp. 456-457;**)

306. Indeed on august 23rd, 1995, Sgt Rankin wrote:

> "...On Wednesday August 23rd, 1995, at approx[imately] 10:00 am while at the Jerry's Oil on Dupree Ave......Carolny Mathis, ...stated that Shelia Bernil and Clement Harris had come into the store to try and cash a check on Scott Turner['s account] Mrs. Mathis refused to cash the check....After advising [Shelia Bernil] of her rights , she stated that she had gone to Scott Turner's , under the pretense of having a drink, but with the real intention of getting (stealing)[sic] some checks. Mrs. Bernil stated that she had picked [up] Clement Harris and told him what they were about to do and that he waited in the car while she got the checks.
> She states that she forged the checks and that she and Clement [Harris] went to E.W. James and Conoco and Hibatchi and forged checks. (one at each location). They then went to Margin & South ....then went to Allen King Road

where Clement took some checks out of the book and they then tore the rest.....
Officer Peeples and myself then went to the garbage can and recovered the
box of checks....then went to the fairgrounds area and found Clement Harris.
After advising him of his rights I asked him about the checks and he stated that
they were in his shirt pocket and he then pulled them out and gave them to me.
One of the checks (#0278) was made out for $500 dollars and signed with Scott
turner's signature... Mr. Harris' statement was similar to Mrs. Bernils..." (see
**Attached Exhibit # 9 Sgt. Anthony Rankin, B.P.D. Treport. Dated
August 23rd, 1995)**

307. Further proof of Mrs. Bernils guilt was confirmed by two separate eyewitnesses;

to wit: Mr. Robert "Bubba" Henry and Mrs. Carolyn Mathis, who were both

employees of Jerry's Oil on I-40 , where Shelia Berneil attempted to pass the

forged checks. **(See Attached Exhibit # 10; Affidavit of Robert Henry, Dated 8-**

**25-1995**

308. The victim Mr. Scott Turner himself, was indignant and livid at his victimization

at the hands of these two criminal deviants, and was insistent on having justice

served by prosecuting Mrs Bernil and Mr. Harris to the full extent of the law. **(See**

**Attached Exhibit # 11; Affidavit of Scott Tucker, Dated 8-24-1995) .**

309. Indeed, Sgt Rankin clarifys this position when he states that " Mr. Turner wants to

prosecute..."(see **Attached Exhibit # 9)**

310. Mrs Shelia Bernil herself, gave a statement wherein she not only admitted her own

guilt but also specifically wrote "...Clement [Harris] has c[hecks] he wanted to

write out [check] for large amount..." **(See Attached Exhibit # 12; Shelia Bernil**

116

signed confession; Dated 8-25-95)

311. Even Clement Harris himself, gave a statement wherein he not only admitted his

own guilt but also corroborated what Mrs. Shelia Bernil confessed to (**See**

**Attached Exhibit # 13; Clement Harris' signed confession; Dated 8-25-95**)

312. Therefore, Mr. Clement Harris was not only criminally responsible[11] for the

actions of his co-conspirator Shelia Bernil, but he was also a principal actor

himself.

313. Thus, with their combined criminal responsibility and complicity in the criminal

episode involving the burglary, theft, and fraud in the victimization of Mr. Scott

Tucker, both Mr. Clement Harris and *Mrs. Sherlia Bernil would have been*

*looking at a maximum sentence of 63 (sixty three) years*[12].-had she been taken to

trial and convicted.

*Shelia Bernil was Guilty of a School zone violation for which she could have*
*received a life sentence, had she not been given a de-facto non-prosecution*
*agreement and favorable treatment by the state.*

---

11      pursuant to **Tenn.Code Ann. § 39-11-402(2)**, *Criminal Responsibility*
*for the Conduct of Another,* One is criminally responsible when acting
with the intent to promote or assist in the commission of the offense or
benefit from proceeds thereof, a person aides, assists, helps or attempts
to aide another in the commission of the offense

12      In other words, each of the seven(7) counts of Forgery and the one
count of theft, and one Count of Aggravated Burglary, were all Class E
felonies and one class C felony which carried 6 years a piece for the Class
E's and 15 years for the class C. Which would be a maximum potential
sentence of 63 (sixty three) years as a career offender, with each count ran
consecutive to the other (i.e.,) [8 F-counts X 6 years/per count= 48 years] +
[15 years for 1 class C felony] = 63 years.

314. On January 6th 1996 Mrs. Shelia Berniel was caught with over .5 grams of Crack cocaine in here home located at 1110 S. Washington St. in Brownsville Tennessee. See **Attached Exhibit #15 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Crack cocaine Dated 1-18-1996; see also Attached Exhibit #16 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Drug Paraphernalia Dated 1-18-1996.).**

315. 1110 S. Washington however, is located within 1000 feet of a church, child daycare center/school which means that D.A. Peeples was supposed to have indicted Shelia Berniel under the Drug Free School zone protection act. **Tenn.Code.Ann. T.C.A. § 39-17-432** Enhancement.

316. Possession of > .5 grams of cocaine is a Class B felony offense, pursuant to **Tenn.Code.Ann. T.C.A. § 39-17-417**, however under the School zone enhancement act, it would have been boosted automatically to a Class A felony offense to be served at 100% a mandatory minimum sentence of either 15 years up to a maximum sentence of 60 years.

317. However, Mrs. Berniel, due to the favorable and ultra lenient treatment given to her pursuant to her de facto non-prosecution agreement, was able to plead guilty to a Class A misdemeanor for Possession of Drug paraphernalia and received a

sentence of 11 months 29 days. see Attached EXHIBIT #17 Shelia Bernils

**Indictment #2545 Counts A&B; dated March 4th 1996., pp 1.2, Cnt (a) Possession of Crack cocaine with intent to sell; Cnt. (b) Possession of Drug Paraphernalia; see also Attached Exhibit #18 Indictment #2545 Counts A&B dated March 4th 1996 pp 1.2, Cnt (a) Possession of Crack cocaine with intent to sell; Cnt. (b) Possession of Drug Paraphernalia; see also Attached Exhibit #19 Plea agreement for Shelia Bernil for Possession of Drug Paraphernalia- Cnt (b) Case No. 2545; Dated July 2nd, 1996; see also Attached Exhibit #20 Judgment Order for Shelia Bernil for Possession of Drug Paraphernalia- Cnt (b) Case No. 2545; Dated July 2nd, 1996**

318. Therefore, her plea bargained sentence was 14 years and 4 months less than the mandatory minimum she would have otherwise received had A.D.A. Clay Peeples not shown her leniency pursuant to a defacto non-prosecution agreement, in exchange for her testimony in Petitioner Miller's August 1996 trial, which at the time of the Mrs Bernils plea, was still pending.

319. Mrs. Bernil was shown this favorable treatment and given a de facto non-prosecution agreement , because she was by definition a material witness, whose testimony was critical to the state's case against Petitioner Miller.

320. To add insult to injury Mrs. Shelia Berniel gave erroneous and misleading testimony regarding the true extent of non drug charges that were dismissed

because of her cooperation with the police and Brownsville District Attorney's Office.

> Q.     You've had drug cases dismissed. Do you remember back in January of this year you had a drug case dismissed?
> A.     No. I don't.
> Q.     You are Shelia Berneil who lives at 110 South Washington in Brownsville?...
> A.     I had a drug charge for some crumb...the crack cocaine that was in my car after a drug dealer had used my car, but there was not enough of the evidence to be charged with. (Tr. I. Vol. I; pp. 34, lines 1-5, 12-21.)

321. During this exchange Mrs. Berneil attempts to mislead both the jury and the trial court by making reference to an unrelated minor misdemeanor drug charge that lacked sufficient evidence to prosecute. (i.e she said "..there was not enough evidence to be charge...")(i.d p. 34 L 23)

322. However she conveniently and intentionally leaves out the most damaging and truly significant drug charges that were dismissed.

323. These were School Zone Drug possession charges that could have netted Mrs. Shelia Berniel over 60 years in prison; Attached Exhibit #15 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Crack cocaine Dated 1-18-1996; see also Attached Exhibit #16 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Drug Paraphernalia Dated 1-18-1996.);

324. D.A. Peeples further attempts to unethically and intentionally mislead the jury when he had this exchange with the Mrs. Berniel:

120

Q    Mr. Berneil, I believe that the case in which Mr. Cider was asking you about you were charged with Three separate crimes..forgery and possession of drug paraphernalia and possession of cocaine. Is that Correct?

A.    Okay this is where I was charge..where I was found guilty was a different charge.

Q.    I believe though that you plea guilty to two of those charges and one was dismissed?

A.    Yes sir.

Q.    In view of the fact that you were pleading guilty to the other one?

A.    Yes sir.

Q.    Now has anybody and please answer this as fully and honestly as you can. Has anybody ever promised you any kind of leniency or any kind of time cut or anything else in exchange for your testimony?

A.    No. sir. They have not.

Q.    Is your testimony true?

A.    Yes. It is.. (**TR-I.** Trial Testimony of Bernil, page 35, L 17-35)

325. Firstly, A.D.A. Peeples mislead the jury by framing the question in such a way as to illicit a knowingly false answer, because Mrs. Berneill in January 1996 was not charged with three (3) charges which included any forgery charges at all.

326. In January 1996 Mrs. Berniel was however charged with possession of .5 grams of cocaine, and Drug paraphernalia, that was recovered from her actual residence at 1110 S. Washington St. see **Attached Exhibit #15 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Crack cocaine Dated 1-18-1996; see also Attached Exhibit #16 Affidavit of complaint/Arrest Warrant for Shelia Bernil Possession of Drug Paraphernalia Dated 1-18-1996.**);

327. Secondly, Mrs. Berniel herself committed perjury on the stand, when she stated that "......I had a drug charge for some crumb...the crack cocaine that was in my

car after a drug dealer had used my car, but there was not enough of the evidence to be charged with. .." (Tr. I. Vol. I; pp. 34, lines 1-5, 12-21.)

328. However, we know for a fact that there was no cocaine found in her vehicle in January 1996, the cocaine was clearly found in her residence.

329. Thirdly, the state know that by letting her plead guilty to a Class A misdemenor with a six month sentence, while dismissing the School Zone enhanced drug charge, with a mandatory 15 year sentence minimum, was the result of nothing short of a non-prosecution agreement.

***Shelia Bernil was on Probation at the time of these offenses and Petitioner's 1996 and 2001 Criminal Trials.***

330. Defendant would show that the witness, Sheila Bernil, was on probation at the time these offenses occurred and if she had been charged she not only would have been facing a combined total of over 100 years in State prison, but would have also had her probation revoked immediately.

331. Indeed Bernil admitted in her trial testimony that she had already been convicted of forgery in 1996 (**TE, Vol. 1, pp 127-128**) , on a separate and distinct charge unrelated to either the Hollis Hunt or Scott Tucker cases, and was thus on felony probation.

332. At the time of Petitioner Miller's 1996 trial, and then later on once again she was on probation during the time she testified at his August 2001 trial, and therefore

122

but for the leniency and favor of the 28th Judicial district D.A.'s office, would have been subject to immediate detention and probation revocation.

333. With respect to Clement Harris, during Petitioner Millers 2001 trial he was in the county jail on an unrelated misdemeanor theft charge, separate and distinct from the Scott Tucker case, and therefore he was never charged, prosecuted or subject to any judicial action for his role in the burglary, theft, fraud and bad check writing conspiracy with his partner in crime Shelia Bernil. **(see TR-II. pp. 171; L-1-24)**

334. It's therefore indisputable that there was incontrovertible proof available that Shelia Bernil committed three (3) separate and distinct series of crimes, dealing with (i) **Theft of Property-T.C.A. § 39-14-103** Class E Felony, ( > $500-*T.C.A. § 39-14-104 Grading of Theft,*); (ii) **forgery -T.C.A. § 39-14-114** Class E Felony; (iii) **Agg. Burglary** (of Habitation)-T.C.A. § 39-14-403 Class C Felony; (iv) **Worthless Checks,** -T.C.A. § 39-14-121(f) Class C Felony (> $500); (v) Drug Free School Zone Violation -**T.C.A. § 39-17-432** Class A Felony;-Poss. Of > .5 grams with intent to sell, -**T.C.A. § 39-17-417;   -T.C.A. § 39-17-408;**

335. Also there was  incontrovertible proof available that Mr. Clement Harris engaged in, at least one (1) criminal episode, involving (i) **Theft of Property-T.C.A. § 39-14-103** Class E Felony, ( > $500-*T.C.A. § 39-14-104 Grading of Theft,*); (ii)

**forgery** -**T.C.A. § 39-14-114** Class E Felony; (iii) **Agg. Burglary** (of Habitation)-T.C.A. § 39-14-403 Class C Felony; (iv) **Worthless Checks,** -T.C.A. § 39-14-121(f) Class C Felony (> $500); wherein he was at the very least criminally responsible for the actions of Shelia Bernil, as well as a principal actor himself).

336. Therefore, its beyond question that both Clement Harris and Shelia Bernill had very long rap sheets with plenty of prior criminal convictions in the State of Tennessee.

337. Indeed Mrs. Shelia Bernil had a lengthy criminal history for, *inter alia* felony drug possession, theft, forgery, prostitution, etc.. **(TR-II. pp. 310-321)**

338. Mr Clement Harris had a lengthy criminal history for, *inter alia* felony drug possession, assault, burglary, etc.. **(TR-II. pp. 310-321)**

339. Therefore, Both Clement Harris and Shelia Bernil would have been eligible for classification as either *a Persistent Offender* pursuant to **T.C.A. § 40-35-107,** or a *Career offender* pursuant[13] to **T.C.A. § 40-35-108.**

340. Which is to say, that based on nothing other then her crimes in the: (i) Scott

_____

[13] *Persistent Offender* pursuant to **T.C.A. § 40-35-107,** requires a combination of (5) or more prior felony convictions within the conviction class; whereas, a *Career offender* pursuant to **T.C.A. § 40-35-108.** requires at least six (6) prior felony convictions of any classification if the defendant's current conviction offense was a class D or E felony.

And in the case of all three criminal episodes, the highest classification of a crime committed during their 1995 Hollis Hunt case involving Barbara Blade would have been a Class E; and during 1996 Scott Tucker case involving Clement Harris. would have been a Class C, and for the School Zone would nave been a class A.

Tucker affair; (ii) the Hollis Hunt affair, and (iii) the School Zone drug Possession, Mrs. Shelia Bernil faced as much as a 231 (two hundred and thirty one) years in state prison (ie. 63 years + 108 years + 60 years), while Mr. Clement Harris faced a maximum of 63 years, for his role in the Scott tucker case.

341. Indeed Berneil admitted in her original 1996 trial testimony that she had already been convicted of forgery in 1996 on a separate and distinct charge unrelated to either the School zone, Mr. Hunt or Mr. Tucker crimes (**TE, Vol. 1, pp 127-128**) and was thus on felony probation, yet she denied any "special relationship" with the police or being helped previously when she had been in trouble.

342. As absurd and outrageous as it may seem to this Honorable District Court, and despite the rank incredibility and unbelievability of her denials, State start witness Shelia Bernil, specifically denied any "special relationship" with the police or District Attorney's office, or being helped previously when she had been in trouble.

343. Once again, it must be re-emphasized that during Petitioner Miller's original Trial in August 1996 Mrs. Bernil testified as follows:

Q. Have you been offered anything for your testimony here today?
A. No. I have not.
Q. You don't have any special relationship with the police?
A. No I do not.
Q. They have never helped you with anything you had before if you had been in trouble?

ial Testimony of Shelia Bernil, No. [illegible] ( TE-2 Trial Testimony of Shelia Berlin, page 33, line 23,

344. Assuming the District Attorney General provided this information to the Court pursuant to the Order for exculpatory evidence, the Petitioner Miller still avers that Trial Counsel Houghton had committed error of a prejudicial nature by not requiring this information to be revealed and introduced to the Jury in order to help his defense at the 2001 trial.

345. In other words, Trial Counsel Houghton never attempted to impeach these witnesses by alleging bias or motive due to a de-facto non-prosecution agreement.

346. Indeed even a fool would find it difficult not to understand the truly exculpatory nature of the evidence of a non-prosecution agreement and special treatment given to these two witnesses.

347. Indeed one must remember that in all three of these crime sprees (ie Aug 1995 Tucker case; the July '96 Hunt case; and the January School zone drug charge), you had two separate victims who both wanted to press charges and seek justice against both state witnesses Shelia Bernil and Clement Harris. **(See Exhibit # 9. pp. 3)**

348. The existence of credible and irrefutable evidence that each of these witnesses faced over 7 decades in state prison, certainly would have been material and exculpatory evidence relating to bias or improper motive of a witness and would have been information or evidence favorable to the defendant on such an issue.-

(not to mention that Mrs. Bernil was specifically allowed to remain on probation).

349. Therefore, by sheer force of reason, based on nothing other their collective criminal histories which would have subjected these two state witnesses to no less than 7 decades a piece for their respective, 1995 and 1996 crime sprees, *its beyond question* that there was a *defacto* or even explicit non-prosecution agreement with these two unscrupulous individual state witnesses, in exchange for their testimony against Petitioner Miller.

350. Therefore, the internal 28th Judicial D.A. Office memos and case files[14] dealing specifically with Shelia Bernil and Clement Harris would reveal the true nature and scope of these agreements, and as a result of this, Counsel Houghton was ineffective for not subpoenaing these records and documents and using them to impeach both of these critical state witnesses.

351. Furthermore, original presiding Circuit court Judge Jerman, in the 1st of 4 (four) hearings on Petitioner Miller's March 1997 motion for new trial, specifically ordered the 28 Judicial district D.A.'s office to request that the T.B.I investigate (i) whether there was a deal between the Haywood County D.A.'s office and Bernil; and (ii) whether the prosecution and Brownsville Police Department knew of

---

14      Such files of the both the Brownsville Police Department and the Haywood D.A." office would not only have been discoverable but also subject to a subpoena due to substantial need of Petitioner Miller to properly defend himself   see **Boyd v Comdata Network, 88 S.W. 3d. 203 (2002)** "Notwithstanding this general rule of inadmissibility , . . . . . . . . . . ordinary or fact work product may be discoverable upon a showing of substantial need and undue hardship..."

these charges at the time she gave her testimony at his original 1996 trial. (see 1998 Opinion of C.C.A. *4-)

352. Petitioner avers that its noteworthy to add that, despite the clear directive of Judge Jerman to the Haywood County D.A's office to have the T.B.I. Investigate the requested areas of concern, the *T.B.I specifically refused to look into or investigate whether or not there ever was a deal between the Haywood county D.A.'s office and Shelia Bernil*; (id)and they also concluded that both the D.A. And the B.P.D. were in fact well aware of these charges at the time Mrs. Bernil gave her testimony during Petitioner's first trial in 1996.

353. Also of particular concern is the fact that in all of the extensive analysis performed by presiding circuit court Judge Jerman, not one time did he ever consider or address the second and third crime spree involving Mr. Tucker, for which both Mrs. Bernil and Mr. Harris were never prosecuted, nor the exceptionally favorable sweetheard deal Mrs. Berniel received on July 2nd 1996, Poss. Of Drug paraphernalia plea agreement, which spared Mrs. Berniel from a minimum sentence of 15 years to be served at 100% (and a maximum sentence of 60 years)

354. As a result of this, Trial Counsel Houghton should have vigorously cross examined both Mr. Harris and Mrs. Bernil at the August 2001 trial, and then impeached them with the irrefutable proof of their guilt in three separate criminal

offenses and for which they faced possible life sentences, and shown than they had

therefore received favorable treatment for their cooperation.

355. Trial Counsel Houghton, while Mrs Berniel was on the stand at the August 2001

retrial, should have had Mrs. Berniel's testimony read back in open court; and

thoroughly impeached her by proving that her testimony at the original August

1996 trial was perjured.

356. Indeed after vigorously cross examining both Mr. Harris and Mrs. Bernil and

then impeached them with the irrefutable proof of their guilt in the Hunt Case and

Tucker case, and the school zone drug offense.

357. Then trial Counsel Houghton should have then held a jury out hearing, and

diligently argued and proved that the State had intentionally committed a

intentional *Brady* (supra) and *Giglio* (surpa) violation, by purposefully not

complying with nor heeding the requirements to turn over all exculpatory

impeachment evidence regarding these two witnesses; (ie. Evidence of their bias

and motive for falsely testifying against Petitioner Miller.)

358. Trial counsel Houghton should have then moved, at that point, for an immediate

mistrial on grounds of prosecutorial misconduct, and for which then presiding

Trial Court Judge Lafferty, would have had not choice but to grant the mistrial

motion in light of such rank prosecutorial misconduct.

359. As already discussed in Napue, the U.S. Supreme Court held that "conviction obtained through the use of false evidence, known to be such by a representative of the State, deprives a defendant of due process..." 360 U.S. at 269.

360. Therefore, when a witness testifies falsely, either on direct or cross examination the state has an affirmative duty to correct the false testimony.." Spurlock 874 S.W. 2d. 602, 617 (Crim.App. 1993)

361. To establish a *Napue* claim the Petitioner must establish by a preponderance of evidence: (a) that false or perjured testimony was admitted at trial., (b) that the state knowingly used such testimony or knowingly allowed it to go uncorrected; and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell, v State, 1995 Tenn.Crim.App. Lexis 221 , 1995 WL 113420 *8 (March 15th, 1995)

362. Therefore, when state star witnesses Clement Harris and his co-defendant Shelia Bernil, testified that they received no special consideration, benefit, deal or offers or expectations of leniency from the state in exchange for their cooperation, this was patently false, perjurous and designed to specifically mislead the jury and the defendant.-and as such it was exactly the type of testimony that both *Giglio* and *Napue*, were designed to prevent and safe guard against.

363. To add insult to injury this was done in the face of the Haywood County D.A.

Office, who did noting to correct or clarify these patent falsehoods and perjurous statements, at the August 1996 trial.

364. These factual arguments evince clearly that, but for the misconduct of the Haywood County district Attorney office the jurors at Petitioner's August 1996 trial, would have been exposed to highly prejudicial and probative impeachment evidence in the form of knowledge regarding the true motive and bias of both state star witnesses Shelia Bernil and Clement Harris to testify falsely against Petitioner Miller.

365. Petitioner Miller avers that due to the prosecution's intentional misconduct, he would have been entitled to a new trial. See **Raybin, Tenn.Crim. Prac. & Proc. Vol 11, §, 33:33; p. 498; 2008 ed.** ("...Where the prosecutor knows or should have known of perjury, a new trial must be granted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. )

366. Once again Petitioner would like to reiterate that he need not show that absent the false testimony and/or prosecutorial misconduct, <u>he would have "been acquitted"</u>. U.S. V Agurs, 427 U.S. 97, 103 (1956); see also State v Spurlock, 874 S.W. 2.d. 602 (Tenn.Crim. App. 1993). (when false testimony is material the defendant is entitled to a <u>new trial even if the false testimony is related only to matter of impeachment.</u>." )

367. These egregious acts of criminal negligence and malfeasance were bad enough, however whats truly deplorable and outrageous is that the Haywood County District Attorney General's office was well aware of these egregious acts and purposefully hid them from the Petitioner's defense team, and to make matters that much worse trial counsel Houghton failed to in any way address or call the state out on its egregious malfeasance., with regard to withholding material exculpatory impeachment evidence of it's two state star witnesses.

368. The prosecutor's duties of disclosure under the due process clause are wholly inclusive of *any and all trial, post trial and collateral attack proceedings.* Banks v. Dretke, 540 U.S. 668, (2004), (presuming a continuous duty by state officials to provide Brady material from pre-trial proceedings through federal habeas proceedings.)

369. The Prosecutors duty to disclose is not limited in scope to "competent evidence" or "admissible evidence". The duty extends to all "favorable information" unknown to the accused. Workman , 868 S.W. 2d. 705, 709 (Tenn.Cr. App. 1993).

370. The cases which have followed *Brady* (supra) have placed an "affirmative duty of inquiry" on prosecutors. It is irrelevant whether an individual prosecutor has actual knowledge of Brady material. "..The individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf

132

in the case, including the police.." Kyles v. Whitley, 514 U.S. At 437.

371. In Kyles, the court applied the Brady v Maryland, rule requiring the prosecution to disclose evidence favorable to the defense and held that the rule applies even when the policy have failed to bring favorable evidence to the prosecutor's attention.

372. Each prosecutor had an affirmative duty to make inquiries of all members of the prosecution team. For example, see U.S. v. Brooks, 966 F.2d 1500 (D.C. Cir. 1992); U.S. v. Perdomo, 929 F.2d 966 (3rd. Cir. 1991) and U.S. v. Deutsch , 475 F. 2d 55 (5th Cir. 1973).

373. For the purposes of this case agents of the State Include, but are not limited to the entire Haywood County District Attorney's office, , the Officer of the Attorney General and Reporter of Tennessee, the Haywood County Sherriff's department, the Brownsville County Police Department, the Tennessee Bureau of Investigation.

374. To this date the State has not willingly come forward to disclose exculpatory/impeachment evidence regarding the favorable implicit or explicit non-prosecution agreement it had with state star witnesses Shelia Bernil and Clement Harris in Petitioner's case.

375. Constitutional due process also prohibits the state from securing a conviction through the use of false or highly misleading evidence or by making affirmative

misrepresentations to the Court or the Jury. See Napue v. Illinois, 360 U.S. 264, 296 (1959), "it is established that a conviction obtained through the use of false evidence , known to be such by representative of the State, must fall under the fourteenth amendment...*[T]he same result obtains when the state., although not soliciting false evidence, allows it to go uncorrected when it appears...*")

376. Brady v. Maryland, 373 U.S. 83, (1963), holds that a prosecutor violates due process when he (1) suppresses evidence,; (2) that is favorable to the defendant, when that evidence (3) is material to guilt or innocence (id) at 87  This extends to evidence that bears upon the credibility of a government witness. Giglio v. United State 405 U.S. 150, 153054(1972).

377. Under Tennessee law, a defendant shows a due process violation for failure to disclose exculpatory  evidence by establishing four criteria:

1) that the defendant requested the information, unless the evidence is obviously exculpatory , in which case the State is bound to release the information whether requested or not
2) the state must have suppressed the information,
3) the information must have been favorable to the accused, and
4) the information must have been material.  (Johnson v State, 38 S.W. 3D 52, 56 (Tenn. 2001).

378. Furthermore, intent on the part of the State, in Brady violations is irrelevant, in that a "Brady claim requires [only] a showing that the evidence is favorable, material, and was suppressed by the State, either 'willfully or inadvertently'"