Banks. v. Dretke, 540 U.S. 688, 691 (2004).

379. Petitioner avers that the evidence of implicit or explicit non-prosecution agreements, was exceptionally "favorable..", in the context of Brady, in that it would have provided "...some significant aid to the defendant's case, whether it furnishes collaboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's versions of the events or challenges the credibility of a key prosecution witness.." Johnson (supra at 57; quoting Commonwealth v. Ellison, Ellison, 379 N.W. 2d. 560, 571 (Mass. 1978)

380. It's firmly enshrined in criminal Justice jurisprudence that state deals offered to state witnesses are both exculpatory and subject to mandatory disclosure. Cf. Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (nondisclosure of state's deal with witness violated defendant's due process rights).

381. It is also well established that evidence "Favorable to an accused" includes both impeachment and exculpatory evidence. U.S. v. Bagley, 473 U.S. 667, 676, (1985). In Bagley, the Court emphasized that only the suppression of material evidence justifies a new trial or re-sentencing under Brady.

382. Petitioner avers that Evidence is material under Brady if it creates a "reasonable probability' that had the evidence been disclosed to the defense, the result of the

proceeding would have been different.

383. A Reasonable Probability is a "probability sufficient to undermine confidence in the outcome." (.id at 682)

384. The U.S. Supreme Court went on to elaborate and delineate further, the holdings of Bagley's materiality standard, in the case of Kyles v. Whitnley, 514 U.S. 419, 434 (1995). , wherein it identified four important aspects of the Bagley standard:

> ".....a showing of materiality **does not require** demonstrations by a preponderance that disclosure of the suppressed evidence *would have resulted ultimately in the defendant's acquittal*....Bagley's touchstone or materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worth of confidence
> ....Second 'Bagley materiality...is not a sufficiency of evidence test. A **defendant need not** demonstrate *that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough to conviction*. (id. 434-35)
> .....Third,....once a reviewing court applying Bagely has found constitutional error there is no need for further harmless-error review...a Bagley error could not be treated as harmless, since a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict
> ....Fourth, materiality must be assessed in terms of the "cumulative effect" of the suppressed evidence, "not item by item". (id 436-37)

385. Therefore, this court is obligated to take a holistic view of the evidence, to determine the "cumulative effect" of the suppressed evidence, and how the various pieces of suppressed evidence, prevented him from receiving ".... a fair trial, understood as a trial resulting in a verdict worthy of confidence.."(id).

386. The existence of credible and irrefutable evidence that each of these witnesses faced over 7 decades in state prison, certainly would have been material and

exculpatory evidence relating to bias or improper motive of a witness and would be information or evidence favorable to the defendant on such an issue.-(not to mention that Mrs. Bernil was specifically allowed to remain on probation).

387. Therefore, by sheer force of reason, based on nothing other their collective criminal histories which would have subjected these two state witnesses to no less than 7 decades a piece for their respective, 1995 and 1996 crime sprees, *its beyond question* that there was a *defacto* or even explicit non-prosecution agreement with these two unscrupulous individual state witnesses, in exchange for their testimony against Petitioner Miller.

388. And had this information been exposed the jury it, more probably than not would have resulted in a different out come, because on it's face the Haywood County D.A.'s office intentional withholding of such probative and valuable impeachment evidence is "....enough to undermine the confidence in the verdict ..."

389. The Petitioner specifically wanted the Records of the Brownsville police Department and the D.A.'s office which irrefutably supported the fact that Mr. Clement Harris and Mrs. Shelia Bernil, received favorable treatment in the form of an implicit or explicit non-prosecution agreement.

390. This in turn could have been used to impeach the witness, and severely undermine their credibility if not have their testimony stricken in it's entirety.

*Trial Counsel Houghton failed to properly challenge and move for a mistrial based on a Conflict of Interest that violated Petitioner Miller's due process rights:*

391. Petitioner Dwight Miller, by and through his attorney of record, prior to his August 2001 conviction, had moved the Honorable Court to issue an order to disqualify the District Attorney General's Office for the Twenty Eighth Judicial District from the prosecution of the Petitioner, in light of the fact that they should not have been allowed to turn over their file to any subsequent prosecutor due to their conflict of interest.

392. In support of the motion, the Petitioner would had explained that on or about July 10, 1995 the District Public Defender's Office for the Twenty Eighth Judicial District was appointed to represent the Petitioner.

393. On or about August 5, 1996 the above case went to trial in Haywood County and the Petitioner was convicted of murder in the first degree.

394. On or about October 14, 1996 William D. Bowen became employed as an Assistant Public Defender for the Twenty Eighth Judicial District.

395. On or about March 10, 1997 the motion for new trial was heard before the Honorable Judge Dick Jerman and the motion was granted. William D. Bowen did work on the motion and did participate in numerous discussions within the office while the motion was pending and did actively participate in some investigative work with the investigator for the District Public Defender's Office, Clifford

Worden.

396. On or about July 7, 1997 the motion for new trial was reconsidered by Judge Jerman and was denied.

397. The above case was then submitted to the Tennessee Court of Criminal Appeals, with said brief being prepared by the District Public Defender's Office. William D. Bowen actively participated in the writing of said brief. The brief was filed with the Tennessee Court of Criminal Appeals on or about April 17, 1998.

398. On or about April 21, 1998, William D. Bowen resigned his position with the District Public Defender's Office.

399. Sometime later in 1998, William D. Bowen began working as an Assistant District Attorney for the Twenty Eighth Judicial District.

400. The Tennessee Court Of Criminal Appeals reversed the conviction of the Petitioner on or about December 29, 1998 and the District Public Defender's Office was again appointed to represent the Petitioner on or about July 14, 1999.

401. Subsequently, William D. Bowen left the office of the District Attorney General for the Twenty Eighth Judicial District and then in November, 2000 again became an Assistant Attorney General for the Twenty Eighth Judicial District.

402. The Petitioner would aver that the prior representation by attorney William D. Bowen while he was an Assistant Public Defender placed Mr. Bowen in

possession of information which proved to be detrimental to the defense of the Petitioner and advantageous to the prosecution of the Petitioner.

403. The Petitioner would further aver that the three step analysis, as outlined in Schiessle v. Stephens, 717 F.2d 417 (7th Cir. 1983) and adopted by the Tennessee Board of Professional Responsibility in Formal Ethics Opinion 89-F-118 requires a determination:

> 1) whether a substantial relationship exists between the subject matter of the former and present representations.
> 2) whether the presumption of shared confidences which arises from its determination that the representations are substantially related has been rebutted with respect to the former representation.
> 3) whether the presumption of shared confidences has been rebutted with respect to the present representation.

404. The first prong of the three step analysis undeniably confirms that there was a substantial relationship between the present and the past representation of Mr. Bowen and therefore there was a presumption that the challenged attorney shared information with the new associates in the District Attorney's Office. To avoid disqualification of the entire District Attorney's Office the state would have had to prove that the challenged attorney (i.e. Mr. Bowen) had been sufficiently "screened" from the remainder of the staff and its work on the pending case, as required by the second and third prongs of the above analysis.

405. The Petitioner would further aver that in his case there was no adequate

screening mechanisms in place which would sufficiently insulate the "tainted"

attorney from the remainder of the staff at the District Attorney General's

Office and due to the structure of the office, the size of the office and the

substantial likelihood of contact between the challenged attorney and the other

attorneys disqualified the entire office. In <u>Mattress v. State</u>, 564 S.W.2d 678,

680 (Tenn. Crim. App. 1977) the Court states:

> It has been firmly established, both in the Canons of the Professional Ethics and by judicial opinions, that attorneys cannot represent conflicting interests or undertake to discharge inconsistent duties. When an attorney has been engaged and has received the confidence of his client, he cannot enter the services of those whose interest are adverse to his client or former client. Citing <u>Autry v. State,</u> 1 Tenn. Crim. App. 95, 430 S.W.2d 808 (1967).

406.  Due to the conflict of interest by William D. Bowen, the Petitioner had asked for

an Order disqualifying the entire Haywood county DA's office.

407.  In *State v. Phillips,* 672 S.W.2d 427 (Tenn. Crim. App. 1984), our appellate

court reversed and remanded for a new trial on the Defendant's conviction for

murder second degree. Attorney Edward R. Sempkowski, was defense counsel

for the Petitioner and at trial was an Assistant District Attorney General.

Sempkowski worked on the Petitioner's case for the prosecution. In reversing,

Judge Scott stated:

> The appellant's retained defense counsel worked with apparent diligence in that capacity and received confidential communications from his client. Although he never sought to properly withdraw, he discontinued his representation of the appellant and went to work as an Assistant District Attorney General. In that capacity, he assisted in the trial preparation by

reviewing the state's file, making notes therein, complying with discovery, preparing and filing a motion for the state, interviewing prospective witnesses and obtaining an expert witness to refute the defense he had interposed for the appellant. For this Court or any court to attempt to weigh or measure actual prejudice would require "unguided speculation." A conviction obtained under these circumstances simply cannot stand regardless of prejudice tom the accused and regardless of his guilt or innocence.

408.  Likewise, in the case sub judice, the state never over came the "presumption of shared confidences", that would have other wise required disqualification of the entire District Attorney's office for the 28th Judicial district.

409.  Indeed, Trial Counsle Houghton had discussed this at the October 2001 motion for new trial hearing, however see abandoned the issue totally and completley on appeal.

410.  Whereas, had she argued the issue pursuant to State v. Phillips (supra) she would have been successful at arguing that Petitioner Miller was entitled to a new trial, due to the fact that his due process rights to a full and fair trial were violated by a a District Attorney's office who illegally used information and evidence obtained from privileged confidential communications, between Petitioner Miller and his then defense team member William D. Bowen, as the basis of their prosecution.

**HAD POST CONVICTION COUNSEL J. BANKS PROPERLY ARGUED DURING THE EVIDENTIARY HEARING THAT UNDER THE *HUTCHINSON, GIGLIO* AND *JACKSON* STANDARD FOR IMPEACHMENT AND THE *TEARS* STANDARD FOR DEFICIENT USE OF EXCULPATORY EVIDENCE THEN-PRESIDING POST CONVICTION JUDGE J MCCRAW WOULD HAVE FOUND, AS A MATTER OF STATE LAW, THAT TRIAL COUNSEL HOUGHTON**

## RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

411. Petitioner avers that the fact's of his case are similar to those of Hutchinson v

State, 118 S.W.3d 720; 2003 Tenn. Crim. App. LEXIS 253

No.E2001-02737-CCA-R3-PC, March 26, 2003, where just like in the case sub

judicie, the defendant Hutchinson, was prevented from presenting valuable

impeachment evidence of both the state's star witness and the state's prosecutorial

theory.

412. Indeed Hutchinson was charged with burglary and the: "Prosecution and defense

counsel stipulated at the ....jury trial........that FBI lab reports were inconclusive in

establishing or eliminating defendant Hutchison's tools as those used to burglarize

Jane Marie Wells vehicle. During the course of that jury trial, <u>the prosecution</u>

<u>strongly implied that defendant Hutchison's tools were used to accomplish the</u>

<u>burglary of the Wells' vehicle...</u>" (id)

413. However, the truth, that Hutchinson was prevented from presenting to the jurors,

was that:

> "........the FBI lab reports in fact, everyone now agrees, conclusively eliminate
> defendant Hutchison's tools as those used to accomplish the burglary. That
> petitioner Hutchison learned that the lab reports excluded his tools after he
> obtained copies of those reports in late 1991 as the result of a freedom of
> information request...."(id)

414. In commenting on the significance of this impeachment evidence, the Court held

that:

"..While this court cannot point to any intentional omission on the part of the state, the trial court specifically found that the petition for relief was filed by Harper within one year of his discovery of the "exculpatory report." That the parties now agree that the testing established that the tools found in Hutchison's residence were not used during the offenses and that one laboratory report qualifies as exculpatory is of significance. In the first trial, Agent Peel testified only as to his findings on the materials transfer test, which were inconclusive. As indicated, neither of the lab reports was offered as an exhibit. Attorney Dixon explained that he did not call Peel to testify at the second trial because his testimony at the first trial had gone so poorly. Had the exculpatory report been produced, Peel's testimony would have likely been helpful for the defense..." (id. At 733)

415. In granting Hutchinson Post conviction relief the Post conviction Court found that:

"Defense counsel should have reviewed the reports and discovered their true content. Which ever way one chooses to view it, it is clear that Petitioners were denied an opportunity to have this important information put before the trier of fact, which, in this court's view, undermines the reliability of the jury's verdict and justifies granting the relief sought by the petitioners..."(id at 737)

416. However, this wasn't the only piece of impeachment evidence at issue in *Hutchinson*, there was also the statement of a witness Mrs. Piece, whose testimony lent credibility and credence to Petitioner Hutchinson's defensive theory at trial, and the failure of Trial Counsel to present this impeachment testimony constituted reversible error and entitled Petitioner Hutchinson to Post Conviction relief.

417. In reaching this holding the Post Conviction Court held:

One of the long standing defense theories in this case is that [the victim's] cousin, who had had a disagreement with and had threatened [the victim] shortly before this incident, was the actual shooter. The statement of Ms. Pierce clearly lends credence to the fact that another individual, who was shouting obscenities, was at the apartment complex shortly before [the victim] was shot. While this evidence does not clearly establish another person as the shooter, it certainly lends support to that theory and should have been disclosed to petitioners and

s information was clearly [illegible] and [illegible] information was clearly developed by the Knoxville

Police Department which was the agency principally responsible for the investigation and intimately involved in the prosecution of petitioners. While the court does not believe that the District Attorney's office was personally aware of this statement, it was clearly evidence developed by the state which should have been disclosed to defense counsel.

418. In up holding the Post Conviction Court's granting of Post conviction relief, the

Tennessee Court of Criminal Appeals held:

> While this single omission may not, in and of itself, justify the granting of a new trial for petitioners, the court believes when taken in conjunction with the information now known about the FBI lab results, _that this additional information further erodes the reliability of the verdict at the second trial of this cause._
>
> The statement of Ms. Pierce qualifies as exculpatory because it tends to support the defense theory that the victim had been shot as the result of a dispute unrelated to the car burglary. She was awakened by someone making threats outside her window. She then heard the victim, who was apparently sleeping in the room above hers, get up and leave the residence just minutes before the gunshots. Her version of the events is in conflict with the account of the victim, who contended that he had been awakened by tapping. .... the trial court implicitly ruled that the petitioners were entitled to relief ....
> The lab report which concluded that certain of Hutchison's tools were not used in the burglary _would have been helpful to the defense_. **_The Pierce statement would have also supported the theory of defense_**. The evidence, in our view, does not preponderate against the finding of the trial court, [that Hutchinson was entitled to Post conviction relief].." (id 738). (emphasis added)

419. Petitioner avers that the second case, that addresses the significance of

impeachment evidence, and it's impact on the defense, is the case of State of

Tennessee v. Noura Jackson, 444 S.W.3d. 554 (November 6th, 2013).

420. Petitioner avers that the review of the facts in his case, should be guided by the

analytical framework established in _Jackson,_ (supra) wherein the Court of

addressed the significance of impeachment evidence, and it's impact on the

defense, **when there's a failure to present such evidence to the jury.**

421. In *Jackson*, the Petitioner was granted a new trial because a Brady violation committed by the State, deprived her of the ability to: (i) Impeach a state witness; and (ii) present evidence which impeached the State's prosecutorial theory.

422. Like here, the State of Tennessee (i.e. the prosecution) conceded that there was impeachment evidence that was never introduced or presented to the Jury in Jackson's trial, <u>however, they argued that Defendant Jackson was not entitled to relief because the prosecution's timely production of the statement would not have affected the outcome of the trial.</u>

423. The Tennessee Court of Criminal appeals however, categorically rejected these arguments, when the Court focused exclusively on the core principle of *"impeachment evidence" and it's significance to the defense during the fact finding process in a criminal trial.*

424. Moreover, "'any favorable evidence known", is relevant and required to be furnished to the defense, for the purposes of allowing them [to use said evidence to] impeach the state['s two main star witnesses Clement Harris and Shelia Bernil].." '" Strickler v. Greene, 527 U.S. 263, 275 n.12, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)); see also Sample v. State, 82 S.W.3d 267, 270-71 n.3

(Tenn. 2002); Johnson, 38 S.W.3d at 56

425. In the case *sub judice* Petitioner Miller, in addition to alleging a "Brady" violation, *is alleging that impeachment evidence, which was both favorable and material to the defense, was available and that Trial Counsel Houghton failed to obtain it **and use it** to impeach the state's start witnesses Clement Harris and Shelia Bernil.*

426. Petitioner must reiterate that favorable evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 433, 435); see also Johnson, 38 S.W.3d at 58.

427. The Tennessee Court of Criminal Appeals concluded: "...that Mr. Hammack's third statement [about Noura Jackson] was material because it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." See Kyles, 514 U.S. at 435; see also Johnson, 38 S.W.3d at 58. Again, the third statement differed significantly from Mr. Hammack's first two statements and his trial testimony. .." Jackson (supra)

428. Likewise, if at Petitioner Miller's August 2001 trial, Counsel Houghton had made the jury aware of the existence of credible and irrefutable evidence that both

Clement Harris and Shelia Bernil faced over 7 decades in state prison, with out the cooperation of the Haywood County D.A.'s office, this certainly would have been material and exculpatory evidence relating to bias or improper motive of a witness and as such would be information or evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (id. Kyles, )

429. This is made that much more self evident when compounded with the testimony of George White and Jimmy Ballard, in the context of arguing the 3rd party guilt of Mr. Clement Harris as a co-conspirator/accomplice. **(see Claims I-VII pp. 36 -104)**

430. Just as the Tennessee Supreme Court found in Jackson, (surpa) "..Again, the third statement differed significantly from [state star witness] Mr. Hammack's first two statements and his trial testimony. .." in Petitioner Miller's case, the statements of the Haywood County D.A.'s two state star witnesses, Clement Harris and Shelia Bernil, are: (i) clearly given for reasons of self-interest and purely motivated by their combined desires to avoid prison time for their own extensive criminal history's ;and (ii) absurd in the extreme and thoroughly impeached, with in the context of other Defense witnesses, that were called or should have been called. (See **Claims I-XII**; testimony of (i) Mrs. Lucille Miller; (ii) Dave C. Williams;

(iii) James Priddy; (iv) Mary Loiuse Taylor; (v) Mrs. Sam Ethel Williams; (vi) former Assist .D.A. Ted Neuman; (vii) Clifford A Worden, (viii) Mr. T.T. Boyd; (ix) Marvin Grandberry; (x) Jennifer Praitt; (xi) Mose Comage; (xii) Harold Booker and (xiii) other witnesses with relevant exculpatory testimony; pp 36-49. [supra])

431. Therefore, if at Petitioner Miller's trial, Counsel Houghton had introduced favorable and material impeachment evidence like that discussed in *Noura Jackson* (supra) and *Hutchinson* (supra), it's more probable than not that the results of the trial would have been different.

432. Petitioner Miller avers that the facts of his case are similar to those of *Johnathan Tears v State of Tennessee, 2013 Tenn.Crim.App. 1075, (April 16th, 2013)*, wherein petitioner Tears was granted Post Conviction Relief, due to; the failure of his trial counsel to: (i) obtain and **then utilize exculpatory** testimony; and (ii) adequately prepare and execute a defense strategy.

433. In explaining how Petitioner Tears had demonstrated that there was a reasonable probability that absent the deficiency of his trial counsel concerning the victims statement, the outcome of the trial would have been different, the Court of Criminal Appeals held:

> "....First, Petitioner contends that trial counsel and co-counsel were in effective for failing to request Jencks material concerning the victim's statement to

Detective Oliver and to use that statement to cross-examine and impeach the victim's testimony at trial. **We agree.**........Importantly.....the statement that the victim gave to Detective Oliver was exculpatory evidence in that it could have been used to impeach the victim's testimony during cross-examination. The statement could have raised questions in the minds of the jurors concerning the victims credibility, specially as to whether Petitioner shot the victim in self-defense. *We find that Petitioner has demonstrated that there was a reasonable probability that absent the deficiency of trial counsel and co-counsel concerning this issue*, the out come of the trial would have been different. *Therefore, we reverse the judgment of the trial court denying post-conviction relief, vacate Petitioner's conviction* for attempted second degree murder and and employing a handgun during the commission of dangerous felony and remand this cause for a new trial.." (Tears, (id)

### *Deferential standard for analyzing tactical decisions of trial counsel Houghton:*

434. Petitioner Miller acknowledges that he is not entitled to the "...benefit of hindsight , [and] may not second guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision.." Goad. (supra)

435. Likewise it's also true that presiding Post Conviction court Judge J. McCraw, would have had to have been highly deferential to counsel Houghton's August 2001 trial performance, Burns, 6 S.W. 3D at 426,; and would not have been allowed to second guess: "...the informed tactical delicious of trial Counsel [Houghton].."

436. This deference, however, would have only applied "if the choices [were] **informed....[and]...based upon adequate preparation....**" Cooper v. State, 847 S.W. 2d. 854, 874 (Tenn. Crim.App. 1992) To establish the prejudice prong, a petitioner, must show that "there is reasonable probability that, but for counsel's

unprofessional errors, the result of the proceedings would have been different...";

Strickland (at 694) *Failure to conduct a reasonable investigation constitutes deficient performance.* See Austin v. Bell, 126 F.3d 843, 848 (6th Cir. 1997).

437. In other words, at Petitioner Millers August 19th, 2014 post conviction evidentiary hearing, Judge J McCraw would have been obligated to determine whether or not trial counsel Houghton's choices were informed ones, based "upon adequate preparation.." Cooper (supra), and if not, whether or not "..a reasonable probability of.." a different out come existed, but for the erroneous tactical decisions predicated upon counsel's inadequate preparation, see Pylant v St, , at 869 (Tenn.. 2008); Bryant v State, 2015 Tenn.Lexis 182 (May 29th, 2014)

438. Had he done this, it would have been clear that there was no basis for a series of tactical decisions which prevented Trial Counsel Houghton for pushing vigorously: to obtain from the state objective proof of an explicit or implicit non-prosecution agreement, with state witnesses Clement Harris and Shelia Bernil, in exchange for their highly prejudicial and patently false testimony against Petitioner Miller.

439. In other words, it could not have been tactically sound for Trial Counsel Houghton, not to offer into the record, the proof that:

(i) The Haywood County D.A.'s office on three (3) separate occasions ꜱᴇᴇ ᴀɴᴅ ꜱʜᴜᴛ ᴄᴀꜱᴇꜱ ᴀɢᴀɪɴꜱᴛ ᴛʜᴇɪʀ ᴛᴡᴏ ꜱᴛᴀᴛᴇ ᴄ...

Witnesses Clement Harris and Shelia Bernil; and

(ii) the three crime sprees in question, carried potential sentences in excess of 231 - 63 years for each witness; and

(iii) the victims in each of these criminal episodes (i.e Mr. Scott Tucker-Aug. 1995 and Mr. Hollis Hunt July 1996) both wanted to press charges against the perpetrators; to wit: State Star Witnesses Clement Harris and Shelia Bernil;

440. Therefore, then presiding Post Conviction Judge McCraw would have been forced to find that the only reason Counsel Houghton failed to properly present this proof at trial, in order to: (a) properly impeach these witnesses by showing motive and bias; and (b) prove prosecutorial misconduct, <u>was because she failed to properly prepare and investigate the facts of Petitioner Miller's case prior to his August 2001 retrial in Haywood County Circuit Court</u>.

441. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

442. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would

have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly impeach these witnesses by showing motive and bias on the part of state star witnesses Shelia Bernil and Clement Harris*].....the result of the proceeding *would* **have been different**.....**" Tears, (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8th. Cir. 1990)

443. In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to diligently investigate, discover and then challenge the State's Brady and Giglio, violations with respect their intentional suppression and concealment of a non-prosecution agreement with state star witnesses Clement Harris and Shelia Bernil*].....**the result of the proceeding would have been different**.....**" *Tears,* (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

444. In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in*

*failing to properly demonstrate that the presumption of shared confidences was not and could not have been rebutted with respect to the D.A.'s office for 28th Judicial district].....***the result of the proceeding would have been different.....***"*

*Tears,* (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

445. Petitioner avers that all of the above referenced evidence (i.e attached exhibits, arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (IX) -(XVI)** in the instant **28 § U.S.C. 2254** Habeas petition, "would resolve a factual dispute". (i.e. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law, had Post conviction Counsel Banks properly presented these claims in order to prove Trial Counsel Houghtons' ineffectiveness)

Thus, Petitioner Miller has clearly shown, in support of **claims (IX) -(XVI)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Hutchinson* (supra), *Jackson* (srupa), *Tears*, (supra), *Zimmerman* (supra); he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## III. SPECIFIC CLAIMS (XVII)-(XXVI) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:

### *Improper Jury instructions and Closing Arguments*

446. The following facts and arguments are being offered in support of the substantial Constitutional Claims, **(XVIII), (XX), (XXII), (XXIV),** and **(XXVI).**

> **(XXVIII)** Trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that the cancellation rule in the State of Tennessee, foreclosed Judge L. T. Lafferty from ruling that the evidence didn't support an instruction on facilitation and Criminal Responsibility.

> **(XX)** Trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that Judge Lafferty violated Petitioner's 6th Amend right to a Jury Trial, when he failed to instruct the Jurors on the lesser included offense of Criminal Responsibility for Facilitation of conduct of another as required by T.C.A. § 40-10-108 and State v. Lewis, 978 S.W.2d. 558 (Tenn.Crim.App 1995) which was the controlling case at the time of Petitioner's August 2001 trial.

> **(XXII)** Trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that Petitioner was entitled to the Lesser included offense instructions pursuant to State v. Eli, 48 S.W. 3d. 710 (Tenn. 2001) and State v. Burns 6 S.W. 3d. 453. (Tenn. 1999), which were the controlling cases at the time of Petitioner's August 2001 trial.

> **(XXIV)** Trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that the evidence as a matter of law is legally insufficient to elevate the murder form Second degree to first degree pursuant to State v Winters 137 S.W. 3d. 641 (Tenn. 2003) and State v. Bordis, 905 S.W.2d. 214 (Tenn.Crim.App. 1995)

**(XXVI)** Trial Counsel Perianne S. Houghton, was ineffective for failing to give fact based and logically consistent closing and opening arguments based on the thirty significant points which thoroughly proved and persuasively supported: (i) Petitioner Miller's innocence; and (ii) third party guilt which focused on Clement Harris, Tracey Taylor and Slouch.

447. The following facts and arguments are also being offered in support of the Procedural gateway Claims, **(XVII)**, **(XIX)**, **(XXI)**, **(XXIII)** and **(XXV)**.

**(XVII)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that the cancellation rule in the State of Tennessee, foreclosed Judge L. T. Lafferty, from ruling that the evidence didn't support an instruction on facilitation and Criminal Responsibility.

**(XIX)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that Judge Lafferty violated Petitioner's right to a Jury Trial, when he failed to instruct the Jurors on the lesser included offense of Criminal Responsibility for Facilitation of conduct of another as required by T.C.A. § 40-10-108 and State v. Lewis, 978 S.W.2d. 558 (Tenn.Crim.App 1995) which was the controlling case at the time of Petitioner's August 2001 trial.

**(XXI)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that

instructions pursuant to State v. Eli, 48 S.W. 3d. 710 (Tenn. 2001) and State v. Burns 6 S.W. 3d. 453. (Tenn. 1999)

(XXIII)    Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue that the evidence as a matter of law is legally insufficient to elevate the murder form Second degree to first degree pursuant to State v. Winters 137 S.W. 3d. 641 (Tenn. 2003) and State v. Bordis, 905 S.W.2d. 214 (Tenn.Crim.App. 1995)

(XXV)    Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to give fact based and logically consistent closing and opening arguments based on the thirty significant points which thoroughly proved and persuasively supported: (i) Petitioner Miller's innocence; and (ii) third party guilt which focused on Clement Harris, Tracey Taylor and Slouch.

448.  At Petitioner's August 2001 retrial the jury was deprived of the chance to hear several distinct alternative options regarding Petitioner Miller's guilt, or lack thereof, that would have effected the deliberations and resulted in a different outcome had these alternative choices been given.

449.  The Jury should have been given instructions allowing them to consider not merely 3rd, party guilt, but also that Clement Harris was an accomplice, and a whole array of other lesser included offenses that were applicable under the Tennessee State law.

450. Petitioner Miller avers that based on the evidence that was introduced at both the 1996 trial and the 2001 retrial there would have been more then enough evidence, to have charged Clement Harris with the murder as: (i) a principal actor and/or criminally responsible actor; or (ii) an accomplice/co-conspirator

451. In State v. Spurlock, 874 S.W.2d 602, 612-13 (Tenn. Crim. App. 1993))., the Tennessee Court of Criminal appeals held that:

> When an individual other than the accused has a motive to commit the very same crime for which the accused has been charged, the accused may prove by competent evidence that there was another individual who was inclined to commit the offense. Green v. State, 154 Tenn. 26, 285 S.W. 554 (1926); Sawyers v. State, 83 Tenn. 694 (1885); State v. Kilburn, 782 S.W.2d 199, 204-205 (Tenn. Crim. App. 1989); 21 Am.Jur.2d Criminal Law, 186 . See State v. West, 767 S.W.2d 387, 395-396 (Tenn. 1989) cert. denied, 497 U.S. 1010, 110 S. Ct. 3254, 111 L. Ed. 2d 764 (1990); Montesi v. State, 220 Tenn. 354, 417 S.W.2d 554 (1967); State v. McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987). In Sawyers, a murder prosecution, the accused attempted to introduce evidence that another individual had a motive to kill the victim. The trial court ruled that this evidence could not be introduced by the accused. In reversing the trial court, the Supreme Court said:

>> The defense offered to prove that [the] deceased had instituted criminal proceedings against two other persons for robbery, which was rejected on objection of the State. It is a rule of law that the guilt of the accused must be made out to the exclusion of every other reasonable hypothesis. If there is proof in the possession of an accused tending to show that another had the motive, or was in condition to be acted upon by causes which might produce the motive to commit the offense, such facts may be shown as items of proof tending to establish a motive in the breast of such other person, and to that extent prove the existence of an hypothesis inconsistent with the guilt of the prisoner, the value of such evidence to be determined by the jury, who should give to it any such weight as its surroundings might justify.

452. In Green, also a murder prosecution, the accused offered evidence to establish that another person had a motive to kill the victim, as well as the reason for the motive.

The trial court ruled that the evidence was not admissible. The Supreme Court, citing Sawyers and other decisions, reversed the accused's conviction, holding that the evidence should have been admitted into evidence. Green, 154 Tenn. at 32-34, 285 S.W. at 556.

453. It is firmly enshrined in Tennessee State law that one is allowed to prove that an individual other than the accused committed the very same crime for which the accused has been charged. As stated in 21 Am.Jur.2d, Criminal Law, 186 at 340: "A defendant may, by proper evidence, prove that another person committed the crime with which he is charged where the guilt of such other person is consistent with the defendant's innocence. . . ."

454. In State v. Kilburn, 782 S.W.2d 199, 204-05 (Tenn. Crim. App. 1989) the Court of Criminal Appeals, in following the precedent of *Green*(supra) reversed a first degree murder conviction because the trial court excluded evidence offered to establish that another person had the motive and opportunity to have committed the offense.

455. In another case, Hensley v. State, 28 Tenn. 243, (1848), an effort was made by the accused to show that the crime in question was committed by another person. The accused was prepared to prove that the other person had threatened to commit the very act for which the accused was being tried; and the other person was in the

neighborhood where the crime was committed. The trial court ruled that the accused could not introduce the evidence. However, the Supreme Court ruled that the trial court had committed reversible error in refusing to permit the accused to introduce the evidence in question.

456. Thus, Trial Counsel Houghton should have followed the rules established in *Sawyers* and *Hensley*, (supra) because these rules are

> ".......evidentiary rules which permit the introduction of evidence to establish that (a) another person had a motive to commit the offense or that (b) another person actually committed the offense, for the purpose of creating a hypothesis that is inconsistent with the accused's guilt. Sawyers v. State, supra. The weight to be given to such evidence must be determined by the trier of fact. Sawyers v. State, supra. If the evidence is accredited by the trier of fact, and it creates a reasonable doubt when taken into consideration with the balance of evidence, it would be the duty of the trier of fact to acquit the accused. Conversely, if the trier of fact does not accredit the evidence, or, when considered with the remaining evidence, it does not create a reasonable doubt, it would be the duty of the trier of fact to convict the accused.(Spurlock , at 613)

457. First, in turning back to the facts of Petitioner Miller's case, if trial Counsel Houghton would have been thorough in her preparation and investigation of the facts of Petitioner's case she would have:

(i) introduced and stressed the fact that there is a confession and credible accusation of actual killer, who is not Petitioner Miller. (see **Exhibit# 21, supra, Mr. White's statement**)

(ii) introduced and stressed the fact that the weapon- to wit 12 gauge shot gun that the allege perpetrator acknowledged hiding after the murder, and threatening physical attack people in order to retrieve it, is an exact make and model of the weapon used to murder Dono (see **Exhibit# 21, supra, Mr. White's statement**)

(iii) introduced and stressed the fact that State Expert witnesses testified that Clement Harris testimony regarding the scenario of the crime was forensically impossible, due to the nature and lacshot wounds produced by the scope of the gunshot wounds produced by the fatal shots. (See

160

Dr. O.C. Smith, TR-II. pp. 360-362)-[shooting had to have occurred from a distance of greater than 5 (five) feet-which would have prevented Mr. Miller, being seated in an adjacent vehicle parked driver-side window to driver-side window with the victims car])

(iv)    ~~Whereas the~~ .12 gauge shotgun that Slough hid, and Mr. George White found, had a barrel that was short enough to have been the murder weapon, that fit within the forensic parameters of plausibility with regard to the Gun shot wound and power burn patterns established by the physical crime scene evidence, as explained by Dr. O.C. Smith.

(v)     introduced and stressed the fact that There was no forensic evidence found or recovered from the scene which in any way independently corroborated Clement Harris' testimony that a murder was actually committed in the Parking lot of Jelks Street at the south end of Fairgrounds street. (see testimony of Johnny Blackburn, (TR-II. pp. 274; L 9-12)

(vi)    introduced and stressed the fact that Pursuant to the testimony of Dr. O.C. Smith There's no credible forensic evidence which puts the time of Mr. Rices murder, around the 1am to 2 am time frame, as alleged my Mr. Harris.(TR-II. pp. 360-362 )

(vii)   introduced and stressed the fact that There were no accurate scientific tests , sch as Gun Shot residue, tests, performed on the Shotgun to determine whether or not it had been fired recently. See S.A. Brian Byrd, (TR-II. pp. 338, L 7-13)

(viii)  the fact that eye witness testimony puts the alleged murderers Tracey Taylor and slouch in the vicinity of Iola Street dropping off victims car after murder during the early morning hours of Thursday April 20th, 1995, (see **Exhibit# 28, supra; Mr. Jesse Jones and Jimmy Ballard**)

(ix)    introduced and stressed the fact that eye witness testimony puts a car matching alleged make and model owned by Slouch at scene abandoning the victims car, during the early morning hours of Thursday April 20th, 1995,. (see **Exhibit# 28, supra; Mr. Jesse Jones and Jimmy Ballard); see also Exhibit# 21, supra, Mr. White's statement)**

(x)     introduced and stressed the fact that there was a on going criminal drug enterprise based-business relationship established between state witness Clement Harris, Tracey Taylor, Slouch and the victim Dono Rice. (**Exhibit# 21, supra**)

(xi)    introduced and stressed the fact that were multiple citings of Clement Harris in Dono's car purchasing and selling drugs, (see testimony of Chief J. Blackburn, see also Statement of Nina

Champion(supra); and Mr. Curtis Johnson, *infra*

(xii) introduced and stressed the fact that Clement Harris specifically perjured himself denying any such drug purchases from Victim Mr. Rice, prior to his murder (id.)

(xiii) introduced and stressed the fact that there was direct evidence that the victim "Dono" had an altercation/argument over drug money with Clement Harris' Associates, Tracey Taylor, and Slouch

(xiv) introduced and stressed the fact that there were unidentified finger and palm prints in the vehicle that very likely belonged to Tracey Taylor and and Slouch or Clement Harris (whose fingerprints were never compared to the latent recovered from the vehicle.)

(xv) introduced and stressed the fact that Mrs. Nina Champion who was close to both Clement Harris and Mr. Harris' associate Mr. Wright Palmer, went out to see the body in the morning of Thursday April 20th, 1995, and this could have only been possible if she were told it's location by Clement Harris.

(xvi) introduced and stressed the fact that witnesses completely debunk and disprove Clement Harris' statements regarding the events of the morning of Thursday April 20th, 1995, specifically during the alleged time frame of the murder (ie 1:00 am – 2:00 am Thursday April 20th, 1995), (see Lucille Miller; Tr. I, pp 230); who specifically impeaches and contradicts Clement Harris' testimony by stating Petitioner Millers was at home and she specifically remembers him snoring.)

(xvii) introduced and stressed the fact that witnesses testified that Clement Harris, had implicated himself as a suspect in the murder of the victim Mr. Donald Rice. (see Sam Ethel Williams, TR-I. pp. 298-300)

(xviii) introduced and stressed the fact that Clement Harris' finger prints, (as opposed to merely his palm prints) *were never excluded* as a potential match, to the unidentified prints found in Mr. Rice's vehicle.(see Hoty Phillip, TR-II. pp. 416, L 1-11)

(xix) introduced and stressed the fact that Constance Howard testified that Petitioner Millers clothes and car tested negative for any trace evidence, DNA or fibers in any way related to the murder of Mr. Rice. (see Hoyt Phillip, TR-II. pp. 341, L 17-22)

(xx) introduced and stressed the fact that witnesses placed the victim, a known Drug Dealer, in the vicinity of the allege crime scene, specifically looking for the State star witness, Clement Harris, *a known drug addict-with violent criminal history*, shortly before the time he was allegedly murdered (see Curtis Johnson; TR-II. pp.

495, L13-29)

(xxi)    introduced and stressed the fact that witnesses that State star witness, Clement Harris, was a known drug addict, with an extensive criminal background, who on the evening in question was on a crack-cocaine smoking binge that lasted for several days, followed by a drinking binge that entailed the consumption of unusually large quantities of alcohol, (*while he was also taking the prescription medication, Dilatins for his epileptic seizures*), immediately after the    the time the victim was allegedly murdered. (see Curtis Johnson; TR-II. pp. 502, L 2-6)

(xxii)   introduced and stressed the fact that witnesses placed Clement Harris in the vicinity of the victims car, at the alleged murder scene at a time when the murder could have occurred .(see introduced and stressed the fact that State star witness, Clement Harris, had no alibi for the times that he alleged the victim was murdered (see Curtis Johnson, TR-II. pp. 497-498) that he was with Harris at 1-2, and the murder's did not happen as Mr. Harris alleged);

(xxiii)  introduced and stressed the fact that James Priddy, TR-II. Vol 2. pp. 252) completely and utterly undermines, debunks and disproves Clement Harris' statements regarding the factual basis of his estimation of the time of the murder and the sequence of events and who was with him on the morning of Thursday April 20th, 1995)

(xxiv)   introduced and stressed the fact that witnesses completely debunk and disprove Clement Harris' statements regarding the events the morning of Thursday April 20th, 1995, in the Brownsville Projects, ( Mary Louis Taylor TR-I. Vol 2. pp. 256)) (who specifically impeaches and contradicts Clement Harris' testimony by stating : (i) she never heard any shot gun blasts as reported by Clement Harris, at the projects that evening; and (ii) she never stuck her head out of any door, on the Project housing tier, as Clement Harris alleged she did, at the time of the murders.)

(xxv)    introduced and stressed the fact that witnesses acknowledged that Clement Harris, had engaged in criminal conduct and attempted to hide/bury, destroy evidence of his crimes, on the very Rd. (Allen King rd.) wherein the victim's body was found in Brownsville.((see Sgt Anthony Rankin, Brownsville Police Dept, who took statements from Both Harris and Shelia Bernil, stating that they both had disposed of evidence of their crimes on Allen King Rd. in Brownsville Tennessee)

(xxvi)   introduced and stressed the fact that State witnesses specifically

contradicted and impeached Clement Harris' testimony regarding both the time and place of the murder of Mr. Rice. (see Curtis Johnson; (id); Mary Louis Taylor (id); James Priddy (id.) and Mose Comage (i.d)

(xxvii)  the fact that Asst. Dist.Atty Ted Nueman and the Brownsville Police Department had information regarding men, from Memphis and who were known associates of Mr. Clement Harris, Tracy Taylor, Slouch and the victim were arguing that evening over money and drugs. (see Attached Exhibit #1 Motion for Exculpatory Evidence -Dated 1999

(xxviii) the fact that on the afternoon of Thursday April 20th, 1995, when Brownsville Police Dept. picked up Petitioner Miller for questioning and detained him for questioning, the Police were actively looking for the victims body that was deposited along Allen King Rd, while Petitioner was in the custody of Police[15].

(xxix)  introduced and stressed the fact that the call that was placed to the Brownsville Police Department alerting them to the location of the body was made by some one who had personal knowledge of the facts of the case, (and this persons' identity was withheld by the State) because the victims body was located in a truly isolated and difficult to reach location, and was made at a time while Petitioner Miller was was in physical custody of the B.P.D-*and therefore unable to make such a call.*(see Lt. Blackwell TR-II. pp. 85 L 1); see also Officer Shawn Williams; TR-II. pp. 156, L 15-18)

(xxx)  introduced and stressed the fact that the records of the Brownsville Police Department that revealed that victim was seen arguing with a group of men from Memphis who are known associates of State star witness Mr. Harris

(xxxi)  introduced and stressed the fact that State star witness Mr. Harris committed perjury on the stand, when he testified hat he never was given a deal or preferential treatment by the state in exchange for his testimony;

---

15     The victims, body was discovered wearing white slacks, that were completely dry, despite the fact that the grass, brush and immediate surrounding area was soaking wet due to heavy rain storm down pours, that occurred for almost several hours during the morning and afternoon of Thursday April 20th, 1995, that stopped only roughly 20 to 30 minutes before the victims body was located. Therefore, the victim's body was placed in the location where it was found, no more than a 30 minutes prior to being found by local law enforcement agents. Counsel should have homed in on this critical point that the body was moved while Petitioner was in custody of police. Petitioner Miller got the Brownsville Police Dept around 3.50 pm Thursday April 20th, 1995 (see Johnny Blackburn, pp. 2

(xxxii)    introduced and stressed the fact that State star witness Clement Harris at the very least should have been considered an accomplice in the murders, with the heretofore unidentified co-conspirators accomplices Mr. Tryacey Taylor and Slouch.

458.    Furthermore, this Honorable U.S. District Court needs to look at the fact that there were three major groupings of contradicted impeached testimony, that Jurors were exposed to that would have supported the inference of Mr. Clement Harris' guilt:

**1st Blatant impeachment and contradiction probative of Mr. Harris' Guilt as co-conspirator/accomplice in the Murder of Mr. Rice:**

Clement Harris' testimony:

Clement Harris specifically denied on the stand: (i)  that he was ever in Mr. Rices car on the evening of Wednesday April 19th, 1995; (ii) that he ever bought crack from Mr. Rice that evening.**(Tr. II. Pp 242; L 23)**

However, Chief Johnny Blackburn, specially stated that

Clement Harris stated that on the night in question he did in fact : (i) get into and ride around inside of Mr. Rices car that evening; and (ii) that he purchased a quantity of crack cocaine from Mr. Rice that evening., **(Tr. II. Pp 291;L 10-18)**

**2nd Blatant impeachment and contradiction probative of Mr. Harris' Guilt as co-conspirator/accomplice in the Murder of Mr. Rice:**

Clement Harris' testimony:

Clement Harris specifically testified that Shelia Bernil gave him a ride to the police station at dawn (i.e "..as soon as day broke".)  on the morning of Thursday April 19th, 1995; a few hours after the alleged murder he witnesses**(Tr. II. Pp 242; L 23)**

However, Chief Johnny Blackburn, specially stated that

Clement Harris stated that it was not Shelia Bernil who brought Clement Harris to the station around dawn, but that Haywood County Sheriffs Deputy Billy Blackwell who went and picked up Clement Harris and brought him to the Brownsville Police Department, around 4:00 pm in the afternoon shortly before Petitioner Miller himself arrived **(Tr. II. pp. 273;L 5-7)**

### 3rd Blatant impeachment and contradiction probative of Mr. Harris' Guilt as co-conspirator/accomplice in the Murder of Mr. Rice:

Chief Johnny Blackburn, specially testified that:

After the victim Donald Rice was murdered, the perpetrator of his accomplice took whatever drug related package that was present in Mr. Rices vehicle, because an examination of the vehicle's blood spatter pattern revealed that there was a void created by the package "...laying beside the driver...between the seat and the door area in that area..." (Tr. II. pp. 271;L 9-11)

### 4th Blatant impeachment and contradiction probative of Mr. Harris' Guilt as co-conspirator/accomplice in the Murder of Mr. Rice:

459. Furthermore, we can look to Clement Harris testimony to show that his rank dishonesty and perjury is further corroboration of his guilt in the murder of Dono Rice, when his specific alleged acts on the night in question, are analyzed against the back drop of physical evidence at the alleged scene of the crime.

460. Mr. Harris testified that despite the fact that he had an unobstructed view of the murder and could clearly see both the rear windows and windshields of both Dono's car and Petitioner Miller, upon hearing the shots, he went to the edge of the building "...I was just peeping around the corner..." (Tr. II. Vol pp. 218.)

461. However, this statement is belied by the physical lay out of the Fair ground housing projects. **See Attached Exhibit #25; Photo of Fairground Apartments.**

462. Attached Exhibit #25; Photo of Fairground Apartments shows the perspective that Mr. Harris would have had of the vehicles that evening, *and the true vantage point that the occupants of the Petitioner Miller's vehicle would have also had that evening.*

463. In other words, if Mr. Harris' testimony was to be taken as true and he was sitting in front of the apartments on the other end of the projects from the actual murders, then he couldn't possibly have "..peeped.." around any corner, as he said he did, because the occupants in both of the cars would have been able to clearly see Mr. Harris just as he said he could clearly see them during the shooting. (**See Attached Exhibit #25; Photo of Fairground Apartments.** )

464. Therefore, there is in fact a reasonable basis to conclude that, in view of the totality of the evidence as a whole, the jury at Petitioner Miller's August 2001 second trial, could have reasonably concluded that Mr. Clement Harris was in fact guilty of the murder himself, or at the very least complicit in the murder and was an accomplice along with Tracey Taylor and Slouch, in the murder of Mr. Donald Rice. (i.e. of particular importance was the fact that Mr. Harris was a known drug addict, offering to give a way cocaine [is preferred drug of choice], and the fact

that there was testimony that the victim Mr. Rice, had drugs on him that evening as was looking for the victim, (see Curtis Johnson testimony, (id)).; Furthermore, there is clear cut irrefutable proof that state star witness Clement Harris, lied on the stand regarding whether or not he was ever present in Mr. Rices car that evening engaged in illicit drug deals.)

465. In the State of Tennessee when the facts of the complicity of the witnesses are in dispute and susceptible of different inferences the issue is one of fact for the jury. Ripley v State 22 S.W. 2d. 26 (1950); Conner v. State 531 S.W.2d. 119(Crim.App 1975)

466. Hence, there's a reasonable basis to conclude that, in view of the totality of the evidence as a whole the jury, if give an instruction to consider such, would in fact have considered the possibility of third party guilt; and/or the fact that State Star witness Clement Harris himself was guilty or at the very least was an accomplice/co-conspirator

467. At the August 2001 retrial had the instructions and supporting line of arguments and evidence of both third party guilt and the fact that State Star witness Clement Harris himself was guilty as a principal actor or criminally responsible actor, (i.e. an accomplice/co-conspirator) been given its more probable than not that (i) Petitioner would have received a hung jury, in which case he would not have been

convicted of the premeditated murder of Mr. Donald Rice; or (ii) Petitioner would have been acquitted of the premeditated murder of Mr. Donald Rice; or (iii) perhaps the jury would have found Petitioner guilty of a lesser included offense of Criminal Responsibility for Facilitation for the conduct of another, or any host of other lesser included offenses. (see T.C.A. 39-11-403; See State v. Lewis. "..virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, Facilitation of the felony would be a lesser included offense.." (id 67)

468. This is especially true in light of the fact that due to trial Counsel Houghton's failure to present and/or focus the jury's attention on: (i) any of the aforementioned 33 factual points of impeachment; (ii) the 3rd party guilt theory; (iii) the guilt and/or accomplice status of State star witness Clement Harris; or (iv) the D.A. Memo showing that Mr. Harris' associates from Memphis were seen arguing with the victim earlier that day- the Jurors at Petitioner Miller's 2001 retrial were never able to have their attention properly focused on a truly probative and coherent defense theory.

469. Stated simply due to Counsel Houghton's failures the juror's at the August 2001 retrial were never exposed to or coherently presented with any evidence which tended to prove, evince, or support third party guilt, and Petitioner's innocence of

the actual April 20th 1995 premeditated murder of Donald Rice-which was especially critical during the guilt and innocence phase of Petitioner's trial.

*Petitioner Miller was entitled to instructions on all lesser included offenses as a matter of state law during his 2001 retrial:*

470. In light of the evidence admitted during petitioner's criminal trial had the jury been given alternative instructions for lesser included offenses and 3rd party guilty of Clement Harris, Tracey Taylor and slouch, the outcome of the trial would have been different.

471. In other words, due to trial Counsel Houghton's failure to present and/or focus the jury's attention on: (i) any of the aforementioned 33 factual points of impeachment; (ii) the 3rd party guilt theory; (iii) the guilt and/or accomplice status of State star witness Clement Harris; or (iv) the D.A. Memo showing that Mr. Harris associates were seen arguing with the victim earlier that day-this Court can not definitively say that but for counsel Houghtons' failures the outcome of the trial would not have been different.

472. In light of the evidence discussed above, then Presiding Post Conviction Judge McCraw would not have been able to definitively say that the failure to instruct the Jurors on all lesser included offenses, didn't effect the out come of the proceedings. (ie. in that it's quite possible that the Jurors in Petitioner Miller' 2001 retrial might very well have acquitted Petitioner of greater offense Premeditated

Murder and convicted him instead of the lesser offenses of either Criminal Responsibility for facilitation of Premeditated Murder, Reckless Homicide, Criminally negligent homicide, etc.); see also **State v. Brown., 311 S.W. 3d. 422, 434 (Tenn. 2010);** ("Given the facts in this case.........a reasonable juror might conclude that the petitioner was guilty of second degree murder.." )

473. Following on this same train of thought Counsel Houghton was ineffective for failing to properly request that the Trial Court give an instruction on the lesser included offenses of (i) *Criminal Responsibility for Facilitation of first Degree Premeditated Murder,* (ii) *Facilitation of Second Degree Murder,* (iii) *Reckless Homicide,* (iv) *Criminally negligent Homicide,* etc.

474. In other words, presiding trial Judge Lafferty violated Petitioner's 6th Amend right to a Jury Trial, when he failed to instruct the Jurors on the lesser included offenses of, *inter alia*, Criminal Responsibility for Facilitation of conduct of another as required by T.C.A. § 40-10-108 and State v. Lewis, 978 S.W.2d. 558 (Tenn.Crim.App 1995) which was the controlling case at the time of Petitioner's August 2001 retrial.

*Lesser included offenses:* *Facilitation of first Degree Premeditated Murder via the Cancellation rule*

475. During Petitioner's August 2001 retrial then-presiding Judge Lafferty, in refusing

to give an instruction on Criminal responsibility and Facilitation, stated:

"...I just feel that the way Mr. Harris testified that he didn't leave any doubt in anybody's mind that his opinion was that it was Petitioner ..." (Tr.II vol 4; P 526, L 16-20)

476. However, this was both an erroneous finding of fact and conclusion of law because, at no time during his direct examination nor cross examination did Mr Clement Harris specifically state that he saw Petitioner Miller actually hold the shot gun and fire it at Mr. Rice.

477. In other words, during the August 2001 retrial Mr. Harris actually testified that:

A.  "..I seen when they stuck the gun out of his car window into Dono's[the victims] car and fired.."
Q.  Did you see any one holding the gun.
A.  No more than it was held out window.." (p 218 L. 21-22);.
Q.  You had not seen Dwight [Miller] with the gun had you?.
A.  No ma'am.." (Tr. II, p 239 L. 4-6);.

478. In yet another exchange Mr. Harris says he only saw the gun and the "..blast" not the "shooter" at the time of the blast. (id. L 7-24).

479. However, at Petitioner Miller's original August 1996 trial, star witness Clement Harris was even more detailed and explicit in his denials of Petitioner Miller's direct culpability as the shooter.

480. Indeed in 1996 Mr. Clement Harris testified under oath that:

A.  "... here, Donald." And Donald pulled back up. And that's when I heard – I seen the gun fire come out of the car into Donald's car. And I went down on the end and peeked around the [corner]..
Q:  And what did you see then?
A:  I seen him – the guy in Donald's car pushed him over -
Q.  Who did that?

| | |
|---|---|
| A: | **I don't know – I wouldn't know**. I couldn't say who was (inaudible) them or the other guy with him. |
| Q: | Did you see who had the gun? |
| A: | **No, mam. But like I said, they went out of the car.** (inaudible). |
| Q: | So your saying you saw a gun shot blast go from Dwight's car to Donald's car? |
| A: | Yes, mam. |
| Q: | **Did you ever see anyone holding a gun?** |
| A: | **No, mam.** |
| Q: | **Don't know who was holding the gun?** |
| A: | **No, mam.** |
| Q: | And then you started peeping, which I can understand – when you peep around, tell me again what you saw. **Someone push Donald over**? |
| A: | Yes, mam. |
| Q: | **But were you able to tell who that was**? |
| A: | I don't know which one it was. But they pushed him over in -- (TE., vol I; pp. 37,38) |

481.  As if the foregoing weren't enough, if one were to actually look specifically at Mr.

Harris' original hand written statement given on the actual day of the murder, it

would be even more revealing in terms of his lack of detailed knowledge and

understanding of the events surrounding Mr. Rice's murder.

482.  Indeed Mr. Harris actually wrote:

"...Both men got out of the car and pushed him [Mr. Rice] over. One got in Dono's car and the[n] both drove off. I didn't [see] who drove Dono's car...." **see Attached Exhibit #26   Original Statement of Clement   T. Harris ; Dated April 20th, 1995, p. 5: L 2-4**

483.  Therefore, contrary to Judge Lafferty's conclusions, based on a plain and objective

review of the actual statements given by Mr. Harris,  there were serious  "doubts"

that would have been "...left in [any] body's mind. That his opinion was that it was

petitioner .." (Tr.II vol 4; P 526, L 16-20) who actually fired the shot that took the

he early morning hours of McDonald Rice during he early morning hours of April 20th, 1995.

484. In other words, Judge Lafferty basically held that: (i) Clement Harris' testimony was direct and unequivocal that he saw Petitioner Miller shoot Mr. Rice and then get behind the steering wheel, while pushing the victims body over; and therefore (ii) since there was no evidence from which a rational juror could infer that somebody else killed the victim, there was no lawful basis to instruct the jury that they could find Petitioner Miller guilty of being criminally responsible for facilitating the conduct of another in the murder of Donald Rice.

485. However, a careful and accurate review of Mr. Clement Harris' testimony reveals that these two conclusions are not only wrong and factually incorrect, but contradicted by the record of Harris' actual: (i) extrajudicial hand written original statement; and (ii) his sworn testimony given at both the original August 1996 trial and the 2001 retrial.

486. Indeed Mr. Clement Harris himself testified under oath that he did not see *who actually shot the victim* or ***who actual pushed the victim over and drove the his car away.***

487. Or stated another way, Mr. Clement Harris' testimony allows a rational juror to conclude that at most Petitioner Miller was sitting in a vehicle driven by an unknown assailant who both shot and killed Donald Rice and then stole the victims car and drove it from the Fair Grounds projects.

488. Petitioner avers that the facts of his case are quite similar to those of Dickerson v. State, 2013 Tenn. Crim. App. LEXIS 171; No. M2011-00644-CCA-R3-PC.

489. This was a rather unique case wherein a Post Conviction Petitioner named Shundell Lynn Dickerson asserted that his appellate counsel's performance was deficient because he failed to properly argue that there was "no evidence presented at trial that [Petitioner] knew another intended to kill [the victim Eric Johnson], a required element" of the offense of facilitation, for which Petitioner Dickerson was convicted.

490. In other words, Petitioner Dickerson arued that there was no evidence from which a rational juror could have inferred that he was criminally responsible for facilitating the October 19th, 2003 first degree murder of Eric Johnson, outside a Nashville Tennessee shopping mall.

491. In his attempts to obtain Post Conviction relief Petitioner Dickerson highlighted appellate counsel's testimony at the post-conviction hearing that he did not recall any evidence being presented at trial that Dickerson knew another intended to kill the victim.

492. The Court then set about analyzing whether the evidence at Shundell Dickerson's trial was sufficient to support his conviction for facilitation of first degree murder; and in up holding Dickerson's conviction the Court of Criminal Appeals found:

The offense of facilitation requires that a defendant, without the intent to promote or assist in the commission of the offense, knowingly furnishes substantial assistance in the commission of the offense and that the defendant knew the other person intended to commit the offense. Tenn. Code Ann. 39-11-403(a). The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn.1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. 39-13-202(d). In order to support Petitioner's conviction for facilitation of first degree murder, the evidence must establish that Petitioner knew that another person intended to commit premeditated murder and that Petitioner furnished substantial assistance in the commission of the offense. See id.

The proof clearly establishes that the murder was premeditated. Viewed in the light most favorable to the State, a vehicle with at least two individuals inside drove up to where the victims were standing in a parking lot and stopped. At least one gunman fired multiple shots at the victims, and the car then fled the scene. The proof establishes that two weapons were fired, and one of the weapons was used by Petitioner five days after the murder when he shot at Ms. Frierson's television. The State argues that the jury could have reasonably concluded that Petitioner assisted in the murder of Eric Johnson. The evidence that the State relies upon in its assertion that there was proof of facilitation is Ms. *Thompson's testimony that she saw two men inside the shooter's car and that one of them was firing a gun*; Ms. Douglass' testimony that she also saw two men in the car fleeing the parking lot after she heard gunshots; and Ms. Frierson's testimony that Petitioner told her he was with "a couple of his home boys" when Johnson was killed. T*he State further asserts that the jury could have found Petitioner's confessions to Frierson and Terrence Gregory, that he killed Mr. Johnson, not credible.*

**We conclude that although the proof of facilitation is not overwhelming, the jury could have inferred that Petitioner was the second individual in the car, but that he was not the shooter;** ............Two witnesses testified that there were two people inside the shooter's car. Ballistics evidence showed that Petitioner was in possession of one of the murder weapons four days after the murder. (id)

493. Likewise, in the case at bar the only evidence, that Petitioner Miller shot the

deceased Mr. Donald rice was the highly incredible and contradictory evidence of

Clement Harris, who at the original 1996 trial, testified under oath that he never

actually saw Petitioner Miller personally stick the shotgun out the drivers side window and that he wasn't sure who fired the weapon into the victim's car.

494. Then at the subsequent retrial in August 2001 during both direct and cross examination, he still maintained that he did not actually see who was holding the gun when it fired, and the only thing he could directly observe see was "blast form the shot gun" and "fire".

495. Furthermore, Mr. Harris, did in fact change his testimony at the 2001 retrial by saying that on the night in question he did in fact see Petitioner Miller get behind the wheel of Mr. Rice's vehicle while pushing the victims body over in to the passenger seat, and then drove the victims car away[16].

496. Whereas at the original 1996 trial 5 years earlier Clement Harris testified under oath that he did not see who got into the victim's car and while pushing the victim's body over into the passenger seat, and drove the victim's car away.

> Q.  ..... **Someone push Donald over**?
> A:  Yes, mam.
> Q:  **But were you able to tell who that was**?
> A:  I don't know which one it was. **(Original 1996 Trial; TE., vol I; pp. 37,38;)**

---

16    However, even assuming that Jurors believed that Petition Miller got behind the wheel in Dono's car, this still would only count as facilitation under **T.C.A §39-13-403**, and not Criminal Responsibility under **T.C.A §39-13-402**,. This is because Petitioner Miller was charged with Premeditated Murder, not felony murder by way of robbery or car theft. Thus, driving the car away didn't help promote the premeditated murder, for it was already complete and finished by the time Petitioner would have gotten behind the wheel.

> "...Both men got out of the car and pushed him [Mr. Rice] over. One got in Dono's car and the[n] both drove off. I didn't [see] who drove Dono's car...." **see Attached Exhibit #26  Original Statement of Clement  T. Harris ; Dated April 20th, 1995, p. 5: L 2-4**

497. It is a rule of law in Tennessee that contradictory statements by a witness in connection with the same fact cancel each other. Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978).

498. In Johnson v. Cincinnati N.O. & T.P. Ry. Co. 146 Tenn. 135, 240 S.W. 429, 436 (Tenn. 1922),  the court explained:

> The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies. But if the proof of the fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.(id 436)

499. In the case sub judicie, Clement Harris' inconsistent testimony was never explained and neither was there ever any independent corroboration of Petitioner Miller's murder. (i.e. the shotgun that was found in Petitioner's house, was located only after Miller directly told Law enforcement of it's location; and it was never forensically determined to have been the murder weapon.)

500. Furthermore, the Shot shell  were never forensically determined to have been the shells that were used in the fatal shooting of the victim Donald Rice. [see Testimony Dr. O.C. Smith; (**Tr. II ; pp. 360-362)**]

501. In light of *Dickerson* (supra) and the cancellation rule in *Johnson* (supra) there was evidence from which a rational juror could have found the elements of facilitation of the murder of Donald Rice, under Tennessee State law.

502. Furthermore, there was a basis to assume that even absent the cancellation rule, the testimony of Mr. Clement Harris could have supported an instruction on criminal responsibility for facilitation; and a finding that Mr. Harris himself could have been considered an accomplice as a matter of state law.

**PERMISSIBLE INFERENCES BASED ON INFERENCES:**

503. An inference is generally regarded as a permissible deduction[17] from evidence which a jury may accept or reject or accord such probative value as it desires. Bell Cab v. Slaon 246 S.W. 2d. 41, 44 (1952). Although a jury can permissibly draw an inference from the evidence before it, whether direct or circumstantial, it is used to be well settled in Tennessee that an inference cannot be properly drawn from another inference.

504. However, this view has been totally abandoned and modified in the State of Tennessee. Indeed our courts have found that:

---

17     What is meant by this rule is that "[a]n inference can be drawn only from the facts in evidence and cannot be based on surmise, speculation, conjecture or guess, it must be reasonably drawn from, and supported by , the facts on which it purports to rest, and must be made in according with correct and common modes of reasoning.." Edenton v. McKelvey, 212 S.W. 616, 618 (Tenn App. 1984). Benton v. Snyder 825 S.W. 2d. 409, 415 (Tenn. 1992). Patton v. L. O. Brayton & Co 201 S W 2D 981 984 (1947) (quoting 32 C.J.S. Evidence, 1044, 1942).

> "...the rule is unworkable because all reasoning must proceed upon a series of inferences, and in everyday life all men frequently act as the result of the repeated piling of inferences upon inferences...Another criticism is that the rule has been used carelessly and inaccurately by the courts as a convenient way of disposing of evidence which it regarded as too remote or uncertain to prove the ultimate facts at issue...." New York Life Inc. Co. v McNeely 52 Ariz. 181, (1938); see also *Modern Status of rule Against Basing an Inference upon an Inference or a presumption upon presumption*; **5 A.L.R. 3Rd 100, 120-131 (1966).**

505. Tennessee has qualified the general rule by adopting a rule that a fact may be inferred from circumstantial evidence, and from the fact thus inferred, another fact may be inferred without contravening the rule that an inference cannot be based upon an inference.

506. What is meant by this rule is that " a 'fact' although arrived at by indirect or circumstantial evidence which is "of such a character and so strong that it justifies a conclusion or a finding of fact which become a proper basis for another inference." Benton (supra, id); see also Nashville Gas & Heating Co. v. Phillips, 69 S.W.2d. 914 (Tenn. 1934)

507. This standard of inferences supporting inferences has been applied to and affirmed in both civil and criminal cases, in our great State of Tennessee.

508. In support of these reasonable inferences, which can be drawn from other inferences or sufficient evidence, we can look at State v. Carie, 2001 Tenn.Crim.App. Lexix 788 (Oct. 1, 2001).

509. In this case the court summarized the pertinent facts as follows:

In March 21 , 1998, the employees of Houdeshell tire, an auto-repair business

in Brentwood, Tennessee arrived at work to find a break-in had occurred while the business was closed overnight. Tools belonging to several employees were stolen.......the apparent point of entry was the bottom left panel of a door to the service bay, which had been damaged. The police concluded the panel was kicked and then pushed in to allow entry into the building. The police conducted an investigation and found a shoe print and five fingerprints close together on the panel. The fingerprints were later identified as belonging to the defendant....."

In this case, the trial court properly arrived at a fact, that the defendant entered the business, through circumstantial evidence, the defendant's fingerprints found on the damaged panel of the door. We conclude the trial court's finding that the defendant committed the burglary was also sufficient to properly support the inference that the defendant committed the theft as well. (id)

510. Thus, we can clearly see that in Carie (supra), the defendant argued that the trial court inferred the defendant's fingerprints were left on the door at the time of the burglary and then, <u>based on that inference</u>, improperly inferred that Carie, entered the building through the panel and stole the tools, and thus committed a theft.

511. This argument, was clearly rebuffed and rejected by the Court of Criminal Appeals, because a fact may be inferred from circumstantial evidence and from the fact thus inferred, another fact may be inferred[18]. Benton. v. Snyder 825 S.W. 2d 409, 415 (Tenn. 1992).

512. In returning to the facts of the case *sub judice*, it's beyond dispute that at Petitioner

---

[18] Once, again, the finder of fact may arrive at ".. a fact." by indirect or circumstantial evidence which is "of such a character and so strong that it justifies a conclusion or a finding of fact which becomes <u>a proper basis for another</u> inference....." (.id) then, this fact may serve as a basis for yet another inference.

The inferences remain operable and may be considered by the jury. See **Graham v. State, 404 S.W. 2d. 475, 478 (Tenn. 1966)** (approving the rule that 'a fact may be inferred from circumstantial evidence and such fact may be the basis of further inference to the ultimate or sought-for fact..." such that the jury may 'accept or reject or accord such probative value as it desires' " State v. Tomes, 1997 Tenn. Crim. App. Lexis 777, (Aug 20, 1997)

Miller's August 2001 retrial there was circumstantial evidence that would have supported the reasonable inference in the mind of the juror's that at most, Petitioner Miller was criminally responsible for facilitating the murder of Donald Rice.

513. Indeed, a rational juror could have looked at the existence of the following summary of evidence, to reach such a conclusion:

(a.) Mr. Clement Harris did not testify that he actually saw Petitioner personally fire the fatal shot that took the life of Mr. Rice.

(b.) Mr. Clement Harris testified that he was not sure who actually fired the fatal shot that took the life of Mr. Rice.

(c.) Mr. Clement Harris gave inherently contradictory and self defeating testimony, by testifying that Petitioner Miller simultaneously was guilty and not guilty, at the same time, of getting into the victims vehicle and pushing Mr. Rice's body over, in order to drive the vehicle away

(d.) there were multiple unidentified footprints and finger prints, found at the scene and in the vehicle itself, that did not match Petitioner Miller.

(e.) There was a missing package, probably containing drugs, left by the blood spatter pattern, (J. Blackburn Testimony)

(f.) the fact that witnesses testified that Clement Harris, had implicated himself as a suspect in the murder of the victim Mr. Donald Rice. (see Sam Ethel Williams, TR-I. pp. 298-300)

(g.) the fact that Mr. James Jesse Jones gave a description of a perpetrator who looked liked Clement Harris, dropping off the victim's car on Iola St. at 5:45 am, on the morning of the murders. ( see Jesse Jones, TR-II. pp. 498, L 24)

(h.) the fact that Clement Harris' finger prints, (as opposed to merely his palm prints) *were never excluded* as a potential match, to the unidentified prints found in Mr. Rice's vehicle.(see Hoty Phillip, TR-II. pp. 416, L 1-11)

(i.) Constance Howard testified that Petitioner Millers clothes and car tested negative for any trace evidence, DNA or fibers in any way related to the murder of Mr. Rice. (see Hoty Phillip, TR-II. pp. 341, L 17-22)

514. Thus, the above cited list of exculpatory facts and evidence clearly evinces that it's more probable than not that had the Jurors been exposed to this additional information regarding these exculpatory factual points of impeachment-(i) they wouldn't have found the Petitioner Miller guilty of 1st Degree Premeditated Murder at the August 2001 retrial; or (ii) the *they could have, if given the option, found him guilty of facilitation of 1st Degree murder*. (**See Attached Exhibit #28; Compiled list of 33 exculpatory factual points of impeachment, that Trial Counsel Perianne S. Houghton failed to present and argue at the August 2001 retrial**)

515. Petitioner must reiterate that *the actual guilt or Innocence of the Petitioner is utterly irrelevant* for the purposes of the instant Post conviction claim, because the only (2) things that are dispositive of whether or not Petitioner is entitled to relief are: (i) *the reasonable inferences that the Jurors could have been drawn from the evidence,* presented (or the inferences that, but for counsels ineffectiveness, could have been reasonably drawn if the proper evidence had been introduced,); and (ii) the result this had on lesser included offense instructions, in the context of the likelihood of a different outcome had they been properly requested and given.

516. Despite the fact that you had testimony from state witnesses *that was inculpatory,*

this in and of itself, is not despositive of whether Petitioner could have been convicted of a lesser included offense.

517. Indeed witnesses such as Clement Harris (the State's sole eye witness, and principle support for their theory), Shelia Bernil, Kathy Blackwell, Nina Champion, all gave primarily inculpatory testimony.

518. However, Petitioner must reiterate that this *inculpatory testimony,* in and of itself, is not dispositive of: (i) whether Petitioner could have been convicted of a lesser included offense; or (ii) whether trial Counsel Houghton was ineffective for failing to properly request these lesser included offense instructions.; or (iii) properly challenge the trial courts failure to give them.

519. Indeed this Honorable Court must remember that "It is the jury's function to credit or discredit all or part of the testimony....the jury was not compelled wholly to accept or wholly to reject the [witnesses testimony]...it was entitled to credit part of his testimony and discredit the balance...." Moore v Chesapeake & O.Ry.Co., 340 U.S. 573, 576 & 579; 71 S.Ct. 428; (U.S. Va 1951); see also "...when the testimony of a witness is not believed , the trier of fact may simply disregard it..." Bose Corp. vs. Consumers Union of U.S. Inc., 466 U.S. 485, 512;

520. For instance in support of the State' prosecutorial theory they put on the testimony of Clement Harris, who testified that some one: (i) Pointed a shot gun out of the

drivers side window, and shot the deceased in the face. (**Tr. Vol 1 of 4, pp. 218**); and then got into the victims car and drove away.

521. However, even assuming that one could argue that a reasonable inference is that this person was Petitioner Miller, Clement Harris never actually stated that he saw Petitioner fire the fatal shot[19].

522. Despite the apparent allure of this supposed direct evidence of Petitioner's guilt the jurors at the August 2001 retrial would have been categorically rejected and thoroughly impeached, had counsel Houghton diligently pursued a vigorous defense which incorporated all of the above referenced exculpatory points of factual impeachment. see [**Attached Exhibit #13 Compiled list of exculpatory factual points of impeachment, that Trial Counsel Perianne S. Houghton failed to present and argue at the August 2001 retrial**]

523. Indeed, the testimony of Clement Harris, notwithstanding, there were a myriad of facts developed during Petitioner's trial, all of which would have supported the

---

19      Clement Harris, at the original 1996 trial, testified under oath that he never actually saw Petitioner Miller personally stick the shotgun out the drivers side and that he wasn't sure who fired the weapon into the victims car, and at the subsequent retrial in August 2001 during both direct and cross examination, he still maintained that he still did not actually see who was holding the gun when it fired. Furthermore, while Mr. Harris, did in fact change his testimony at the 2001 retrial by saying that on the night in question he did in fact see Petitioner Miller get behind the wheel of Mr. Rice's vehicle. At the original 1996 trial, 5 years earlier, he testified under oath that he did not see Miller do this. [Q. ..... **Someone push Donald over**?. A:   Yes, mam.; Q:   **But were you able to tell who that was**? A:   *I don't know which one it was*. (Original 1996 Trial; TE., vol I; pp. 37,38;)

reasonable inference, in the mind of the jurors, that this particular State witness Clement Harris, was dishonest and his testimony was inherently untrustworthy[20], and as a result "...the jury was not compelled wholly to accept or wholly to reject the [witnesses testimony]...it was entitled to credit part of his testimony and discredit the balance...." Moore v Chesapeake & O.Ry.Co., 340 U.S. 573, 576 & 579; 71 S.Ct. 428; (U.S. Va 1951)

524. However, to continue expounding upon the contours of the reasonable and permissible deductions from this evidence, one such inference is that there were multiple person's, -inside the car at or near the time that the victim was killed-and thus these individuals were perpetrators of this horrific crime. (ie. there was circumstantial evidence: [i] multiple unidentified finger prints, found in the victim's vehicle; [ii] Mr. Clement Harris' finger prints, as opposed to his palm

---

[20]     This testimony notwithstanding, a reasonable juror could have chose to discount this testimony as inherently incredible/false in light of the fact that: (i) There was witness testimony, purposely withheld from the defense, that Victim was involved in a fight/argument with individuals from Memphis, who were known associates of State Star Witness Clement Harris; (ii) Clemont Harris was disposing of evidence of a crime on the same street where the victim was found.; (iii) Clemont Harris' testimony was particularly incredible both as a matter of law and common sense; (iv)   Mr. Harris was contradicted and impeached by several witnesses, including three different State witnesses, not merely defense witnesses.; (v) it's much more likely that the jurors would have simply regarded Mr. Harris testimony for what it was: a desperate attempt by a career criminal, drug addict, save himself from becoming a focus of an investigation of a murder that he was up to his neck in; (vi) it's much more likely that the jurors would have simply regarded Mr. Harris testimony for what it was: a desperate attempt by a career criminal, drug addict, to receive favorable treatment by the D.A.'s office for his own crimes, which the "...the jury was not compelled wholly to accept or wholly to reject the [witnesses testimony]...it was entitled to credit part of his testimony and discredit the balance...." **Moore v Chesapeake & O.Ry.Co., 340 U.S. 573, 576 & 579; 71 S.Ct. 428; (U.S. Va 1951)**

prints, were never excluded as a possible match. Only his palm prints were compared to those found in the vehicle. Therefore, to this day, Mr. Harris' finger prints were never compared to nor excluded as a possible match to those prints found in the Mr. Rices vehicle after the shooting[21].)

525. Indeed based on the facts of Petitioner's case, there is evidence from which a rational juror could have reasonably found that Petitioner, while lacking the intent to promote or assist in the commission of the offense of 1ˢᵗ degree premeditated murder (pursuant to **Tenn.Code Ann. § 39-11-402(2)**, *Criminal Responsibility for the Conduct of Another,)* Petitioner did in fact, render substantial assistance, pursuant to **Tenn.Code Ann. § 39-11-403** *Criminal Responsibility for Facilitation of the Conduct of another.* See **State v. Allen, 69 S.W. 3d. 181,189 (Tenn 2002)**

526. Or Stated another way, this Court can not definitively say that the failure to instruct the Jurors on (i) *Criminal Responsibility for Facilitation of first Degree Premeditated Murder,* (ii) *Criminal Responsibility for 2ⁿᵈ Degree Murder,* (iii) *Facilitation of 2ⁿᵈ degree Murder,* etc.. didn't effect the out come of the proceedings. ("Given that the evidence supported a jury instruction on facilitation of Premeditated Murder ... we find that the trial court erred in refusing to provide

---

21      yet this is exactly what the jurors at Petitioner Millers August 2001 retrial were mislead to believe. That Mr. Harris' finger prints were excluded as a possible match, when they never were; because only his Palm prints were tested not his finger prints.

one...") State v. Thomas 2004 WL. 370297, *54 (Tenn.Crim.App. 2004);

527. Petitioner avers that the circumstances of his case are virtually indistinguishable from those in State v. Zimmerman, 823 S.W. 2.d. 220, 225 (Crim.App. 1991), wherein, the Court of Criminal Appeals, in reversing Defendant Zimmerman's conviction for second degree murder stated:

> "It may be that none of these three areas of deficient performance, standing alone, would have justified the grant[ing] of a new trial. Yet, we think that the cumulative effect of these errors deprived the defendant of a meaningful defense. The reliability of the verdict is in question. *__We reiterate that these circumstances may not have justified an acquittal__*; there is considerable evidence indicating guilt of the crime charged. There is, however a thin line between second degree murder and voluntary manslaughter. *Had the defendant's proof been presented to the jury, as planned, there is a reasonable probability that the results would have been more favorable to the defendant*...The judgment is reversed. The matter is remanded for new trial.." (id 228)

### *Lesser included offenses:   Reckless Homicide and Criminally Negligent Homicide*

528. Continuing along this analytical path, Petitioner would point out that Trial Counsel Houghton failed to invoked the requirements of State v. Ely, (supra) wherein the Court of Criminal Appeals discussed the cases of two different criminal defendants, to wit: (i) Laconia Lamar Bowers ; and (ii) Curtis Jason Ely.

529. The central point of contention was whether or not  second degree murder, reckless homicide, and criminally negligent homicide, where lesser included offenses of 1st degree murder, and in concluding that they were, the Tennessee Court of Criminal Appeals held that

After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test.5.."(id 721,722)

.......The evidence in this case includes testimony by Artis Bonner that the face he saw in the window of the van at the time the victim was shot was that of the {48 S.W.3d 724} defendant Bowers. A careful review of the evidence shows that the likely motive for the shooting in this case stemmed from a drug deal gone bad, and that the likely target of this shooting was Bonner, not Whatmough. Nevertheless, the law is well settled that criminal liability is the same regardless of whether the third-party victim is unintended. See Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999). The evidence shows that the defendant aimed and fired a handgun in the general direction of a van containing three people. Such conduct clearly falls within the definition of knowing conduct because Bowers had to be aware that he was reasonably certain to strike and kill one of those people. We therefore conclude that the evidence was sufficient to support a conviction for second degree murder. It was entirely proper for the trial court to instruct the jury on that offense and on the lesser offenses of reckless homicide and criminally negligent homicide under the principles and procedures espoused in Burns. Bowers's conviction for second degree murder is therefore affirmed.

[with respect to Ely]

Our review of the record leads us to conclude that there was, however, sufficient evidence from which reasonable jurors could have convicted Ely of second degree murder, reckless homicide, or criminally negligent homicide. If the jury believed that Ely was present, it may have reasonably concluded that his actions in either repeatedly striking the victim over the head with a brick, or assisting co-defendant Carden as he did so, constituted at least criminally negligent homicide, reckless homicide, or second degree murder. Certainly one who participates in beating another person over the head with a brick "ought to be aware of a substantial {48 S.W.3d 725} and unjustifiable risk [death] will occur." If the jury believed this theory of the offense, it could have convicted Ely of criminally negligent homicide. Tenn. Code Ann. 39-11-302(d) . Alternatively, an ordinary person engaging in such conduct would be aware of the "substantial and unjustifiable risk that [death] will occur." If the jury believed that Ely was aware of, but consciously disregarded, such risk, it could have convicted him of reckless homicide. Tenn. Code Ann. 39-11-302(c) . Similarly, participation in beating a victim over the head with a brick is conduct "reasonably certain to cause [death]." Tenn. Code Ann. 39-11-302(b) . If the jury believed that Ely was aware ... that [his]

conduct [was] reasonably certain to cause [death]," i.e., a knowing killing, it may have convicted him of second degree murder. We believe that a conviction for any of these three lesser-included offenses was supported by the evidence, and that failure to instruct these offenses was error.
....After careful consideration of the law and the facts presented in these cases, we conclude that facilitation, second degree murder, reckless homicide, and criminally negligent homicide are lesser- included offenses of felony murder. In Ely's case, the evidence supported instruction on the lesser offenses of second degree murder, reckless homicide, and criminally negligent homicide. Therefore, the failure to give such lesser-included offense instructions was error. We conclude that this error is not harmless beyond a reasonable doubt, {48 S.W.3d 728} and we reverse Ely's conviction and remand his case for a new trial. In Bowers's case, because the evidence supports a finding of a knowing killing, we conclude that the trial court properly instructed the jury on the lesser-included offense of second degree murder. Accordingly, we affirm Bowers's conviction for second degree murder.(id. 728)

530. Just as in Zimmerman, (supra) in Petitioner Miller' case, it did not matter that there was some evidence of guilt that a reasonable juror could have relied upon to sustain a conviction for First Degree Premeditated Murder, because that same reasonable juror could have looked at the same facts and evidence of the case and just as easily concluded that Petitioner was guilty of some other lesser included offense, (ie. (i) *Facilitation of first Degree Premeditated Murder,* (ii) *Criminal Responsibility for 2nd Degree Murder,* (iii) *Facilitation of 2nd degree Murder,* (iv) *Reckless Homicide;* (v) *Criminally negligent Homicide, etc...*).

531. Indeed a plain reading of *Ely,* would show that if Post Conviction Counsel Banks had substituted the facts of Petitioner Miller's case with those of *Ely,* in a coherent argument made at Petitioner's August 19th, 2014 evidentiary hearing, this would have forced Post Conviction Judge McCraw to conclude that:

"..... there was, however, sufficient evidence from which reasonable jurors could have convicted *[Petitioner Miller]* of second degree murder, reckless homicide, or criminally negligent homicide. If the jury believed that *[Petitioner Miller]* was present, it may have reasonably concluded that his actions in either ..... *[shooting the victim in the face].. with a [shot gun]* ..., or assisting co-defendant *[i.e. unidentified man who accompanied him]* as he did so, constituted at least criminally negligent homicide, reckless homicide, or second degree murder. Certainly one who participates in *[shooting the victim in the face].. with a [shot gun]* ....'ought to be aware of a substantial and unjustifiable risk [death] will occur.' If the jury believed this theory of the offense, it could have convicted *[Petitioner Miller]* of criminally negligent homicide. Tenn. Code Ann. 39-11-302(d) . Alternatively, an ordinary person engaging in such conduct would be aware of the "substantial and unjustifiable risk that [death] will occur." If the jury believed that [Petitioner] was aware of, but consciously disregarded, such risk, it could have convicted him of reckless homicide. Tenn. Code Ann. 39-11-302(c) . Similarly, participation in *[shooting the victim in the face].. with a [shot gun]* ... is conduct "reasonably certain to cause [death]." Tenn. Code Ann. 39-11-302(b) . If the jury believed that *[Petitioner Miller]* was "aware . . . that [his] conduct [was] reasonably certain to cause [death]," i.e., a knowing killing, it may have convicted him of *[facilitation of]* second degree murder. We believe that a conviction for any of these three lesser-included offenses was supported by the evidence, and that failure to instruct these offenses was error. .." [quote from *Ely* with specific factual substitution, based on the facts of Petitioner Millers 2001 retrial.(id.)]

532. Based on the foregoing, its beyond question that Petitioner Miller' has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived

of his right to a full and fair jury trial[22], (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

533. Indeed, Petitioner Miller has met the second prong for prejudice, in that there is a _reasonable probability_ that but for counsel's unprofessional errors: "..the result of the proceeding _would have been different_....not that _it necessarily would have been different_....[in other words] ..the probable result need not be an acquittal. A **_reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland_**....." State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

534. Furthermore, based on a plain and clear reading of the decisions of _Zimmerman_ (supra) _Thomas_ (supra), _Wiley_ (supra)_, and Ely_ (supra), Petitioner Miller has clearly demonstrated that Trial Counsel Houghton rendered ineffective assistance of Counsel by failing to effectively argue that Judge Lafferty violated Petitioner's 6th Amend right to a Jury Trial, when he failed to instruct the Jurors on the lesser included offense of Criminal Responsibility for Facilitation of conduct of another

---

22    The well established law of this state recognizes that the right to lesser -included offense instructions derives not only from statutory law, but also from the right to trial be jury as embodied at **Tenn. Const.Art I, Sec. 6**, which provides that "the right of trial by jury shall remain inviolate" Wiley (id. at 430)

as required by T.C.A. § 40-10-108 and State v. Lewis, 978 S.W.2d. 558 (Tenn.Crim.App 1995) which was the controlling case at the time of Petitioner's Augusnt 2001 retrial.

535. Thus, its been conclusively established that based on the foregoing, Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

536. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a _reasonable probability_ that but for counsel's unprofessional errors [*in failing to properly argue that the cancellation rule in the State of Tennessee, militated against Judge L. T. Lafferty's adverse ruling on jury instructions for facilitation of 1st degree murder*] .....the result of the proceeding *would* **have been different**....." Tears, (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8th. Cir. 1990)

537. In addition to the foregoing reason, Petitioner Miller, at his Post Conviction

evidentiary hearing, would have ***also*** met the second prong for prejudice, in that

there is a <u>*reasonable probability*</u> that but for counsel's unprofessional errors [*in*

*failing to properly argue Petitioner was entitled to the Lesser included offense*

*instructions pursuant to <u>Ely</u>, and <u>Burns</u>*].....**the result of the proceeding would**

**have been different.....**" *Tears,* (id); see also State v. Zimmerman, 823 S.W. 2d.

220, 225 (Crim. App. 1991) citing Chambers v Armontrout,, 907 F. 2d. 825, 832

(8th. Cir. 1990)

538.  In addition to the foregoing reasons, Petitioner Miller, at his Post Conviction

evidentiary hearing, would have ***also*** met the second prong for prejudice, in that

there is a <u>*reasonable probability*</u> that but for counsel's unprofessional errors [*in*

*failing to give fact based and logically consistent closing and opening arguments*

*based on the 33 exculpatory factual points of impeachment which thoroughly*

*proved and persuasively supported: (i) Petitioner Miller's innocence; and (ii)*

*third party guilt which focused on Clement Harris, Tracey Taylor, and*

*Slouch.*].....**the result of the proceeding would have been different.....**" *Tears,*

(id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991)

citing Chambers v Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

539.  Petitioner avers that all of the above referenced evidence (i.e attached exhibits,

arguments, factual averments etc..) if presented at an evidentiary hearing in

support of **claims (XVII) -(XXVI)** in the instant **28 § U.S.C. 2254** "would resolve a factual dispute". (i.e. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law, had Post conviction Counsel Banks properly presented these lines of arguments and supporting evidence, in order to prove Trial Counsel Houghtons' ineffectiveness)

540. Thus, Petitioner Miller has clearly shown, in support of **claims (XVII) -(XXVI)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Zimmerman* (supra) *Thomas* (supra), *Wiley* (supra), *and Ely* (supra), he would have been entitled to Post Conviction relief, had Post Conviction Counsel J. Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

# IV. SPECIFIC CLAIMS (XXVII)-(XXVIII) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:-

*failure to properly challenge prejudicial admission of prior bad acts*

**(XXVII)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that admission of prior bad acts, was done in direct violation of Tenn.R.Evid. Rule 404(b) and therefore violated Petitioner's due process rights at the August 2001 retrial.

**(XXVIII)** Trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that admission of prior bad acts, was done in direct violation of Tenn.R.Evid. Rule 404(b) and therefore violated Petitioner's due process rights at the August 2001 retrial.

541. The following facts and arguments are being offered in support of the substantial Constitutional Claim, **(XXVIII)** and procedural gateway claim **(XXVII)**

542. Petitioner avers that during his August 2001 retrial, state witness Shelia Bernil, Clement Harris and Kathy Blackwell were all allowed to give testimony to the jury regarding prior bad acts supposedly committed by Petitioner Miller.

543. For instance, Mr. Blackwell was able to tell the jurors that she drove to meet Petitioner Miller at the Fairgrounds, to purchase some crack cocaine, at which time Petitioner Miller stole her $35 dollars and then gave her some crack, while cursing at her. (Tr. II. Vol III, pp. 328-353)

544. There was nothing presented by the State at Petitioner's August 2001 retrial, that had any thing to do with Petitioner Miller "stealing money" or "dealing crack", in any way remotely relevant to the victim's death.

545. Indeed not one time the State make reference to a single motive or reason, why Petitioner would have shot Mr. Rice.

546. Therefore, there was absolutely no reason to introduce any evidence whatsoever of a single prior bad act committed by Petitioner Miller.

547. Thus, the introduction of any reference to any crack dealing or theft of money was irrelevant and highly prejudicial, and would have required a reversal of the conviction had Trial Counsel Houghton brought it up in a motion for new trial.

548. In State v. Adkinson, 899 S.W.2d 626,646, (Crim.App. 1994) The Court of Criminal Appeals, in reversing the conviction of a defendant, due to the admission of prior drug deals, held:

> The term "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.".... In short, evidence is relevant if it tends to prove a material issue.98 However, there are limitations on the relevant evidence that the state may elicit during the cross-examination of a defense witness. Tenn. R. Evid. 402 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
> The question asked by the assistant district attorney general sought to elicit irrelevant evidence from the witness, i.e., proof of independent crimes to establish the appellant's propensity or disposition to commit the crime alleged in the indictment. The admissibility of evidence for this purpose is clearly barred by

The Tennessee Rules of Evidence specifically provide that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."100 This evidence, standing alone, is deemed irrelevant, and, therefore, inadmissible.101 However, if such evidence becomes relevant to establish a material issue, other than conduct conforming with a character trait, the trial court may in the exercise of its discretion, admit the evidence if it finds that the probative value of the evidence outweighs the danger of unfair prejudice.

In this case, the state has not contended that the evidence was relevant to establish a material fact. Consequently, the evidence sought to be elicited was irrelevant, and, therefore, should not have been admitted. (at 646)

..........In summary, the assistant district attorney general infected the jury with prejudice against the appellant. The only purpose for introducing this evidence was to establish the appellant's propensity and disposition to commit the crime for which he was being tried. It was prejudicial error to introduce this evidence -- evidence which was clearly irrelevant and inadmissible As previously noted, this error involves a substantial right *and more probably than not affected the verdict returned by the jury.*" (citations omitted)

549. In State v. Toliver 117 S.W.3d 216, 231; (Tenn. 2003) the Tennesse State suprme

Court held that:

> The prosecution made extensive use of this inadmissible evidence, both in opening statements and in closing argument. When evidence of other crimes, wrongs, or acts is offered, "a real probability exists . . . that the jury could be tempted to convict based upon a defendant's propensity to commit crimes rather than convict solely upon evidence relating to the charged offense." Spicer, 12 S.W.3d at 448; see also State v. James, 81 S.W.3d 751, 758 (Tenn. 2002) (noting that "the admission of other-acts evidence poses a substantial risk that a trier of fact may convict the accused for crimes other than those charged"). That probability is especially great in this case where a great deal of the evidence presented should have been excluded. Therefore, after reviewing the record we conclude that the erroneous consolidation of the indictments combined with the erroneous admission of additional evidence of other uncharged acts of abuse involving the victim and the victim's brother affirmatively appear to have affected the verdict of the jury. Accordingly, new trials are required to ensure that these verdicts were not the result of unfair prejudice. See Shirley, 6 S.W.3d at 251. Other issues raised by the defendant are therefore pretermitted. (at 231)

550. In State v. Luellen, 867 S.W.2d 736, 741; 1992 Tenn. Crim. App. LEXIS 873

No.;02C01-9111-CC-00261; November 18, 1992, the Tennessee Court of Appeal

held that:                                          the Tennessee Rules of E

> In this case, testimony from Mickey Williams and Hughland Lake concerning the alleged incident make the probative value of the *three prior incidents slight in comparison to the prejudicial effect that resulted.* As such, the trial court erred in admitting the evidence. The state contends, however, that this constitutes harmless error and therefore the judgment should be affirmed. **We respectfully disagree.**
> Despite the state's argument, <u>we believe that the wrongful admission of the prior convictions constituted harmful error.</u> As our Supreme Court concluded in State v. Roberts, 703 S.W.2d 146, 147 (Tenn. 1986) when it adopted the language of our colleague Judge Dwyer:
>
> When the prior conviction was shown, it may have settled all questions for the jury, allowing them to conclude that because he did it once, more than likely he did it again.
>
> We are of the opinion that when the state was permitted to introduce the prior bad acts via the testimony of Chief Smith, t**he chances of either appellant receiving a fair trial became remote.** See U.S. Const. Amend. V and XIV; Tenn. Const. Art. I, [5] and 8......."

551.    In a myriad of cases, the admission of prior bad acts, and crimes has been held to be highly prejudicial and grounds for reversal of the conviction, see    State v Shrophire  45  S.W.3d 64;  2000  Tenn.  Crim.  App.  LEXIS  946 No. E1998-00872-CCA-R3-CD; December 12, 2000, ( Because the jury heard evidence that the defendant committed a crime other than that for which he was on trial, which was the subject of an acquittal, the judgment of the trial court is reversed.) ;see also State v. Ford, 861 S.W.2d 846; 1992 Tenn. Crim. App. LEXIS 583;  No.02-C-01-9112-CC-00271;  July 1, 1992,(".. the jurors could have reasonably concluded albeit erroneously that if the appellant had previously sexually abused K.D.F., he probably sexually abused the victim in this case. In

other words, the jurors could have concluded that the appellant had the propensity to sexually abuse children. Of course, such evidence [of prior bad acts, and crimes] cannot be introduced for this purpose.[in direct violation of **Tenn.R.Evid. 404(b)]**...This Court concludes that the appellant is entitled to a new trial due to this error.") see also State v. Gilliland 22 S.W. 3d. 266, (the trial court abused its discretion in admitting evidence of the other killings, not relevant to the crime for which defendant was on trial,)

552. Therefore, had Counsel Houghton brought these errors up during the direct appeal, after having properly presented them in a motion for new trial, Petitioner Miller would have been entitled to appellate relief on this issue, and would have received a new trial.

553. Petitioner Miller avers that the facts of his case, are analogous to those of the defendant in Wiley v. State 183 S.W. 3d. 317 (Tenn. Jan. 2006).

554. In Wiley v. State 183 S.W. 3d. 317 (Tenn. Jan. 2006), Attorney Lionel Barrett, who was trial counsel for the accused William Glenn Wiley, could offer no logical, sensible or tactically sound reason, as to why he failed to preserve a viable appellate issue, during the motion for new trial or the direct appeal.

555. In ruling on this blatant failure, the Supreme Court stated:

> "We conclude that counsel [Barrett] was deficient in [i] failing to [timely address a critical issue] .... and [ii] *in failing to preserve the issue for appeal....*

> *.....trial counsel failed to object, failed to raise the error in a motion for new trial, and failed to take any step toward preserving the issue....We also conclude that counsel's deficiency was prejudicial.* ... '.[because]....the failure to [instruct on [the required lesser included offense instruction] .....as required at the time ...**would have been reversible error on direct appeal if the issue had been preserved...**
>
> ....In addition had the issue been preserved and raised on appeal the petitioner's direct appeal would been in the appellate pipeline [for review under favorable Supreme court precedent] ...
>
> ...*Since the evidence supported* .....[lesser included offense instructions and]....*the failure to instruct on* **[this lesser included offense] ....... would have been reversible error** under Burns.......
>
> <u>Accordingly, we conclude that trial counsel was deficient in failing to preserve this issue and that the deficiency was prejudicial to the petitioner. We therefore remand for a new trial on the offense  of felony murder.....</u>" (id 330, 331)

556. Petitioner avers that just like the Petitioner in *Wiley*, (supra) he too would have been entitled to a new trial, had Trial Counsel Houghton  properly raised and argued-either at a Motion for new trial and/or preserved for direct appeal-that Petitioner's right a fair hearing were violated, by the introduction of highly prejudicial inadmissible evidence of prior bad acts and other crimes.

557. And her collective failure to properly argue, and preserve this issue constituted a deficient performance, that "....was [inherently] prejudicial to petitioner.." Wiley (id.), insomuch as but for Counsel Houghton's failure the outcome of Petitioner's motion for new trial and direct appeal would have been different. (ie. Petitioner would have been granted relief and had both his conviction overturned and his sentenced vacated.); see also **Lewis v. U.S. 187 F.2d. 636,  (C.A. 6 (Ky.) 1999)**(a colorable claim of Ineffective assistance of counsel is made, upon a showing that

"...the [proper] direct appeal of these issues would likely have been successful." )

558. Thus, During the direct appeal stage trial Counsel Houghton rendered ineffective assistance of Counsel by failing to put on adequate supporting evidence and effectively argue that then presiding Judge Lafferty's decision to erroneously allow the introduction of evidence of Petitioner's prior bad acts and other crimes, constituted Plain error, that would have entitled Petitioner to an automatic new trial pursuant to *Adkinson*, (supra) State v Shrophire 45 S.W.3d 64; 2000 Tenn. Crim. App. LEXIS 946; State v. Ford, 861 S.W.2d 846; State v. Luellen, 867 S.W.2d 736, 741; State v. Roberts, 703 S.W.2d 146, 147 (Tenn. 1986) State v. Gilliland 22 S.W. 3d. 266,

559. Furthermore, based on a plain and clear reading of the decisions of *Wiley* (supra) and *Zimmerman* (supra); *Adkinson* (supra), *Shrophire* (supra); *Ford* (supra); *Luellen* (supra); *Roberts* (supra); and *Gilliland* (supra) Petitioner Miller has clearly demonstrated that, as a matter of state law, Trial Counsel Houghton rendered ineffective assistance of Counsel by failing to effectively argue that Judge Lafferty's decision to erroneously allow the introduction of evidence of Petitioner's prior bad acts and other crimes, violated Petitioner's right to full an fair trial; See U.S. Const. Amend. V and XIV; Tenn. Const. Art. I, 6 and 8.

560. Indeed, the judgments of the trial court would have been reversed and the case

remanded for new trial, specifically due to the erroneous admission of evidence of other crimes, wrongs, or acts committed by defendant, had Counsel Houghton properly argued these issues at the motion for new trial.

561. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

562. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly challenge and preserve for direct appeal, the erroneous and prejudicial admission of evidence of prior bad acts and other crimes*].....the result of the proceeding *would* **have been different**....." Tears, (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8[th]. Cir. 1990)

563. Petitioner avers that all of the above referenced evidence (i.e attached exhibits,

arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (XXVII) -(XXVIII)** in the instant **28 § U.S.C. 2254** Habeas petition "would resolve a factual dispute". (ie. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law, had Post conviction Counsel Banks properly presented this argument at the August 19th, 2014 evidentiary hearing, in order to prove Trial Counsel Houghtons' ineffectiveness)

564. Thus, Petitioner Miller has clearly shown, in support of **claims (XXVII) - (XXVIII)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Wiley* (supra) and *Zimmerman* (supra) and *Adkinson* (supra), *Shrophire* (supra); *Ford* (supra); *Luellen* (supra); *Roberts* (supra);and *Gilliland* (supra) he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## V. SPECIFIC CLAIMS (XXIX)-(XXX) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:
*Failure to properly inform Plaintiff of the terms of a plea agreement*

**(XXIX)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, was ineffective for providing erroneous legal advice concerning the plea bargain, that was proffered by the State.

**(XXX)** Trial Counsel Perianne S. Houghton, was ineffective for failing in her duty to properly communicate the terms and conditions of a formal best *interest plea* offer from the prosecution, that was favorable to Petitioner Miller.

565. The following facts and arguments are being offered in support of the substantial Constitutional Claims, **(XXX)** and procedural gateway claim **(XXIX)**.

566. Petitioner avers that prior to his August 2001 retrial the state had made a formal offer to settle the case prior to trial.

567. At the second trial the state made an offer that was for less than 25 years, with eligibility for parole after serving a 30 percent of the sentence. (i.e. 7.5 years)

568. This was considerably less than the life sentence that Petitioner would have received, wherein he would have only been eligible for parole after serving 25 years.

569. Had Petitioner known he could merely plead guilty to this lesser charge and lesser

sentence, he would have entered either an Alford (best interest plea) or a general

plea of guilty, simply to avoid the unnecessary risk of being falsely convicted of

the greater crime that he had already been convicted of in 1996.

570. This failure on the Part of Trial Counsel Houghton constituted ineffective

assistance of counsel.

571. In Missouri v. Frye 132 S. Ct. 1399, 1408, March 21, 2012, the U.S. Supreme

Court stated:

> This Court now holds that, as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Any exceptions to that rule need not be explored here, for the offer was a formal one with a fixed expiration date. {182 L. Ed. 2d LEdHR10}[10] When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires...
> Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides. The American {182 L. Ed. 2d 391} Bar Association recommends defense counsel "promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney," ABA Standards for Criminal Justice,; Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994); ...." 132 S. Ct. at 1408

572. This finding of the U.S. Supreme Court supports and perfectly aligns with the

holding of the Tennessee State Supreme court, with regard to failure of Counsel to

effectively communicate a plea offer to a defendant.

573. In **Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994)** trial counsel failed to

communicate to the defendant the offer made by the state.( at **663**.) The defendant

went to trial ignorant of the State's offer and was convicted. He was sentenced to a

prison term far in excess of the uncommunicated plea offer. (id). The State, conceded that this constituted deficient representation.

574. The Tennessee Supreme Court in concurring with the state's finding of deficiency went a step further and held that: "...the defendant's ignorance of the plea offer so undermined confidence in the outcome of the prosecution as to demonstrate sufficient prejudice to satisfy the second prong of Strickland..." (id. At 665-666)

575. Petitioner avers that just like the Petitioner in *Harris* (surpa) and *Frye* (supra) he too would have been entitled to a new trial, had Post conviction counsel Banks, explained to the post conviction court that trial Counsel Houhgton failed to communicate to him a much more favorable sentence in a plea agreement then he would have received at trial.

576. And her collective failure to properly communicate this offer to Petitioner Miller constituted a deficient performance, that so "....undermined confidence in the outcome of the prosecution as to demonstrate sufficient prejudice to satisfy the second prong of Strickland..." (id. Harris At 665-666)

577. Insomuch as but for Counsel Houghton's failure the outcome of Petitioner's motion for new trial and direct appeal would have been different. (ie. Petitioner would have plead guilty pursuant to a best interest plea and been home over 12 years ago. see also **Lewis v. U.S. 187 F.2d. 636, (C.A. 6 (Ky.) 1999)**(a colorable