claim of Ineffective assistance of counsel is made, upon a showing that "...the [proper] direct appeal of these issues would likely have been successful." )

578. Thus, had Post conviction Counsel Banks properly presented this argument at the August 19th, 2014 Post Conviction evidentiary hearing, Petitioner Miller would have entitled to an automatic new trial pursuant to *Harris* (surpa) and *Frye* (supra)

579. Furthermore, based on a plain and clear reading of the decisions of *Harris* (surpa) and *Frye* (supra) Petitioner Miller has clearly demonstrated that, as a matter of state law, Trial Counsel Houghton rendered ineffective assistance of Counsel by failing to effectively communicate the exact terms of this favorable plea agreement and this failure violated Petitioner's right to Effective assistance of counsel See U.S. Const. Amend. VI ; Tenn. Const. Art. I, 8.

580. Indeed, the judgments of the trial court would have been reversed and the case remanded for new trial, specifically due to the failure of trial Counsel Hougton to properly and adequately communicate to Petitioner Miller the terms of the proffered plea agreement .

581. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived

of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

582. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly communicate to Petitioner the favorable terms of a plea agreement* ].....the result of the proceeding *would* **have been different.....**" *Harris* (surpa) and *Frye* (supra) ; see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8[th]. Cir. 1990)

583. Petitioner avers that all of the above referenced evidence (i.e attached exhibits, arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (XXIX) -(XXX)** in the instant **28 § U.S.C. 2254** Habeas petition "would resolve a factual dispute". (ie. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law, had Post conviction Counsel Banks properly presented this argument at the August 19th, 2014 evidentiary hearing, in order to prove Trial Counsel Houghtons' ineffectiveness)

584. Thus, Petitioner Miller has clearly shown, in support of **claims (XXIX) -(XXX)** in

the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Harris* (supra) and U.S. Supreme Court precedent announced in *Frye* (supra), he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## VI. SPECIFIC CLAIMS (XXXI)-(XXXVIII) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:-*Failure to Call Expert Witnesses*

585. The following facts and arguments are being offered in support of the substantial Constitutional Claims, (XXXII), (XXXIV), (XXXVI) and (XXXVIII).

(XXXII) Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed *to properly request* funding from Judge Lafferty, by showing a particularized need and complying with the requirements of Tenn.S.Ct Rule 13 and State v. Barnett 909 S.W.2d 423 (Tenn. 1995), in order to obtain the funding for a videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXIV) Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to *properly obtain and present exculpatory* expert witness testimony of a qualified videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXVI) Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly request, obtain and present *exculpatory* expert witness testimony of a qualified blood spatter expert in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXVIII) Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly request, obtain and present *exculpatory* expert witness testimony of a pathologist in order to prove the physical and

scientific impossibility of state Star witness's Clement Harris' testimony; with regard to the i)Time of Death; (ii), condition of the body, and (iii) range of gun shot wounds

586. .The following facts and arguments are also being offered in support of the

Procedural gateway Claims, (XXXI), (XXXIII), (XXXV) and (XXXVII)

(XXXI)   Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to *properly request* funding from Judge Lafferty, by complying with the requirements of Tenn.S.Ct Rule 13 and State v. Barnett 909 S.W.2d 423 (Tenn. 1995), in order to obtain the funding for a videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXIII)  Post Conviction Counsel Micheal Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th Amend. U.S. Const. Claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to *properly obtain and present exculpatory* expert witness testimony of a qualified videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXV)   Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly request, obtain and present *exculpatory expert witness* testimony of a qualified blood

spatter expert in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony.

(XXXVII) Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, rendered ineffective assistance of counsel when she failed to properly request, obtain and present *exculpatory* expert witness testimony of a pathologist in order to prove the physical and scientific impossibility of state Star witness's Clement Harris' testimony; with regard to the i)Time of Death; (ii), condition of the body, and (iii) range of gun shot wounds

587. Petitioner avers that there is a plethora of controlling Tennessee State law on the above mentioned claims, that would have required that then-presiding post conviction Judge J. Weber McCraw grant Petitioner Miller relief, had Post Conviction Counsel Bank's properly argued and demonstrated Trial Counsel Houghton's ineffectiveness.

UNDER THE HORNSBY *(infra)*, STANDARD FOR IMPEACHMENT AND THE *TEARS* (infra) STANDARD FOR INEFFECTIVENESS OF COUNSEL, HAD POST CONVICTION COUNSEL PROPERLY ARGUED THAT TRIAL COUNSEL HOUGHTON WAS INEFFECTIVE FOR FAILING TO ADEQUATELY AND PROPERLY PRESENT FAVORABLE AND MATERIAL IMPEACHMENT EVIDENCE, THE POST CONVICTION COURT WOULD HAVE RULED THAT COUNSEL HOUGHTON, AS A MATTER OF STATE LAW RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

588. The only evidence at trial, that was dispositive of the question of guilt, was the diametrically different version of events offered through: (a) the exculpatory

testimony of Petitioner Miller, which completely denied any involvement in the murders at all (TR-II. pp. 250; L 6-22); and (b) the inculpatory testimony of the State Star witness Clement Harris.

589. Indeed, though there were four state witnesses, who all gave inculpatory testimony ,it was only Clement Harris' testimony that was of paramount importance to the State, for it was the only direct evidence of Petitioner Miller's guilt.

590. However, not only was this inculpatory eyewitness testimony extremely weak and contradictory, it would have been totally impeached and proven both physical impossible, and thus in violation of the physical facts rule, had Trial Counsel Houghton, diligently and properly followed the requirements of **Tenn.S.Ct. Rule 13.**

*Trial Counsel Houghton's ineffectiveness, in failing to properly invoke and substantiate the physical facts rule standard for impeachment,*

591. In analyzing the ineffectiveness Counsel Houghton, in failing to properly invoke and substantiate the physical facts rule standard for the impeachment of Mr. Harris' highly prejudicial and inculpatory testimony, we need to look at the significance of what Mr. Clement Harris said, specifically about his his vantage point, the night in question, and his ability to clearly observe what it is he alleged he observed. (ie the murder of Mr. Donald Rice.)

592. In effect Mr. Harris testified that that while sitting on the lower tier of the Projects

on Fairgrounds street, on the North end closest to Young St., he was able to and

accurately and clearly:

    a.)    observe that both Petitioner Miller and Mr. Rice, sitting in their respective vehicles

    b.)    observe what both Petitioner and Mr. Rice were wearing

    c.)    observe what both Petitioner and Mr. Rice were saying,

    d.)    observe that someone stuck a shotgun out of the window directly into Mr. Rice's car and fired;

    e.)    observe that Mr. Miller subsequent to the shooting, got into the victims car pushed him over in the car, and drove it away.

    f.)    observe all of the above, despite the fact that both drivers had their engines off and the lights out on their respective vehicles.

593. Petitioner avers that it would, as a matter of strict physical law, have been

impossible for Mr. Harris to have visually observed what he is alleged to have

seen, from the vantage point he alleges he was sitting at, on the North end near

Young Street, on Fairgrounds Rd.

594. Indeed, during his first trial, Mr. Clifford A. Worden, Private investigator for the

28th Judicial Dist. Public Defender's office, testified that he made a videotape

beginning where Clement Harris testified he had been sitting on a bucket, walking

toward the alleged homicide scene at the end of the apartment building. (TE, Vol.

3, pp 309 - 310).

595. Worden testified there were both cars and people standing in the area where the

alleged homicide occurred during his videotaping. Even as he approached the

area, he testified he could not identify people although they were outside the

*vehicles.* (TE, Vol. 3, p 310).

596. Worden then testified on the record, that he was at the alleged site of the homicide on the Sunday night before the trial began. He was there between 9:30 and 10:00 p.m. When it was dark outside. (TE, Vol. 3, p 318)

597. Once more, He testified there were both people and vehicles in the parking lot and that the people were standing outside the vehicles, and that he could not tell who the people were or discern what they were wearing from a distance actually closer than where Clement Harris testified he had been sitting. **(TE, Vol. 3, pp 319-320)**

598. However, On cross-examination, the prosecution established that Mr. Worden was not a technician on either film or cameras. (TE, Vol. 3, p 313), and that his testimony and video tape , in effect lacked a sufficient indicia of reliability.

599. The state objected to Worden's testimony and the trial judge stated the tape should be viewed. (TE, Vol. 3, p 314); and after looking at the tape, the trial judge made a specific finding "... that there's no way that this approximates what Mr. Harris could have seen..." and it was ruled inadmissible. (TE, Vol. 3, p 316).

600. Then Presiding Trial judge Jerman's main concern was that the video recording machinery was not specifically calibrated to accurately reflect the inherent level of luminosity that would or wouldn't have been perceptible and the resulting level of visual acuity that would have been possible, under the specific lighting conditions

216

that existed under the exact conditions as reported by Mr. Harris. (i.e at 1-2 am, at the exact distance, with the exact or similar weather conditions, affecting visibility, etc..)

601.    Therefore, trial Counsel Houghton, was specifically put on notice of what the presiding Trial Judge Jerman's main problem with the original video tape was; to wit: it's lack of a sufficient indicia of reliability.

602.    Thus, Messers Crider and Houghotn were specifically put on notice that the court's primary concern dealt with the lack of reliability of P.I. Wordens' methodology under McDaniel v CSX Transportation Inc. 955 S.W. 2d. 257 (Tenn. 1997) and Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993)

603.    In explaining how the *Frye* test is no longer applicable, the Tennessee Supreme Court in McDaniel v. CXS Transportation Inc. 955 S.W. 2d. 257 (Tenn. 1997), listed five factors taken from Daubert:

    i)      whether scientific evidence has been tested and the methodology with which it has been tested;
    ii)     whether the evidence has been subjected to peer review or publication
    iii)    whether a potential rate of error is known
    iv)     whether as formerly required be Frye, the evidence is generally accepted in the scientific community; and
    v)      whether the expert's research in the field has been conducted independent of litigation.

(xx)     This evidentiary standard, was of course based on Daubert, which held there are several factors that might be considered by a trial judge:

(1) whether a theory or technique can be (and has been) tested;
(2) whether the theory or technique has been subjected to peer review and publication;
(3) the known or potential rate of error of a particular scientific technique;
(4) the existence and maintenance of standards controlling the technique's operation; and
(5) a scientific technique's degree of acceptance within a relevant scientific community.[16]

604. This point is of particular importance, and forms a bedrock portion of these Constitutional claims, so we shall return to it shortly.

605. However returning to the point at this juncture, we need only focus on the fact that so significant was this video proof of the *scientific impossibility of Mr. Clement Harris' testimony,* that on June 2nd, 1997 original Trial counsel Tom Crider, filed a motion requesting funding for a videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state Star witness Clement Harris' testimony. .

606. In the motion he wrote:

> COMES now the defendant and moves the Court to Order payment of necessary expenses to hire a professional photographer to make a video tape of the alleged scene of the homicide should the Court not allow a jury view of the scene during evening hours.
> The defendant would show that this is vital to his defense that the jury be able to "see" the location under conditions of darkness. While such a view can best be held in person, a videotape would be appropriate exhibit

---

16    In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one." The Court also rejected the suggestion that its liberal construction of Rule 702 would "result in a 'free- for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions." Rather, the Court expressed confidence in the adversary system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

for the record.

The defendant would show that he does not have the funds to have such video professionally made due to his status as an indigent and that he has been incarcerated for some two years.

The defendant further states through his appointed counsel that such a view - or at least a video – is necessary to have effective counsel as mandated through the United States and Tennessee Constitutions.

The defendant would further show that an amateur video was rejected by the Court in earlier proceedings herein at least partly due to the Stat's objection that it was not professionally done and the product of an expert in photography.

The defendant would assert that these services should be available for no more than Fifteen Hundred Dollars.**(see attached exhibit # 5 Motion for Funding, June 2nd, 1997)**

607. However, then presiding Judge Jerman, (who was eventually replaced by Judge Lafferty) denied this motion, by writing:

This case came on to be heard on the 2nd day of June 1997 upon the Motion of the defendant to have the jury at the trial view the purported scene of the homicide during the hours of darkness to see the conditions that exist for viewing and seeing. The Court respectfully denied the Motion. **(see attached exhibit # 6 order denying Motion for Funding, June 12nd, 1997)**

608. There was no doubt that Messers Crider and Houghton understood the inherent importance of this experts testimony, for it could have single-handedly been the strike that eviscerated the state's case, by literally having state star witness Clement Harris' testimony stuck, as being deemed incredible as a matter of law.

609. In stressing the vital nature of this evidence, former defense attorney Tom Crider explained:

The testimony of extreme importance to the issue of the trial judge's decision to deny the defendant's motion requesting a jury view of the scene. While the testimony offered through Mr. Harris, as well as other witnesses, might have given the jurors a - concept of the layout of the crime scene, *it could not, and did*

> ***not, demonstrate the virtual impossibility of Mr. Harris***
> ***witnessing the event as he claimed. Only*** by the use of a jury
> visit to the scene, or in the alternative a video of the scene taken
> under approximately the same conditions as those at the time of
> the alleged incident, could the jurors truly be in a position to
> understand the cover of night, perhaps under the influence of crack
> cocaine, Mr. Harris could not have identified anyone as he claimed
> during his testimony. (see appellate Brief, Dated 1998; pp. 18)

610. Furthermore, Tennessee State courts have long recognized the value of videotaped evidence, when there is a sufficient indicia of reliability attached to the videotaped evidence itself.

611. In a somewhat analogous case, the Tennessee Court of Criminal Appeals held that a videotape depicting a crime scene, as well as an alleged witness's view of the scene, ***was highly probative.*** See, *State v. Bailey* , No. 01C0-9403-CC-0105 Tenn. Crim. App. (1995) Lexis 605: App denied (copy in appendix).

612. In *Bailey,* the video was offered by the State and the Court opined that the videotape "... provided the jury with accurate and relevant information without the slightest danger of fair prejudice to ..." the defendant in that case. Id., p 9. The defendant contends the same is true of the tape he attempted to offer as part of his defense.

613. The Court even went so far as to praise the value of videotaped evidence in *Bailey* by stating that "[a] carefully made videotape should substantially assist a jury in making its determination of the facts without creating unfair prejudice against the accused." Id., p 9. The court went on to add that comment by stating that

videotapes can aid both the prosecution and the defense "... in presenting the clearest and most convincing case possible." Id., p 9. Certainly, if these principles apply to tapes offered by the State in its plight to deprive the accused citizens of their freedom, or life, they ought to apply to the citizen attempting to defend himself against the allegations brought against him by the state.

614. Therefore in the case *sub judicie,* even former Counsel Crider, understood "...the importance of this particular videotape *evidence to the defendant's case is staggering*. State's witness Mr. Clement Harris that he actually witnessed the offense from a vantage point at which he could clearly observe the parties involved. The video, taken during nighttime hours so as to best approximate the scene at the time of the offense, *clearly demonstrated that it would have been impossible for Mr. Harris to have observed what he claimed, under oath, to have witnessed.*) (CCA Appellant's Brief, pp. 19)

615. Having established that the video was probative and essential, we can now look at what the video would have done had it been properly made, introduced and presented to the jurors at Petitioner Millers August 2001 retrial.

> *Tennessee State's Physical Facts Rule, if properly invoked- (based on the introduction of a properly made video accompanied by the testimony of an expert videographer/crime scene reconstructionist, whose methodology had a sufficient indicia of reliability,)-would have rendered Clement Harris' testimony incredible as a matter of law.*

616. The rule of law, that "established physical facts are controlling over direct testimony", has been recognized and applied in several Tennessee cases.

617. In Gordan's Transport v. Bailey, 41 Tenn. App. 365; 294 S.W.2d 313; 1956 Tenn. App. LEXIS 95, the court found that:

> "It seems to be now firmly established that appellate courts may disregard impossible or palpably improbable testimony and treat it as no evidence: [Quock Ting] v. U. S., 140 U.S. 417 [11 S. Ct. 733], 35 L. Ed. 501. Tested by this rule, plaintiff's explanation of the seeping of the fluid from the outside must be discredited. This case was and is demonstrably impossible, and no court could proceed to judgment satisfactorily under the circumstances." Nashville, C. & St. L. R. R. Co. v. Justice, 5 Tenn. Civ. App. 69, 70-71.

> "'A statement of alleged facts inherently impossible and absolutely at variance with well-established and universally recognized physical laws will not supply the required scintilla of evidence, a theory inherently impossible based upon a statement of alleged facts certainly cannot supply it.' Louisville Water Co. v. Lally, 168 Ky. 348, 182 S.W. 186, 187, L. R. A. 1916D, 300.

> "'Courts* * * {294 S.W.2d 332}are not required to give credence to a statement that would falsify well-known laws of nature.' Weltmer v. Bishop, 171 Mo. 110, 71 S.W. 167, 169, 65 L.R.A. 584, Writ of Error Dismissed in 191 U.S. 560, 24 S. Ct. 848, 48 L. Ed. 302.

618. Another famous controlling case on the subject, has explained it as follows:

"'When the testimony introduced by plaintiff is shown by the physical facts and surroundings to be absolutely untrue, or when it is so inherently improbable as that no reasonable person can accept it as true or possible, the Circuit Judge should take the case from the jury, notwithstanding oral statements tending to show a right of action.' Nashville, C. & St. L. R. [Co.] v. Justice, 5 Tenn. Civ. App.

69.

619. Pursuant to *Tennessee Jurisprudence, EVIDENCE , I. INTRODUCTION.; IV. RELEVANCY, MATERIALITY, COMPETENCY AND ADMISSIBILITY. (63). Incredible Evidence,* it states:

> The so-called physical facts rule is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence the testimony can be disregarded. 1572 That is, where the testimony of a witness cannot possibly be true, is inherently unbelievable or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it. 1573
>
> Tennessee courts recognize and follow the physical evidence rule. Courts may disregard impossible or palpably improbable testimony and treat it as no evidence. Further, testimony of facts inherently impossible and absolutely at variance with well-established and universally recognized physical laws is not credible evidence. 1574
>
> The ₹ physical facts rule ¥ is applicable to both civil and criminal cases. 1575

620. The Tennessee State Supreme Court in State v. Hornsby, 858 S.W.2d 892; 1993 Tenn. LEXIS 279 (Tenn. 1993) held that:

> The so-called "physical facts rule" is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. ......
>
> That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it. United States v. Narciso, 446 F. Supp. 252, 282 (E.D. Mich. 1977). As stated by the Court in Wood v. United States, 342 F.2d 708, 713 (8th Cir. 1965), "where undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control. No jury can be allowed to return a verdict based upon oral opposed to physical facts, testimony which is fully opposed to physical facts, the existence of which is

223

incontrovertibly established." Id. at 713-14. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. See, e.g., United States v. Palacios, 612 F.2d 972, 973 (5th Cir. 1980). Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

When it is impossible to reconcile the physical evidence with the testimony given by the witnesses, an appellate court is not bound by the witnesses' testimony when determining the sufficiency of the evidence. ...... "Established physical facts are controlling over direct testimony when it is impossible to reconcile {858 S.W.2d 895} the physical facts with the direct testimony." .... ...... "Where the physical facts are such that belie the truth of oral testimony there can be no weight given to the oral testimony, for it becomes no evidence whatever."

Our courts have also correctly observed that to apply the physical facts rule, the facts used to negate testimony must be "well-established and universally recognized physical laws." Nelms v. Tennessee Farmers Mut. Ins. Co., 613 S.W.2d 481, 483 (Tenn. App. 1978). .....
The State in this case argues that the physical facts rule should not apply to ......While it is true that the physical facts rule has not been discussed in the context of a criminal case in this State, we see no reason why testimony that is entirely impossible to reconcile with the physical laws of nature ought not be disregarded in a criminal case, just as it would be in a civil case. Indeed, the physical facts rule has been the focus of much discussion in several criminal cases in other jurisdictions, both federal,.......and state,.....
        We hold that the physical facts rule is applicable to both civil and criminal cases. We caution, however, that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly. Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law. Lerma, 657 F.2d at 789. (id. 896)

621.    Under this standard then-presiding Post Conviction Court Judge J Weber McCraw,

would have been obligated to determine, in view of the totality of the evidence

presented, whether or not there was a reasonable basis to conclude that its more

probable than not that the results of Petitioner Miller's August 2001 retrial would

have been different had Trial counsel Houghton properly requested and obtained

funding for an expert videographer whose testimony and methodology contained a sufficient indicia of scientific reliability[23].

622. In other words, had Counsel Houghton obtained the services of an expert with a sufficient indicia of scientific reliability to be trustworthy within the meaning of Tenn.R.Evid. 703, and McDaniel v CSX Transportation Inc. (Tenn. 1997), and Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993)- this expert with specialized training and equipment, who analyzed the field of vision, vantage point and other variables, relevant to Mr. Clement Harris testimony, would have been able to testify that Mr. Harris' alleged observations were physically impossible.

623. Had Counsel Houghton obtained the testimony of such an expert, with a sufficient indicia of scientific reliability to be trustworthy within the meaning of Tenn.R.Evid. 703, and McDaniel v CSX Transportation Inc. (Tenn. 1997), and Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993) ,and presented it to Judge Lafftery, *prior to Petitioner Miller's 2001 retrial,* the trial court would have been obligated to find Mr. Harris testimony incredible as a matter of state

---

23D    In other words this experts test results and testimony woul dhave been based on a methodology, which relied upon professional grade machinery specifically calibrated to accurately reflect the inherent level of luminosity that would or wouldn't have been perceptible, and resulting level of visual acuity that would have been possible, under the specific lighting conditions that existed under the exact conditions as reported by Mr. Harris. (file at 239m, at the exact distance, with respect to similar weather conditions, affecting visibility..etc..)

law, and have it stricken from the record.

624. Petitioner avers that the facts of his situation, are similar to those of State v. Farrar

355 S.W.3d 582; 2011 Tenn. Crim. App. LEXIS 498; No. M2011-00838-CCA-

RM-CD, (2012).

625. In *Farrar*, the Court of Criminal Appeals was called upon to assess "....

whether[or not] there was no substantial evidence to support the trial court's

determination to revoke the defendant's probation, we first compare the scope of

the videotape evidence with that of the videotape evidence at issue in

Garcia[another case that was resolved by video footage of the crime.]"(id)

626. And in overturning the Trial Court's revocation of Mr. Farrar's probation the

Tennessee Court of Criminal appeals held:

> Officer Tory Moore, the arresting officer in the present case, testified (1) that the
> defendant "sway[ed] back and forth" and was unsteady on his feet, (2) that his
> speech was slurred, (3) that he smelled of alcohol, and (4) that the defendant's
> eyes were glassy and bloodshot. Necessarily, the trial court's determination that
> the defendant violated his probation was based upon its findings that one or
> more of these four conditions existed. ....
> **The videotapes contradicted Officer Moore's testimony** that the defendant
> admitted to drinking "several" beers; the tape revealed that the defendant said
> he had had two beers. **The videotapes also contradicted** the claim that the
> defendant swayed and was unsteady on his feet, and they do not support the
> claim that his speech was slurred. All of the interaction of Officer Moore with the
> defendant was recorded on both audio and video tracks. *The videotapes show*
> *that the defendant stood in place without swaying during interrogation by Officer*
> *Moore and during the extended times when the officer walked away from the*
> *defendant to talk to other persons. ..*
> ....... we note that, ...... *it is analogous in the present situation, and its use in*
> *criminal cases in Tennessee, see State v. Hornsby, 858 S.W.2d 892, 893*
> *(Tenn. 1993), supports the approach we have taken in reviewing the evidence in*
> *the present case.* The physical facts rule is the accepted proposition that in
> cases where the testimony of a witness is entirely irreconcilable with the

physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it.State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (quoting Hornsby, 858 S.W.2d at 894). .....

Based upon these analyses,_ *we opined that the record evinced "no substantial evidence from which the trial court could have concluded that the defendant committed the offense of public intoxication."* James E. Farrar, Jr., 2010 Tenn. Crim. App. LEXIS 1102 at *11. ...... and based upon our conclusions, we held that the trial court abused its discretion in revoking the defendant's probation. (id).

627. Likewise in the case sub judice, had counsel Houghton, properly obtained a video made by an expert with a sufficient indicia or reliability, trial Judge Laffety would have been obligated to allow it's admission to the jury, and as a result would have found that the video rendered Mr. Clement Harris' testimony incredible (and therefore inadmissible) as a matter of law.

628. Or stated in simple terms, had Counsel Houghton properly obtained and introduced this tape, the state as a matter of law would have had insufficient evidence to sustain a first degree premeditated murder conviction against Petitioner Miller.

629. Indeed pursuant to Tennessee law, Judge Lafferty, at the August 2001 retrial, would have been obligated to consider the evidence in the light most favorable to the prosecution, and determine whether a any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979);

State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000).

630. And even considering the fact that, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987), Judge Lafferty would have been required, find that before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the {137 S.W.3d 655} guilt of the defendant." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971); Jones, 901 S.W.2d at 396.; "..[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

631. In other words, presiding Judge Lafferty would have had to find that after

excluding the State' star witnesses testimony, as being incredible as a matter of law, that no web of guilt could be woven around Petitioner Miller, from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the Petitioner Miller, beyond a reasonable doubt.

632. However, absent Mr. Harris' testimony, such a Judicial finding by Judge Lafferty *__would have been impossible__*, and as a result the state would not have been able to meet it's evidentiary burden under *Jackson*, (supra).

633. Therefore, after trial Counsel Houghton was specifically put on notice of what the presiding Trial judge Jerman's main problem with the original video tape was- it's lack of a sufficient indicia of reliability- she should have specifically addressed this deficiency of Mr. Wordens initial attempt to introduce a video, by presenting expert witness testimony which possessed the requisite indicia of scientific reliability to justify the introduction of, and underlying methodology used to create, the video.

634. Trail Counsel Houghton failed to comply with the requirements of **Tenn.S.Ct. Rule 13.** , as explained in State v. Barnett, 909 S.W.2d 423; (Tenn. 1995)

635. What Trial counsel Houghton was required to do, was file a ex parte motion because :

"..... an an ex parte hearing is required when an indigent defendant, in a written sealed motion to the trial court alleges particular facts and circumstances that raise the question of the defendant's [defense tht requires the expert testimony] sanity. As to form, *the motion should conform to Tenn. Sup. Ct. Rule 13 (2) (B)(10). A bare allegation that sanity will be a significant factor at trial is not sufficient.* An ex parte hearing, in which the defendant is afforded an opportunity to establish particularized need, should be granted if these procedural criteria are satisfied.

636. The Court when on the conclude:

"...Having concluded that an ex parte hearing is required when certain procedural criteria are satisfied, we must next consider the showing required to trigger the State's federal constitutional obligation,6 to provide the defendant access to an independent competent psychiatrist "who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id.7(id 430)
In order to make a threshold showing of specific need for the expert sought, the defendant must demonstrate that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case.

Later, the same court noted that "mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided." State v. Mills, 332 N.C. 392, 420 S.E.2d 114, 117 (NC. 1992). In general, a defendant must demonstrate, by reference to the facts and circumstances of his particular case, that appointment of a psychiatric expert is necessary to insure a fair trial. State v. Campbell, 127 N.H. 112, 498 A.2d 330, 332 (N.H. 1985).

The North Carolina Supreme Court recognizes that trial courts must be given latitude {909 S.W.2d 431} when applying the test, by commenting that the "particularized showing demanded ... is a flexible one and must be determined on a case-by-case basis," and that the trial court "should consider all the facts and circumstances known to it at the time the motion for [expert] assistance is made." Mills 420 S.E.2d at 117-18.

We approve of and adopt the principles developed by the North Carolina Supreme Court, as well as those enunciated in our prior cases interpreting our statute requiring the furnishing of state-funded experts.

Accordingly, before an indigent defendant is entitled to the assistance of a state-funded ........*expert, the defendant must make a threshold showing of particularized need. To establish particularized need, the defendant must show that [the].... expert is necessary to protect his right to a fair trial. Unsupported assertions that a ...... expert is necessary to counter the* State's proof are not sufficient. The defendant must demonstrate by reference

to the facts and circumstances of his particular case that appointment of a psychiatric expert is necessary to insure a fair trial. Whether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made. (id 431)

637. In the case *sub judicie*, Counsel Crider's June 1997 Motion (and by virtue of the fact that she never filed one of her own at any time thereafter), Counsel Houghton's Motion failed to "make a threshold showing of particularized need" (id).

638. Furthermore, the requirements of **Tenn.S.Ct. Rule. 13§(5)(b)(2)** required that any motion for expert funding include, *inter alia,*:

> (a) the nature of the services requested
> (b) the name , address qualifications, and licensure statues, as evidenced by a curriculum vitae or resume, of the person or entity proposed to provide the services.
> (c) the means, date, times, and location at which the services are to be provided.
> (d) a statement of the itemized costs of the services including the hourly rate, and the amount of any expected additional or incidental costs..

639. In total, pursuant to **Tenn.S.Ct. Rule. 13§(5)(b)(2)** any motion for expert funding required over 15 separate pieces of detailed critical and fact specif information on both the nature of the services and the expert service provider, to be included.

640. Suffice it to say that Trial Counsel Houghton's adopted motion of Tom Crider, filed in June 1997, contained exactly zero (0) of the statutorily required information for expert services.

*Post conviction Counsel Micheal J Banks was ineffective when he failed to properly request expert funding for Petitioner Miller's August 2014 evidentiary hearing*

641. Furthermore, Post Conviction Counsel Banks was ineffective when he himself, failed to request the expert funding pursuant to **Tenn.S.Ct. Rule. 13§(5)(b)(2)** for a videographer/crime scene reconstruction expert, in order to prove the deficiency of Trail Counsel Houghton.

642. Indeed Tennessee State Courts have held that strict application of **Tenn.S.Ct. Rule 13.** violates due process in the face of an adequate claim that an expert's services are needed to protect a criminal Defendants rights.

643. In explaining this view the Court held: "....In our view, for us to even analyze this due process claim, the petitioner was required at a minimum to make a threshold showing that such as an expert exists. This showing would demonstrate that the claim that an expert could have testified to rebut Heflin was more than mere speculation. We cannot conclude that the Due process clause was violated based on mere conjecture. .." Lowe v State 2008 Tenn. Crim.App. Lexis 176*21 (August 21st, 2007)

644. Holt v. State, 2010 Tenn.Crim.App.Lexis 610(May 18th, 2010), following the precedent in *Lowe*, (supra) which established the two pronged threshold showing required before funding could be provided in non-capital post Conviction

proceedings like Petitioner Millers the: "...Court noted the prohibition for expert services in non-capital post-conviction proceedings and determined that for the Court to analyze the petitioner's claim, she "was required at a minimum to make a threshold showing that such as an expert exists. This showing would demonstrate that the claim that an expert [would have helped the defense was] more than mere speculation..."

645. Once again, the Court of Criminal Appeals in keeping with the evolving standards needed to address the modern day realities of criminal justice procedure for indigent defendants, understood that that DNA Post Conviction Procedure Act, constituted an *ipso facto*, repeal and modification of the general prohibition on funding for expert witnesses in a non-capital post-conviction proceeding pursuant to **Tenn. St. C. Rule., 13§ (5)(a)(2).**

646. Indeed a strict interpretation and application of **Tenn. St. C. Rule., 13§ (5)(a)(2)'s** prohibition on funding for expert witnesses in a non-capital post-conviction proceedings would in effect render the Tennessee D.N.A. Post conviction act **T.C.A. § 40-30-301 et seq.,** illegal and unworkable[24]. (i.e. a person charged with

---

[24]       **T.C.A. § 40-30-303 states:** " Notwithstanding part 1 of this chapter or any other provision of law governing post-conviction relief to the contrary, a person convicted of and sentenced for the commission of [a non-capital crime] may.. file a petition requesting the forensic DNA analysis of any evidence ........ that resulted in the judgment of conviction and that may contain biological evidence..." Furthermore **T.C.A. § 40-30-305** (1) .....the court may order DNA analysis if it finds that a reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's

233

child rape or burglary where DNA was left at the scene, is by definition entitled to have a *state funding provided to an expert* to test the biological material that might set him free-despite the fact that in both situations the cases would be non-capital ones.)

647. Once again the Court of Criminal Appeals has been squarely presented with the issue of state funding for expert witnesses in a non-capital post conviction proceedings on three (3) separate occasions in *Asata Lowe* (supra), **Holt v. State 2010 Tenn.Crim.App. Lexis 610 (May 18th, 2010)** (citing that "same analysis applies....") and **Trevor Ford v. State of Tennessee, 2010 Tenn.Crim.App. Lexis 850.,** and not one single time did the Court ever find that such funding was prohibited out right under any and all circumstances.

648. Quite to the contrary in balancing the clear intent of and scope of **Tenn. St. C. Rule., 13§ (5)(a)(2)** with the wide scope of due process protections indigent criminal defendants are entitled to, the Court has, *ipso facto*, modified the criteria under which indigent Post Conviction Petitioner's can request and be granted state funding for expert services.

649. Therefore, pursuant to the holdings of *Asata Lowe v State* (supra), *Holt*(supra) and *Ford* (supra) indigent Defendants like Petitioner Mathews can now request and be

verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction....."

granted state funding for expert witnesses provided that they make "...threshold showing .." *Asata Lowe* (.id)

650. Pursuant to the holdings of *Asata Lowe v State* (supra), *Holt*(supra) and (supra) in order to make a "....threshold showing..." Petitioner Miller merely needed to: (i) show that such an expert exists; and (ii) demonstrate that the claim that an expert would have helped the defense was more than mere speculation.

651. Petitioner avers that at the August 19th, 2014 Post conviction evidentiary hearing, Counsel Micheal J Banks could have easily met this threshold.

652. Furthermore, Dr. O.C. Smith, testified there was absolutely no forensically credible evidence that proved or even supported the suggestion that a murder even occurred before 3 am to 5:30 am of that morning. **(TR-II. pp. 360-362 )**

653. Thirdly, there was no independent forensic evidence, that in any way corroborated or supported the testimony that a crime/murder was even committed at the small parking lot off Jelks street, on the morning of Thursday April 20th, 1995. (see testimony of Johnny Blackburn, **(TR-II. pp. 274; L 9-12)**

654. Fourth, we can look at the fact that the blood spatter evidence found in the Mr. Rices' vehicle disproves forensically the version of events given by Mr. Harris. (ie the blood spatter trial is in consistent with any body shooting the victim in the face as alleged and *then merely pushing his body over into the passenger seat)*

655. Quite to the contrary the blood trace evidence, proves that someone physically picked up the victim and placed him in the back side drivers seat area, not pushed the victims body over into the passenger side of the vehicle as Mr. Harris alleged.

656. Furthermore a pathologist's testimony contradicting Harris description of the distance between the vehicles, would have also proved that state Star witness Clement Harris' was perjuring himself and giving inherently false testimony on the stand.

657. Just as in *Tears*, (supra) in Petitioner Miller's case, no reasonable juror could have returned a lawful conviction for First Degree Premeditated Murder if State Star witness Harris' testimony had been properly impeached and had his testimony deemed incredible as a matter of law,.

658. Or in the alternative if there was a professional video made,, along with expert blood spatter testimony and pathologist testimony contradicting Harris' description of the distance between the vehicles, it would have been favorable and material impeachment evidence like that discussed, in *Jackson* (supra) and *Tears* (supra);) and just as easily a reasonable juror could have concluded that Petitioner Miller was in fact telling the truth, and that he did not murder Mr. Donald Rice, as alleged by Mr. Clement Harris.

659. Based on the foregoing, its beyond question that Petitioner Miller has proven that

Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance, Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

660. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a _reasonable probability_ that but for counsel's unprofessional errors [*in failing to properly comply with the requirements of* **Tenn.S.Ct. Rule. 13§(5)(b)(2)** for funding of a videographer/crime scene reconstruction expert ].....the result of the proceeding *would* **have been different.....**" Tears, (id); see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8[th]. Cir. 1990)

661. In addition to the foregoing reason, Petitioner Miller, at his Post Conviction evidentiary hearing, would have *also* met the second prong for prejudice, in that there is a _reasonable probability_ that but for counsel's unprofessional errors [*in failing to properly comply with the requirements of* **Tenn. S.Ct. Rule. 13§(5)(b)** *(2) for funding of a blood spatter expert, and pathologist* ]....the result of the

proceeding would have been different....." *Tears,* (id); see also   State v.

Zimmerman,   823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v

Armontrout,, 907 F. 2d. 825, 832 (8th. Cir. 1990)

662.   Petitioner avers that all of the above referenced evidence (i.e attached exhibits,

arguments, factual averments etc..) if presented at an evidentiary hearing in

support of **claims (XXXI) -(XXXVIII)** in the instant **28 § U.S.C. 2254** Habeas

petition, "would resolve a factual dispute". (ie. Show that at his post conviction

evidentiary hearing, he would have been entitled to relief as a matter of state law,

had Post conviction Counsel Banks properly presented this exculpatory evidence,

in order to prove Trial Counsel Houghtons' ineffectiveness)

663.   Thus, Petitioner Miller has clearly shown, in support of **claims (XXXI) -**

**(XXXVIII)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the

State law announced in *Horsby* (supra), *Tears*, (supra), *Zimmerman* (supra); he

would have been entitled to Post Conviction relief, had Post Conviction Counsel

Banks, made adequate and proper arguments that Trial Counsel Houghton

rendered ineffective assistance of Counsel.

## VII. SPECIFIC CLAIMS (IXL)-(XLII) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:
*Failure's with Respect to witness Kathy Blackwell*

**(IXL) Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that during the original August 1996 trial, Judge Jerman, had no lawful authority to personally examine Mrs. Blackwell**

**(XL) Trial Counsel Perianne S. Houghton, was ineffective at the August 2001 retrial for failing to have stricken any and all portions of Mrs. Blackwell's inculpatory testimony *incident to her in court Judicial examination* from the original 1996 trial**

**(XLI) Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, was ineffective for failing to have stricken any and all portions of Mrs. Blackwell's inculpatory testimony incident to TBI S.A. Brian Byrd's, interview at the original 1996 trial**

**(XLII ) Trial Counsel Perianne S. Houghton, was ineffective for failing to have stricken any and all portions of Mrs. Blackwell's inculpatory testimony incident to TBI S.A. Brian Byrd's, interview, because there was was never a proper foundation for the authenticity and admissibility of the alleged statements at the original 1996 trial.**

664. The following facts and arguments are being offered in support of the substantial

Constitutional Claims, **(XL)** & **(XLII)** and procedural gateway claims **(IXL)** &

**(XLI)**

239

665. Petitioner avers that during the original August 1996 trial, then-presiding-Haywood-County Circuit Court Judge, Dick Jerman, Jr. had no lawful authority pursuant to Tenn.R.Evid. Rule 614 to conduct an in court examination of Kathy Blackwell.

666. Indeed Cathy Blackwell was called and then subjected to direct and cross examination by the respective parties.

667. Katherine Blackwell, testified first as a state's witness, during which time she essentially claimed total memory loss of pertinent events as she had previously described in statements given to the T.B.I. and a defense investigator.

668. The court allowed the prosecution to treat Blackwell as a hostile witness, as was their prerogative, however, after Blackwell completed her testimony, the court had the jury removed from the courtroom, then sua sponte advised Blackwell,

> I'm going to let you go into the custody of the Sheriff and see if your memory gets any better. For purposes of this record, I don't find the fact that you say you don't remember to be credible. . . . And so, you go with the Sheriff, and when you feel like that you can remember and you can come back in here and testify truthfully before this jury, you can let me know. Until then you can remain in the custody of the Sheriff. (Tr. I. Vol I, )

669. Thereafter, Special Agent Bryan Byrd testified for the state. During the course of his investigation, he took two signed statements from Blackwell. He read both of these statements to the jury. In them, Blackwell claimed that she saw the defendant and the victim together around 1:00 on the morning of the murder at the

location where the murder later took place. Around 2:00 that morning, the defendant and another man came to the house where Blackwell and Sheila Bernil were living. The defendant was angry. Several hours later, Blackwell went to buy crack cocaine from the defendant. He was driving a car like one she had previously seen the victim driving. The defendant told her that the victim was dead.

670.    After the state rested, the court allowed the state to reopen its proof, and the court called Blackwell as its own witness. The court explained to the jury: "I'm calling her as my own witness. Neither side will have to vouch for her credibility, but I asked her to take her statements and go back and -- and try to remember what happened and see if her memory improved any."

671.    Judge Jerman, then addressed the witness, "Now, what I want you to do is I want you to tell these ladies and gentlemen in your own words what happened that night, and . . . I want you to tell them the truth, whatever that is . . . ."

672.    At that time, Mrs. Blackwell then proceeded to testify in accord with her previous statements. She said her memory had improved in the hours since her first appearance on the witness stand because she did not want to go to jail.

673.    Blackwell also testified that she had been beaten by three unknown assailants shortly after she talked to the T.B.I. She said she did not know why the beating

occurred, but she could think of no reason other than her involvement in this case. She admitted, however, that she had not received any threats relative to this case.

674. The first and foremost critical error was that, the judge in effect violated Tenn.R.Evid. Rule 614 *at Petitioner's original August 1996 trial*, because he never made a finding of extraordinary circumstances that would have justified calling her as a court witness.

675. Tenn.R.Evid. Rule 614(b) expressly permits the trial court to interrogate witnesses, but 614(a) admonishes that that the court may not call witnesses except in extraordinary circumstances.

676. In Thompson v Thompson 2009 Tenn.App. Lexis 708, September 15th, 2009, the Trial courts decision was reversed and remanded due to abuse of authority under 614(a). ("..in the case now before us, the trial court obtained documentary evidence from Ms. Hunter that was used by the trial court in calculating child support. No extraordinary circumstances were shown which would have allowed for such a sua sponte investigation....")

677. Likewise, in Petitioner Miller's first trial then presiding Judge Jerman, simply didn't like the testimony offered by the witness Mrs. Blackwell, and ordered her in effect to give testimony he desired.

678. At Petitioner Miller's August 1996 original trial Judge Jerman's unusual procedure

influenced the witness's testimony to the Petitioner's detriment.

679. Indeed, the trial court told the witness, "Until [you can testify truthfully] you can remain in the custody of the sheriff." Later, during her second visit to the witness stand, the witness testified her memory had improved in the last few hours "because I didn't want to go to jail." (id)

680. Furthermore, the witness's testimony once she abandoned her claim of memory loss was *probative of the defendant's guilt.* Her testimony placed the defendant with the victim around 1:00 a.m. on the night of the murder. About an hour later, the defendant and another man came to the house where the witness was living and argued with the witness's roommate about whether the men could come inside. This evidence is significant because it is contrary to the defendant's statement to the police the he was not in Brownsville on the night of the murder. Blackwell also testified that she saw the defendant several hours later, and he told her about the victim's death. This was prior to the discovery of the victim's body. Further, the witness testified she had been assaulted after talking to the T.B.I. and offered the possibility of a causal connection between the two events. Clearly, the trial court's actions influenced testimony which was damaging to the defense.

681. Thus Judge Jerman abused his discretion because, the manner in which he exercised it amounted to a comment on the evidence. Montesi v. State, 220 Tenn.

354, 370, 417 S.W.2d 554, 561 (1967); see Tenn. Const. art. VI, 9. The trial court should exercise its discretion only where doing so will further the interests of justice. Montesi, 220 Tenn. at 370, 417 S.W.2d at 561.

682. Petitioner avers that Judge Jerman, during the original August 1996 trial overstepped the lawful and permissible bounds of witness admonishment as established in State v. Schafer, 973 S.W.2d 269, 278 (Tenn. Crim. App. 1997).

683. Indeed, a trial court may not declare its belief the witness is being untruthful and threaten the witness with prosecution for perjury to such a degree that the witness changes his testimony to the detriment of the defendant. Schafer, 973 S.W.2d at 278. When the trial court's actions exceed the bounds of an appropriate warning, "the defendant's right to a fair trial is compromised and the outcome of the trial brought into question." Schafer, 973 S.W.2d at 278.

684. Furthermore, the introduction of the statements, also violated the hearsay rules, in that the statements, couldn't have been lawfully introduced by Special Agent Bryan Byrd during his testimony for the state, as they were. They could only be introduced by asking Mrs. Blackwell whether she made these statements and then if she denied them, she had to be directly cross examined herself.

685. Indeed the Criminal Court of appeals, in commenting on this very same line of reasoning stated:

244

> We have mentioned above that T.B.I. Agent Byrd, a state witness, read to the jury the written pretrial statements wherein Blackwell described her early-morning encounters with the defendant. This account helped to establish the defendant's presence in Brownsville at the time of the murder. The evidentiary rationale for admitting these statements was not clear, ..............Out of curiosity, we have examined the admission into evidence of Blackwell's extrajudicial statements.....
>
> The method of presenting this evidence -- via a second state witness -- suggested that the state may have been trying to impeach Blackwell's testimony through the use of a prior inconsistent statement. See Tenn. R. Evid. 613. However, if this was the strategy, the state did not explain it as such to the court. Nor did the court instruct the jury that the evidence could be used only for impeachment purposes. Therefore, the statements in fact came in as substantive evidence to prove the truth of the matter asserted, that is, that the defendant was in the locality in the early morning hours of April 20, 1995, and that he knew of the victim's death before the discovery of the body. (Miller I., id)

686. In further showing that the admission of Kathy Blackwell's statement through the testimony of Officer Bryn Bryd was illegal and erroneous, we can look to the fact that the state never showed Kathy Blackwell her own supposed statements given to Officer Byrd, and directly asked her on the stand whether she in fact made them or not.

687. This point was off particular importance and was highlighted by the Court of Criminal appeals themselves when they wrote,

> we have reviewed our rules of evidence to determine whether the statements are admissible under some exception to the hearsay rule. See Tenn. R. Evid. 802, 803. The only exception which conceivably applies is the exception for the use of a recorded recollection. See Tenn. R. Evid. 803(5); ........ Under rule 803(5), "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately" is admissible as substantive evidence if the memorandum can be "shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly." If admitted, such a memorandum may be "read into evidence but may not itself be received as an exhibit unless offered by an adverse party." The Advisory Commission Comments to rule 803(5) say, "The

safeguard is the requirement of adoption at the time when the witness could vouch for the document's correctness." (Emphasis added.) ......In her testimony Blackwell admitted that she gave a statement to the T.B.I. and that, at the time such a statement was given, she would have told the truth. .... *On the other hand, the witness did not acknowledge at trial that the written statements possessed by Byrd were her statements.* (id. Miller I, Ftnt#16)

688.   The court went on to hold that admission of Kathy Blackwells statements as

substantive evidence would have been deemed an error.

689.   Therefore, in Petitioner's case even the Criminal Court of appeals had to conclude

that:

we believe this error mandates reversal.15 See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); Schafer, 973 S.W.2d at 278. First, the trial court's actions resulted in serious prejudice to the defendant. When Blackwell returned to the witness stand, her testimony was not merely duplicative of evidence already before the jury via Special Agent Byrd.Rather, she made an additional extremely damaging claim that she had been assaulted and that the assault might be attributable to the defendant. Moreover, her initial reluctance to testify which was overcome only by the prospect of incarceration was played out before the jury. Unquestionably in these circumstances the testimony upon the witness's second trip to the stand suggest that she had been previously coerced not to testify against the defendant. *Second, the entire procedure was prejudicial to the judicial process.* Tenn. R. App. P. 36(b) (judgment shall be set aside if it "would result in prejudice to the judicial process"); Tenn. R. App. P. 52(b) (plain error may be noticed "where necessary to do substantial justice"). (Miller I)(emphasis added)

690.   Trial Counsel Houghton, was ineffective at the August 2001 retrial for failing to

have stricken any and all portions of Mrs. Blackwell's inculpatory testimony

*incident to her in court Judicial examination* from the first August 1996 trial

because there was never a finding of extraordinary circumstances pursuant

pursuant to Thompson v Thompson 2009 Tenn.App. Lexis 708.

246

691. Trial Counsel Houghton, was ineffective for failing to have stricken any and all portions of Mrs. Blackwell's: (i) inculpatory testimony incident to TBI S.A. Brian Byrd's, interview; and (ii) her coerced testimony offered after her post incarceration period at the original August 1996 trial.

692. During the August 2001 retrial Trial Counsel Houghton, was ineffective for failing to have barred and deemed inadmissible, any and all portions of Mrs. Blackwell's inculpatory testimony incident to TBI S.A. Brian Byrd's, interview admitted from the original August 1996 trial because there was was never a proper foundation for the authenticity and admissibility of the alleged statements, in light of the fact that Mrs. Blackwell never acknowledged making them at the original August 1996 trial.

693. Petitioner avers that just like the Petitioner in Thompson, (surpa) he too would have been entitled to a new trial, had Post conviction counsel Banks, explained to the post conviction court that trial Counsel Houghton failed to effectively challenge Judge Lafferty's abuse of discretion at the August 2001 retrial, by forcefully challenging and explaining that Jerman abused his of authority under Tenn.R.Evid. 614., during Petitioner Miller's original August 1996 trial.

694. And her collective failure to do so, constituted a deficient performance, that so "....undermined confidence in the outcome of the prosecution as to demonstrate

sufficient prejudice to satisfy the second prong of Strickland..." (id. Harris At 665-666)

695. Insomuch as but for Counsel Houghton's failure the outcome of Petitioner's motion for new trial and direct appeal would have been different. **Lewis v. U.S. 187 F.2d. 636, (C.A. 6 (Ky.) 1999)**(a colorable claim of Ineffective assistance of counsel is made, upon a showing that "...the [proper] direct appeal of these issues would likely have been successful." )

696. Thus, had Post conviction Counsel Banks properly presented this argument at the August 19th, 2014 evidentiary hearing, Petitioner Miller would have been entitled to an automatic new trial pursuant to *Thompson* (supra) and *Schafer* (supra)

697. Furthermore, based on a plain and clear reading of the decisions of *Thompson* (supra) and S*chafer* (supra) Petitioner Miller has clearly demonstrated that, as a matter of state law, Trial Counsel Houghton rendered ineffective assistance of Counsel by failing to effectively challenged the admissibility of the coerced testimony of Kathy Blackwell. see U.S. Const. Amend. VI ; Tenn. Const. Art. I, 8.

698. Indeed, the judgments of the trial court would have been reversed and the case remanded for new trial, specifically due to the failure of trial Counsel Houghton to properly challenge the prejudice caused by the combined abuse of discretion committed by both Judge Jerman in 1996 and then Judge Lafferty in August 2001.

699. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

700. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly challenge the admissibility of Kathy Blackwell's coerced testimony via errenous Trial Court examination and Hearsay violations*].....the result of the proceeding *would* **have been different.....**"; State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8[th]. Cir. 1990)

701. Petitioner avers that all of the above referenced evidence (i.e attached exhibits, arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (IXL) -(XLII)** in the instant **28 § U.S.C. 2254** Habeas petition "would resolve a factual dispute". (ie. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law, had Post

conviction Counsel Banks properly presented this argument at the August 19th, 2014 evidentiary hearing, in order to prove Trial Counsel Houghtons' ineffectiveness)

702. Thus, Petitioner Miller has clearly shown, in support of **claims (XXIX) -(XXX)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law announced in *Thompson* (supra) and *Schafer* (supra) he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## VIII. SPECIFIC CLAIMS (XLIII)-(XLIV) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:

*Failures with respect to witness Nina Champion*

> **(XLIII)** Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that during the original August 1996 trial, Judge Jerman, failed to make a lawful finding of unavailability of Nina Champion

> **(XLIV)** Trial Counsel Perianne S. Houghton, was ineffective for failing to put on adequate supporting evidence and properly argue that during the original August 1996 trial, Judge Jerman, failed to make a lawful finding of unavailability of Nina Champion

703. The following facts and arguments are being offered in support of the substantial Constitutional Claim, **(XLIII)** and procedural gateway claim **(XLIV).**

704. During the original August 1996 trial, Judge Jerman, failed to make a lawful finding of unavailability of Nina Champion, based on the lack of diligence of the Haywood County D.A.'s office in attempting to locate her.

705. Indeed Mrs. Champion could have been located and produced as a witness, if either the D.A';s office or the Brownsville Police Dept. had been diligent in their attempts to locate her.

706. Once again we must remember, that these are the same groups of state actors who

251

claimed hat they were unable to locate Mr. Jimmy Johns, who was a material witness with regard to the criminal conduct of Shelia Bernil, (see Attached Exhibit #4  Statement of Jimmy Johns directly implicating State Witness Shelia Bernil), (see also. **CLAIMS (IX)-(XVI) pp. 102, [supra]**)

707.  Indeed, in *Miller I* (supra) the Court of Criminal Appeals made the following findings reflecting their lack of faith in the assertions of the D.A and law enforcement:

> At the first of four hearings on the motion for new trial, Investigator Johnny Blackburn testified that he was aware that Bernil had been implicated by Barbara Blade in a forgery scheme when Blade was arrested thereon. Investigator Blackburn had investigated this information but had not been able to develop sufficient evidence to charge Bernil. **Significantly, he had been unable to locate a key witness**. (id) (emphasis added)

708.  However even the court knew that this statement necessarily reflected the fact that B.P.D. had failed to exercise even a modicum of diligence because the Court further found:

> **At this first hearing, the trial court indicated its skepticism** ....of the prosecution's claim there was no deal with Bernil. The court asked the prosecution to request a T.B.I. investigation of whether there was sufficient evidence to charge Bernil, whether a non-prosecution deal had been struck with Bernil, and whether the prosecution or the officers knew Bernil might be charged with a crime at the time of her testimony........
> Thereafter, the defense filed an amended motion for new trial alleging the trial court erred in denying complete access to the T.B.I. file and in reversing its previous order on the motion for new trial. A*n affidavit of Jimmy Johns, who was the witness the investigator claimed he had been unable to locate, was attached to the amended motion.* (id)

709.  Petitioner avers that Trial Counsel Houghton was ineffective for failing to properly

argue at his August 2001 retrial, that his constitutional right of confrontation was impermissibly curtailed by the admission of Champion's former testimony.

710. In Tennessee, admission of former testimony is governed by Tennessee Rule of Evidence 804, which provides a hearsay exception for the former testimony of a declarant who is unavailable as a witness if the testimony was" . . . given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination."Tenn. R. Evid. 804(b)(1).

711. However, before such testimony will be admitted, however, the proponent must establish that the witness "is absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

712. Further, in cases such as the one at bar in which the prosecution seeks to offer the former testimony of an unavailable witness, the state must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. *First, the state must show that the declarant is truly unavailable, after good faith efforts to obtain her presence,* and second, that the evidence

carries its own indicia of reliability. State v. Arnold, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (stating the rule of Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)).

713. During the original August 1996 trial, Judge Jerman, failed to make a lawful finding of unavailability of Nina Champion, based on the lack of diligence and the fact that there was no genuine good faith effort of the Haywood County D.A.'s office.

714. Based on the foregoing, its beyond question that Petitioner Miller has proven that Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

715. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly challenge the unavailability of Nina Champion and the admission of her Hearsay statements*].....the result of the proceeding *would* **have been different**.....''; see

also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing

Chambers v Armontrout, 907 F. 2d. 825, 832 (8th. Cir. 1990)

716. Petitioner avers that all of the above referenced evidence (i.e attached exhibits,

arguments, factual averments etc..) if presented at an evidentiary hearing in

support of **claims (XLIII) - (XLIV)** in the instant **28 § U.S.C. 2254** Habeas

petition "would resolve a factual dispute". (ie. Show that at his post conviction

evidentiary hearing, he would have been entitled to relief as a matter of state law,

had Post conviction Counsel Banks properly presented this argument at the August

19th, 2014 evidentiary hearing, in order to prove Trial Counsel Houghtons'

ineffectiveness)

717. Thus, Petitioner Miller has clearly shown, in support of **claims (XLIII) - (XLIV)**

in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law he

would have been entitled to Post Conviction relief, had Post Conviction Counsel

Banks, made adequate and proper arguments that Trial Counsel Houghton

rendered ineffective assistance of Counsel.

## IX. SPECIFIC CLAIMS (XLV)-(XLVI) THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:

### -DEFICIENT TRIAL PERFORMANCE WITH RESPECT TO JURY COMPOSITION AND INTEGRITY:

**(XLV)       Post Conviction Counsel Michael J. Banks was ineffective pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct., 1309 (2012), when he failed to properly present, argue and preserve the 6th U.S. Const. Amend claim that Trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue and demonstrate that an alternate juror who was used to replace Juror Sonya Bell, had not been present for all of the evidence and testimony.**

**(XLVI       Trial Counsel Perianne S. Houghton, was ineffective for failing to properly argue and demonstrate that Petitioner Miller's 6th U.S. Const. Amend right to a jury trial was violated due to the use of an alternate juror who had not been present during all of the trial proceedings wherein evidence and testimony was received into the record.**

718. The following facts and arguments are being offered in support of the substantial Constitutional Claim, **(XLVI)** and procedural gateway claim **(XLV).**

719. In the case at Bar Court of criminal Appeals reached the following conclusion:

> On the second day of trial, a bomb threat was relayed to the trial judge. The judge ordered one of the sheriff's deputies to take the jury to the train station for safe-keeping. The judge did not give the jurors any instructions. The judge also did not give any of the pending witnesses any instructions. Trial did not resume that day.
> Trial resumed the next morning. Juror Westbrook stated that she discussed the "matter" with her grandchildren. Juror Sonya Bell did not return, so the trial judge replaced her with an alternate juror. (Miller III, 2013 Tenn. Crim. App. LEXIS 69)

720. Petitioner avers that the alternate juror was not present during all of the times in which evidence and testimony was put forth, therefore replacing Juror Sonya Bell

with this alternate violated Petitioner's right to a jury trial.

721. This case concerns the requirement that every defendant in a criminal case receive "a fair trial by a panel of impartial, 'indifferent' jurors," which is a "basic requirement of due process." Irvin v. Dowd, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961) (quoting In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955)).

722. The Sixth Amendment to the United States Constitution and Article I, Section IX of the Tennessee Constitution guarantee a criminal Defendant the right to trial "by an impartial jury." Moreover, the Tennessee Constitution guarantees every accused "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn. 1954)). Thus, the function of voir dire is essential. Voir dire permits questioning by the court and counsel in order to lead respective counsel to the intelligent exercise of challenges. Id. (citing 47 AM. JUR. 2D Jury §95 (1969)). "Since full knowledge of facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" Id. at 355 (quoting 47

AM. JUR. 2D Jury 208 (1969)).

723.  The common law rules governing challenges to juror qualifications typically fall

in two categories: propter defectum or propter affectum. An objection based upon

general disqualifications, such as alienage, family relationship, or statutory

mandate, falls within the propter defectum, or "on account of defect," class, and,

as such, must be made before the return of a jury verdict. Id. Propter affectum,

meaning "on account of prejudice," is based upon the existence of bias, prejudice,

or partiality towards one party in the litigation actually shown to exist or presumed

to exist from circumstances and may be challenged after the return of the jury

verdict. Id. This court has described "bias in a juror [as] a leaning of the mind;

propensity or prepossession towards an object or view, not leaving the mind

indifferent; a bent; for inclination." Id. at 354 (citation omitted). Thus, when a

juror conceals or misrepresents information tending to indicate a lack of

impartiality, a challenge may properly be made in a motion for new trial. Id. at

355.

724.  In the case at bar, the alternate juror's qualifications were adversely effected by

propter defectum, because by definition this juror didn't hear all of the evidence

submitted a trial.

725.  Based on the foregoing, its beyond question that Petitioner Miller has proven that

Trial Counsel Houghton's performance undoubtedly "[fell] below the range of competency demanded of attorney's in criminal cases.", and as a result of this deficient performance Petitioner Miller suffered real prejudice and was deprived of his right to a full and fair jury trial, (see 6th Amend U.S. Const.; Art. 1 § 9, Tenn. Const.). (See also Strickland, at 687 (Supra) and Overton v. State 874 S.W 2d. 6, 11 (Tenn. 1994).

726. Therefore, Petitioner Miller, at his Post Conviction evidentiary hearing, would have met the second prong for prejudice, in that there is a *reasonable probability* that but for counsel's unprofessional errors [*in failing to properly challenge the lawful jurisdiction of the empaneled jury, due to the fact that one of the jurors didn't hear all of the evidence introduced into the record.*].....the result of the proceeding *would* **have been different.**....."; see also State v. Zimmerman, 823 S.W. 2d. 220, 225 (Crim. App. 1991) citing Chambers v Armontrout, 907 F. 2d. 825, 832 (8[th]. Cir. 1990)

727. Petitioner avers that all of the above referenced evidence (i.e attached exhibits, arguments, factual averments etc..) if presented at an evidentiary hearing in support of **claims (XLV) - (XLVI)** in the instant **28 § U.S.C. 2254** Habeas petition "would resolve a factual dispute". (ie. Show that at his post conviction evidentiary hearing, he would have been entitled to relief as a matter of state law,

had Post conviction Counsel Banks properly presented this argument at the August 19th, 2014 evidentiary hearing, in order to prove Trial Counsel Houghtons' ineffectiveness)

728.  Thus, Petitioner Miller has clearly shown, in support of **claims (XLV) - (XLVI)** in the instant **28 § U.S.C. 2254** Habeas petition, that pursuant to the State law he would have been entitled to Post Conviction relief, had Post Conviction Counsel Banks, made adequate and proper arguments that Trial Counsel Houghton rendered ineffective assistance of Counsel.

## X.  SPECIFIC CLAIMS (XLVII)-(LII) ; THAT JUSTIFY AN EVIDENTIARY HEARING AND EXPANDING THE RECORD:
### -State Court reached an unreasonable Determination in light of the facts and evidence:

729.  The following facts and arguments are being offered in support of the substantial

Constitutional Claims, **(XLVII)-(LII),** which have been previously adjudicated at

the state court level.

> **(XLVII.)** The Court of Criminal Appeals Court reached a decision that was both contrary to, and involved an unreasonable application of clearly established Federal law, pursuant to Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2D 389 (2000), when it found that Trial Counsel Perianne S. Houghton was not ineffective for failing to call three defense witnesses; to wit: Mr. Rosa Carney George Liggons, Lucille Miller

> **(XLVIII.)** The Court of Criminal Appeals Court reached a decision that was an unreasonable determination of the facts in light of the evidence presented, when it found that Trial Counsel Perianne S. Houghton was effective despite failing to call three potential witnesses Mr. Rosa Carney George Liggons, Lucille Miller.

> **(XLIX.)** The Court of Criminal Appeals Court reached a decision that was both contrary to, and involved an unreasonable application of clearly established Federal law, as determined by the U.S. Supreme Court when it found that the trial court did not err in refusing to grant a mistrial after a bomb threat;

> **(L.)** The Court of Criminal Appeals Court reached a decision that was an unreasonable determination of the facts in light of the evidence presented, when it found that the trial court did not err in refusing to grant a mistrial after a bomb threat;

> **(LI.)** The Court of Criminal Appeals Court reached a decision that was both contrary to, and involved an unreasonable

**application of clearly established Federal law, as determined by the U.S. Supreme Court when it found that the trial court did not err in allowing the prior testimony of an unavailable witness to be read into the record.**

**(LII.) The Court of Criminal Appeals Court reached a decision constituted an unreasonable determination of the facts in light of the evidence presented, when it found that the trial court did not err in allowing the prior testimony of an unavailable witness to be read into the record.**

730. On the second day of Petiitoner Miller's August 2001 retrial a bomb threat was relayed to the trial judge. The judge ordered one of the sheriff's deputies to take the jury to the train station for safe-keeping. The judge did not give the jurors any instructions. The judge also did not give any of the pending witnesses any instructions. Trial did not resume that day.

731. It's beyond question that the dismissal of the jury "during a threat of serious harm ... is enough to consider that the jurors were tainted and potentially unwilling to return and pay real attention to the facts and evidence presented at trial"

732. Therefore, "It is understandable that a reasonable juror would have concerns for their own safety in a building that had been threatened by a bomb and would have difficulty in continuing to serve with a clear mind."

733. Thus, the inescapable conclusion is that the trial court abused its discretion in denying his motion for a mistrial.

734. This case concerns the requirement that every defendant in a criminal case receive "a fair trial by a panel of impartial, 'indifferent' jurors," which is a "basic requirement of due process." Irvin v. Dowd, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961) (quoting In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955)).

735. In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. Mattox v. United States, 146 U.S. 140, 148-150, 36 L. Ed. 917, 13 S. Ct. 50; Wheaton v. United States, 133 F.2d 522, 527.

736. This court has not limited the Remmer requirements to cases in which there is a deliberate attempt to subvert the jury process in some way. See United States v. Walker, 1 F.3d 423 (6th Cir. 1993) (highlighted transcripts of video taped deposition that jury heard were inadvertently sent to jury room with exhibits); United States v. Cooper, 868 F.2d 1505 (6th Cir.) (prosecutor's handwritten notes

found their way into jury room), cert. denied, 490 U.S. 1094, 104 L. Ed. 2d 996, 109 S. Ct. 2440 (1989). Rather, we require a Remmer hearing in all cases involving an unauthorized communication with a juror or the jury from an outside source that presents a likelihood of affecting the verdict. Walker, 1 F.3d at 429.

737. Therefore, the Court of criminal appeals decision in up holding Judge Lafferty's 2001, denial of Petitioner's motion for new trial, due to the Bomb Threat, was T both contrary to, and involved an unreasonable application of clearly established Federal law, pursuant to Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2D 389 (2000),

738. The Tennessee Court of Criminal Appeal's decision was "contrary to" Supreme Court precedent because "....the state court arrives[d]at a conclusion opposite to that reached by [the Court] on a question of law," and "...[the Tenn. Court of Crim.App. ] .....confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Court's decision. ..."Alley v. Bell, 307 F.3d 380, 385 (6th Cir. 2002) (internal citation omitted) (quoting Williams, 529 U.S. at 405, 409-10), cert. denied, 157 L. Ed. 2d 72, 124 S. Ct. 99 (2003) (with modifications)

739. Petitioner further avers that the Court of Criminal Appeal's decision "...involve[d] an "unreasonable application" of clearly established Supreme Court precedent

[because] it correctly identifie[d] the governing legal standard but applie[d] it to the facts of the case before it in an objectively unreasonable manner...."(id. *Alley*

740. Furthermore, Petitioner Miller avers that the Court of criminal appeal's decision to up hold Judge Lafferty's 2001, denial of Petitioner's motion for new trial, due to the Bomb Threat, was an unreasonable determination of the facts in light of the evidence presented.

741. Likewise, the Court of criminal appeal's decision to up hold Judge Lafferty's 2001, decision to allow both the prior testimony of eyewitnesses Kathy Blackwell and Nina Champion was an unreasonable determination of the facts in light of the evidence presented.

742. In cases such as the one at bar in which the prosecution sought to offer the former testimony Mrs. Kathy Blackwell and Nina Champion, who were both unavailable witness, the Supreme Court has held that the state must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the state must show that the declarant is truly unavailable after good faith efforts to obtain her presence, and second, ***that the evidence carries its own indicia of reliability***.(stating the rule of Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)).

743. Likewise, the Court of criminal appeal's decision to up hold Judge Lafferty's 2001,

decision to allow the prior testimony of unavailable eyewitnesses Kathy Blackwell and Nina Champion to be admitted to the jurors, involved an unreasonable application of clearly established Federal law, as determined by the U.S. Supreme Court. Because this testimony of Mrs Blackwell was by no means reliable-it was coerced.

744. Therefore, the Court of Criminal Appeals reached a decision that constituted an unreasonable determination of the facts in light of the evidence presented, when it found that the trial court did not err in allowing the prior testimony of an unavailable witness to be read into the record, because the evidence clearly evinced that Mrs. Blackwell's testimony lacked a sufficient indicia of reliability.

745. Furthermore, the Court of Criminal Appeal's decision that Trial Counsel Perianne S. Houghton was not ineffective for failing to call three defense witnesses; to wit: Mr. Rosa Carney George Liggons, Lucille Miller, was both (i) an unreasonable determination of the facts in light of the evidence presented; and (ii) "contrary to" Supreme Court precedent.

746. It was "contrary to" Supreme Court precedent because "....the state court arrives[d]at a conclusion opposite to that reached by [the Court] on a question of law".

747. To evaluate these claims, the Sixth Circuit summarized the Supreme Court's

precedents governing legal principles on ineffective assistance of counsel claims. Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). In Mitchell, the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel's performance was deficient on specific issues and was demonstrably prejudicial to the defendant.

748. Clearly failing to call exculpatory alibi eyewitnesses on behalf of Petitioner was deficient, and prejudicial because had these witnesses been called no reasonable juror would have convicted Petitioner Miller of the murder of Donald Rice.

749. As a result, the Court of Criminal Appeal's decision that Trial Counsel Perianne S. Houghton was **_not_** ineffective for failing to call the three abovementioned defense witnesses was both (i) an unreasonable determination of the facts in light of the evidence presented; and (ii) "contrary to" Supreme Court precedent.

# XI. SPECIFIC CLAIM (LIII) THAT JUSTIFIES AN EVIDENTIARY HEARING AND EXPANDING THE RECORD: -Petitioner Miller is actually innocent of the April 20th, 1995 Murder of Mr. Donald Rice:

750. In support of this Claim (LIII) Petitioner would rely on all of the factual averments, evidence and legal arguments, contained within **Claims (I) – (VIII). pp. 31 -96,** in the instant petition.

## CONCLUSION:

751. Petitioner currently has no petition or appeal now pending in any court, either state or federal, as to the judgments under attack.

752. The following is a list of the name and address, of each attorney who represented Petitioner though the following stages of the case that resulted in the judgment under attack:

    (a) At preliminary hearing:    Mr. Tom Crider
    (b) At arraignment and plea:   Mr. Tom Crider
    (c) At trial:                    Mrs. Perianne S. Houghton
    (d) At sentencing:        Mrs. Perianne S. Houghton
    (e) On appeal:            Mrs. Perianne S. Houghton

753. In the judgment's Petitioner is attacking he was sentenced for all counts of the indictment at the same time, as a result of the same criminal trial.

754. Petitioner has no future sentence to serve after he completes the sentence imposed

by the judgment under attack.

The instant petition for Habeas Corpus Relief is being filed November 13th , 2015.

**Wherefore**, petitioner prays that the court grant petitioner the relief to which petitioner is entitled in this proceeding.

## SELF VERIFICATION AND DECLARATION
## PURSUANT TO 28 U.S.C. § 1746

Pursuant to **28 U.S.C.** § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my belief, information, and knowledge.

Executed on: <u>November 12th, 2015.</u>

<u>Dwight Miller</u>
Signature of Petitioner

**STATE OF TENNESSEE**      )
                                          :
**COUNTY OF WAYNE**         )

**SWORN TO AND SUBSCRIBED** before me this the _12_ day of November , 2015

<u>Wanda Spears</u>
N O T A R Y   P U B L I C

My Commission expires: _11-19-18_