IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DWIGHT MILLER,                          )
                                        )
        Petitioner,                     )
                                        )
v.                                      )          Case No. 1:15-cv-01281-STA-jay
                                        )
KEVIN GENOVESE,                         )
                                        )
        Respondent.                     )

ORDER DENYING MOTION FOR EVIDENTIARY HEARING,
DENYING § 2254 PETITION,
GRANTING A LIMITED CERTIFICATE OF APPEALABILITY,
AND
CERTIFYING THAT A LIMITED APPEAL WOULD BE TAKEN IN GOOD FAITH

Petitioner Dwight Miller has filed a *pro se* habeas corpus petition (the "Petition"),
pursuant to 28 U.S.C. § 2254 (ECF No. 1), as well as a motion for an evidentiary hearing (ECF
No. 43). For the following reasons, the motion and the Petition are **DENIED**. Petitioner will,
however, be **GRANTED** a limited certificate of appealability and leave to appeal *in forma
pauperis*.

**BACKGROUND**

The following background summary is drawn from the state court record (ECF No. 24)
and the decisions in Miller's first direct appeal ("*Miller I*"), direct appeal after retrial ("*Miller
II*"), delayed direct appeal after retrial ("*Miller III*"), and appeal from denial of post-conviction
relief ("*Miller IV*"). *See State v. Miller*, No. 02C01-9708-CC-00300, 1998 WL 902592, at *1
(Tenn. Crim. App. Dec. 29, 1998) (*Miller I*); *State v. Miller*, No. W2001-03095-CCA-R3-CD,

1

2004 WL 115374, at *1 (Tenn. Crim. App. Jan. 14, 2004), *perm. appeal denied* (Tenn. May 10, 2004) (*Miller II*); *State v. Miller*, No. W2011-00447-CCA-R3-CD, 2013 WL 324401, at *1 (Tenn. Crim. App. Jan. 28, 2013), *perm. appeal denied* (Tenn. Jan. 28, 2013) (*Miller III*); *Miller v. State*, No. W2014-02093-CCA-R3-PC, 2015 WL 3881597, at *1 (Tenn. Crim. App. June 24, 2015), *perm. appeal denied* (Tenn. Oct. 16, 2015) (*Miller IV*).

## I.      First Trial and Direct Appeal

In July 1995, a Haywood County, Tennessee, grand jury returned an indictment charging Miller with the first degree murder of Donald Rice.  (ECF No. 24-1 at 4-5.) [1]  At Petitioner's jury trial, the "[e]yewitness testimony of Clement Harris, who was sitting outside a housing project [on Fairground Road in Brownsville] at the time of the crime, established the defendant as the perpetrator."  *Miller I*, 1998 WL 902592, at *1.  He testified that sometime between one and two o'clock in the morning of April 20, 1995, he observed "Rice and the defendant . . . sitting in their cars, which were parked driver's window to driver's window," and noticed that there was someone in the car with Miller.  *Id.*; (ECF No. 24-3 at 53, 60, 61.)  He knew Miller from high school and Rice "from the streets."  (ECF No. 24-3 at 59.)  The men engaged in a short conversation, after which Rice began backing away.  (*Id.* at 60.)  Miller said "Come here Donald. Come here, Donald," to which Rice replied "No.  You're bullshitting, Dwight."  (*Id.* at 60.)  Harris testified that he recognized Miller's voice.  (*Id.* at 64.)  When Rice moved toward the defendant's car, Harris saw gunfire from the driver's window where Miller was seated.  (*Id.* at 60.)

---

[1]  In their respective briefs, the parties cited to the state court record at ECF No. 21.  The Clerk of Court discovered a deficiency in the docketing of the record as originally filed, and directed Respondent to refile the record.  (ECF No. 22.)  The refiled record appears at ECF No. 24.  Citations to the state court record in this order are to ECF No. 24, rather than ECF No. 21.

Harris observed that Miller exited his car, moved Rice's body over, and drove away. (*Id.*) The unknown person drove away in Miller's car. (*Id.* at 60, 65.) As both cars drove by Harris, who at that point was a couple of car lengths away, Harris could see Miller and the unidentified individual clearly. (*Id.* at 65.) Harris stated that "after they drove off," he "went over to a guy that stayed across the street—Mose Com[]age's house and told him about it." (*Id.* at 66.)

Harris further testified that he had seen Miller and the other individual earlier that day at "the Projects on Fairground . . . and asked [Miller] for a cigarette." (*Id.* at 67.) Harris observed "a shot gun shell" in Miller's car "when [Miller] pulled the armrest up and gave [Harris] a cigarette." (*Id.*)

On cross-examination, Harris admitted he was a cocaine user and had felony convictions for drugs, robbery, and forgery. (*Id.* at 72.) The witness stated that a man named James Priddy had taken him to a store shortly before one o'clock in the morning on April 20th, 1995. (*Id.* at 76.) He remembered talking to a resident of the apartments named Mary Taylor shortly after the murder, and recalled that she told him that she had heard gunfire. (*Id.* at 78.) He acknowledged having smoked crack cocaine around the time of the murder, but insisted he was in his right "senses" at the time of killing. (*Id.* at 83.)

Billy Blackwell, an investigator with the Haywood County Sheriff's Department, testified that after receiving a tip he found Rice's body in a ditch with a gunshot wound to his head. (*Id.* at 31-33.) Investigator Shawn Williams from the Brownsville Police Department testified that he located Rice's car, which had a maroon exterior and contained blood and brain matter within the interior compartment. (*Id.* at 42-44.) "The medical examiner testified that Mr. Rice died as a result of a shotgun wound to the head." *Miller I*, 1998 WL 902592, at *1.

Lieutenant Johnny Blackburn of the Brownsville Police Department testified that he questioned Miller about the murder, but Miller denied any involvement. (ECF No. 24-3 at 95.) Miller told Blackburn that, on April 19, 1995, he "made it home [from work] at 4:00[,] . . . painted his mother's den[,] . . . left home about 7:30[,] . . . went to the Projects in Stanton[,] . . . ran across some friends[,] . . . [and] left the Projects at 12:20 [and] went home." (*Id.*) Blackburn further testified that, with the defendant's permission, he retrieved a 12-gauge shotgun, as well as spent shotgun shells, from Miller's bedroom. (*Id.* at 100-03.) He stated that the shotgun smelled as if it had been "recently" fired. (*Id.* at 99.)

The prosecution sought to introduce the preliminary hearing testimony of Nina Champion over defense counsel's objection that the State had not diligently tried to find her to testify in person. (ECF No. 24-5 at 25.) Blackburn was recalled to testify about his efforts to locate Champion. (*Id.* at 23-25.) He reported that, over the course of a year, he asked Champion's mother, Sam Ethel Williams, several times where her daughter was. (*Id.* at 23-24.) She always told him that she only knew that her daughter was in Nashville. (*Id.* at 24.) Because Williams told him that her daughter might be in trouble with the law, Blackburn contacted the Metro jail to see if she was in custody there, but she was not. (*Id.* at 23-24.) During her own trial testimony, Williams insisted she would have given Blackburn her daughter's phone number if he had asked. (*Id.* at 19.) However, when asked by the trial judge what the phone number was, she said she did not know. (*Id.* at 22.) Finding that Champion was unavailable to testify in person, the judge admitted her preliminary hearing testimony. (*Id.* at 25; ECF No. 24-3 at 117-30.)

Champion testified at the preliminary hearing that she had seen Miller "all evening" in Brownsville in the hours before the murder (*id.* at 124), and had observed "a shotgun in the trunk of [his] car." *Miller I*, 1998 WL 902592, at *1. When asked how she was able to see in the

trunk, Champion explained that the trunk lid was open at the time and she peeked in because she was "nosey." (ECF No. 24-3 at 128.)

Sheila Bernil testified that the defendant came to her house, where she lived with Kathy Blackwell, in the early morning hours of April 20, 1995, and that he "was very insistent that he be allowed inside." *Miller I*, at *2. She "did not allow him entry." *Id.*

Blackwell, who "testified first as a state's witness[,] . . . essentially claimed total memory loss of pertinent events as she had previously described in statements given to the [Tennessee Bureau of Investigation] and a defense investigator." *Id.* at *10. The State was "allowed . . . to treat Blackwell as a hostile witness." *Id.* "After [she] completed her testimony, the court had the jury removed from the courtroom, then *sua sponte* advised Blackwell" that he was putting her "into the custody of the Sheriff [to] see if [her] memory gets any better." *Id.* He also told her "you go with the Sheriff, and when you feel like that you can remember and you can come back in here and testify truthfully before this jury, you can let me know," but "[u]ntil then you can remain in the custody of the Sheriff." *Id.*

Special Agent Bryan Byrd read two signed statements that he had taken from Blackwell in which she stated that,

> she saw the defendant and the victim together around 1:00 on the morning of the murder at the location where the murder later took place. Around 2:00 that morning, the defendant and another man came to the house where Blackwell and Sheila Bernil were living. The defendant was angry. Several hours later, Blackwell went to buy crack cocaine from the defendant. He was driving a car like one she had previously seen the victim driving. The defendant told her that the victim was dead.

*Id.*

The court later "called Blackwell as its own witness," telling her "'what I want you to do is I want you to tell these ladies and gentlemen in your own words what happened that night, and

... I want you to tell them the truth, whatever that is.'" *Id.* at *11. The witness then testified that "her memory had improved in the hours since her first appearance on the witness stand because she did not want to go to jail." *Id.* She "proceeded to testify in accord with" the statements she had given to the special agent. *Id.* When her testimony was concluded, defense counsel "moved to strike the testimony [on the ground that] the witness was coerced by her fear of incarceration to testify in accord with her previous statements." *Id.* The trial court denied the motion. *Id.*

The defense called George Liggons, who testified that he rode with Miller to work on April 19th, the day before the murder. (ECF No. 24-4 at 70.) He was with Miller all day until Miller dropped him off at home in the early evening. (*Id.* at 70, 73-74.) He testified that, when Miller picked him up for work that morning, he put his tools into the trunk of Miller's car. (*Id.* at 74.) He saw no shotgun in the trunk, and did not see shotgun shells in the backseat. (*Id.* at 74-75.)

Defendant's mother, Lucille Miller, testified that her son painted a room in her house on April 19th. (*Id.* at 91.) She stated that he had come in that night later in the evening, but she was unable to give an exact time of when that occurred. (*Id.* at 94.) Travis Boyd testified that he was with Miller in Stanton on April 19, 1995, from about 4:00 p.m. until approximately 10 p.m.. (*Id.* at 110.)

James Priddy testified that he had no recollection of taking Harris to a store in the late hours of April 19th. (*Id.* at 116.) Mary Louis Taylor testified that she did not have a conversation with Harris in the early morning of April 20th, but she did recall that she may have heard a loud noise similar to a gunshot. (*Id.* at 120.)

The defense also called Champion's mother, Sam Ethel Williams, to provide testimony to impeach her daughter's preliminary hearing testimony. (ECF No. 24-5 at 16-18.) A hearing was

held outside the presence of the jury to determine whether she had impeachment information. (*Id.*)  Williams testified that at "one time" her daughter told her that "she knew who [killed Donald Rice] and the next time she said she didn't" know.  (*Id.* at 16.)  Williams said she did not know "how long after the murder" the statements were made, or "[h]ow far apart [they] were." (*Id.*)  The prosecutor objected that the witness's testimony did not impeach the preliminary hearing testimony because Champion had not testified "that she knew something about the murder."  (*Id.* at 17.)  The judge sustained the objection, and Williams was not allowed to testify before the jury.  (*Id.* at 18.)

Jesse Jones testified that, around 5:30 or 6:00 in the morning on April 20, 1995, he was walking to work in Brownsville when he observed two cars drive past him.  (ECF No. 24-4 at 143.)  One of the cars was "maroon looking and the other one light colored with a bunch of design or writing on it."  (*Id.*)  Jones described the driver of the maroon vehicle as having "long jericurls."  (*Id.*)  Later in the day, Jones and others saw the maroon car parked nearby.  (*Id.* at 145.)  The car contained "meat and blood and stuff all up in the ceiling."  (*Id.*)  Jones further testified that, "about three day later" when he was with his friend Jimmy Ballard, he noticed the light car "backed up beside a green building."  (*Id.*)  After telling "Jimmy . . . 'That's the car I seen that morning over there," Ballard "said it belonged to some Taylor boy."  (*Id.* at 145.)

After the jury found the defendant guilty, *see Miller I*, 1998 WL 902592, at *1, the defense filed a motion for a new trial, alleging that the State had withheld information about Bernil:

> Sheila Bernil . . . was . . . involved with Barbara Blade in stealing, forging and cashing checks that belonged to another individual. Blade implicated Bernil and was ultimately convicted for the scheme. Bernil was never prosecuted, and the defense argued that no information about Bernil's alleged wrongdoing was ever revealed.

*Id.* at *4. "The defense further questioned whether some sort of non-prosecution agreement existed between Bernil and the [S]tate, consideration for which was Bernil's testimony in the defendant's murder trial." *Id.* The trial court ordered the Tennessee Bureau of Investigation (the "T.B.I.") to "find out if there [was] sufficient evidence to take [Bernil] to trial" regarding her check forging scheme with Barbara Blade, and "to find out why it was not relayed to the defense counsel when they asked about it." (ECF No. 24-6 at 14.) The trial court subsequently reviewed the completed T.B.I. report *in camera* without disclosing its contents to the defense, and determined that no *Brady* violation had occurred. *Miller I*, 1998 WL 902592, at *4. During the course of the proceedings, the state "disclosed as 'pre-trial discovery" "information that Clement Harris and Sheila Bernil were involved in a forgery scheme which [was] apparently unrelated to the one involving Bernil and Blade." *Id.* at *6 & n. 10.

Miller appealed his conviction, arguing that the trial court committed seven reversible errors, and that the "cumulative effect of the alleged errors . . . prejudiced [him] and compromised the judicial process." *Id.* at *1. Three of the eight grounds involved the following arguments: (1) "the trial court [erred in] determin[ing] that [Champion] was unavailable and . . . her testimony at the preliminary hearing [could] be admitted as evidence," (2) "the trial court erred by placing [Blackwell] in custody as a means of improving her memory after [she] testified she could not remember events about which she had previously given a statement," and (3) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose information to the defense about uncharged crimes against Bernil and possible non-prosecution agreements with Harris and Bernil. *Id.*

The appellate court determined that the admission of Champion's preliminary hearing testimony at trial did not violate Miller's constitutional right of confrontation. *Id.* at *8. The

record showed that the prosecution made a "good faith effort to secure Nina Champion's presence." *Id.* at *7. Specifically,

> Officer Johnny Blackburn testified that he went to the home of Sam Ethel Williams, who is Ms. Champion's mother, two or three times over the course of a year and questioned her about her daughter's whereabouts. Officer Blackburn reasonably followed up on the leads that Ms. Williams provided; however, it would be an understatement to say that she was less than forthcoming with Officer Blackburn. *See Roberts,* 448 U.S. at 75-76, 100 S.Ct. at 2544 (great improbability that further efforts would yield favorable results removes them from realm of reasonableness required of prosecution). Process had been issued. According to Ms. Williams, someone had been at her home attempting to serve a subpoena on Champion.

*Id.* The court also found that Champion's preliminary hearing testimony was reliable, as it fell within the hearsay exception for testimony given at a prior proceeding. *Id.*

The appellate court ruled in Miller's favor, however, regarding his challenge to Blackwell's testimony. *Id.* at *12-13. The court found the trial court's procedure to be prejudicial to the defendant and "to the judicial process," and ruled that Miller was entitled to a new trial. *Id.*

As to the *Brady* claim, the appellate court found that it was "unable to address th[at] . . . concern." *Id.* at *5. It so concluded because the defense had not had an opportunity to fully argue all elements of a *Brady* claim due to the trial court's withholding of portions of the T.B.I report involving the circumstances of Bernil's crimes. *Id.* at *5 & n.7. In light of the fact that it was remanding the case for a new trial due to the trial court's handling of Blackwell, the TCCA found that "the defendant w[ould] receive appropriate relief by the prosecution providing the T.B.I. report during pre-trial discovery in the proceedings which will take place on remand." *Id.* at *6.

## II.     Second Trial and Direct Appeal

Miller received a new trial in 2001, *Miller II*, 2004 WL 115374, at *2, at which he was represented by a new assistant public defender, *Miller IV*, 2015 WL 3881597, at *2.  The State put on substantially the same proof as it had in the first trial, with the exception that it presented the transcript of Kathy Blackwell's previous testimony because, it asserted, she was unavailable to testify in person.    *Miller III*, 2013 WL 324401, at *8.  "[T]he trial court held a jury-out hearing" to determine if Blackwell was indeed unavailable.  *Id.*  Four State witnesses, whom counsel cross-examined, testified that they could not locate Blackwell    (ECF No. 24-13 at  15-47.)  "After the hearing, the trial court concluded that Blackwell was unavailable and that the State would be allowed to read into the record portions of her testimony from the Defendant's first trial.  *Miller III*, 2013 WL 324401, at *8.  "[T]he portions that were read into the record d[id] not include the first trial court's admonitions to Blackwell; any indication that her testimony was presented at two different times; Blackwell's explanation that her memory had improved since her first appearance on the stand because she did not want to go to jail; or her testimony about being beaten and her thought that the beating was related to the case."  *Id.* at *12.

Officer Billy Blackwell[2] was the first of the prosecution's witnesses.  *Id.* at *2.  During his testimony, "one of the deputies approached the bench and informed the trial court that '[t]here's been a bomb threat to the courthouse.'"  *Id.* at *2.  The judge ordered the deputy to have the jurors taken outside and informed that there was a possible emergency.  *Id.*  Although the judge had instructed that the jury members be brought to a certain location so that he could talk to them, the jury was inadvertently released.  *Id.* at *3.  Defense "counsel suggested an

---

[2]  There is no indication that Investigator Blackwell was related to Kathy Blackwell.

individual voir dire" of the jurors in order to ensure that they did not "have any preconceived notions that maybe [the Defendant was] involved in any way in th[e] episode." *Id.* The judge conducted the voir dire of each juror the next morning. *Id.* "Each of the jurors indicated . . . that they had not discussed the case with anyone after they were evacuated from the courthouse," and that they were not "tainted by any outside influence during the separation and . . . did not discuss the case amongst themselves after they were evacuated." *Id.* at *7. The defense filed a motion for a mistrial, which the court denied. *Id.* at *1. George Liggons, who had been subpoenaed to testify and was among those in the courthouse evacuated, did not return the next day to testify. *Miller IV*, 2015 WL 3881597, at *3.

Defense counsel called several witnesses, but did not call Priddy or Miller's mother to testify, as had been done in the first trial. *Id.*; (*See also* ECF No. 24-13 at 6-8.) Defense witnesses that testified at the second trial, but not at the first, included a forensic scientist from the T.B.I., who stated that he was not able to match Miller's fingerprints to any of the fingerprints found in the victim's car (ECF No. 24-15 at 120-24); a forensic scientist with the T.B.I.'s crime lab, who testified that there was no blood on any of Miller's clothes (*id.* at 132-40); a sergeant with the Brownsville Police Department, who testified that Harris and Bernil had admitted to him that they had stolen checks (ECF No. 24-16 at 13); a friend of the Miller family, who testified that the gun in Miller's home had had dust on it (*id.* at 13-16); and Curtis Johnson, who testified that he was at the apartments on Fairground with Clement Harris until 3:30 a.m. on April 20, 1995, and that he did not see or hear anything strange while he was there (*id.* at 52-61).

The jury returned a guilty verdict, and the trial court imposed a life sentence. (ECF No. 24-12 at 89.) After judgment was entered, defense counsel filed an untimely motion for a new trial, "raising, inter alia, the trial court's refusal to grant a mistrial following [the] bomb threat

and [its] admission of [Blackwell's] prior testimony." *Miller III*, 2013 WL 324401, at *1 The court held a hearing and denied the motion. *Id.*

"The Defendant filed a notice of appeal," but "[b]ecause the motion for new trial was not filed timely, the [appellate court] addressed only the sufficiency of the evidence." *Id.* (citing *Miller* II, 2004 WL 115374, at *1). The appellate court determined that the evidence was sufficient to convict Miller of first degree murder. *Miller II*, 2004 WL 115374, at *1. The defendant's application for permission to appeal to the Tennessee Supreme Court was denied.

## III. Post-Conviction Proceedings and Delayed Direct Appeal

Miller filed a state "petition for post-conviction relief . . . alleging that his lawyer . . . was ineffective for failing to timely file his motion for new trial." *Miller III*, 2013 WL 324401, at *1. "[T]he parties stipulated that [defense] [c]ounsel did not timely file a motion for new trial in the Defendant's second trial," and the post-conviction court granted a delayed appeal. *Id.* The post-conviction proceedings were stayed pending the appeal. *Miller IV*, 2015 WL 3881597, at *1.

Miller argued in his delayed appeal that the trial court erred in declining to "grant[] his motion for a mistrial following the bomb threat at the beginning of the second trial." *Miller III*, 2013 WL 324401, at *2. He also maintained that it was error for the court to have admitted the prior testimony of Katherine Blackwell after the Tennessee Court of Criminal Appeals had ruled in his first appeal that her testimony "was . . . prejudicial to him." *Id.* at *10. The appellate court rejected both arguments. *Id.* at *13. The Tennessee Supreme Court denied permission to appeal.

Upon resumption of the post-conviction proceeding in 2014, Miller filed an amended petition (ECF No. 24-34), "claiming ineffective assistance of counsel for failure to call three potential alibi witnesses." *Miller IV*, 2015 WL 3881597, at *1, 3. The post-conviction trial court found that counsel had not provided ineffective assistance and denied the claims. *Id.* at *1.

Miller appealed, and the Tennessee Court of Criminal Appeals affirmed. *Id.* The Tennessee Supreme Court denied permission to appeal.

## DISCUSSION

On November 20, 2015, Miller filed his federal Petition, which consists of a seventy-seven-page main document (ECF No. 1), supplemented by 196 pages of argument (ECF Nos. 1-1, 1-2, and 1-3). He asserts six claims that challenge certain TCCA rulings made in his several appeals (Claims 47 through 52); a stand-alone claim of actual innocence (Claim 53); twenty-three claims of counsel's ineffective assistance, which he concedes are procedurally defaulted (even numbered claims in the range 2 through 46); a gateway claim of actual innocence to excuse the procedural defaults (portion of Claim 1); and twenty-three assertions that post-conviction counsel was ineffective for failing to raise the procedurally defaulted ineffective assistance claims (portions of Claim 1, and odd numbered "claims" in the range 1 through 45).[3] (ECF No. 1 at 16-26.) Respondent, Kevin Genovese, filed the state-court record (ECF No. 24), and a fifty-one-page answer to the Petition (the "Answer") (ECF No. 23) on February 13, 2017. He argues that the procedural defaults are unexcused, and that the claims challenging the TCCA's determinations are without merit.

On April 17, 2017, Petitioner filed documents styled "Motion for Leave to Conduct Discovery & Motion for Fact Finding Procedures/Expansion of the Record" (ECF No. 32), "Motion for Fact Finding Procedures" (ECF No. 33), and "Plaintiff's Reply and Memorandum of Law and Facts in Support of Motion for Fact-finding Procedures" (the "Reply") (ECF No. 34). Respondent filed a response opposing the motions. (ECF No. 39.) The Court denied Petitioner's motions without prejudice on February 26, 2019. (ECF No. 42.) "Given the number of

_____

[3] The Court has retained Petitioner's numbering of the claims, but has converted the Roman numerals to Arabic numerals for ease of reading.

procedurally defaulted claims," the Court advised the parties that it would "consider [the] discovery arguments when it addresses the merits of the Petition." (*Id.* at 3.)

On June 4, 2018, Miller filed a document titled "Motion to Grant a Martinez Hearing." (ECF No. 43.) He argues that the ten procedurally defaulted claims for which he had requested discovery should be litigated in a hearing regarding cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012). By order dated March 19, 2019, the Court directed the parties to submit supplemental briefs addressing the Supreme Court law governing Petitioner's claim that the admission of Kathy Blackwell's testimony at his second trial violated his constitutional right to confront witnesses. (ECF No. 47.) Petitioner thereafter filed his supplemental brief (ECF No. 48), as did Respondent (ECF No. 49).

## I.     Legal Standards

### A.  Habeas Review and Procedural Default

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by § 2254, as amended by the Antiterrorisim and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254. Under § 2254, habeas relief is available only if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The availability of federal habeas relief is further restricted where the petitioner's claim was "adjudicated on the merits" in the state courts. 28 U.S.C. § 2254(d). In that circumstance, the federal court may not grant relief unless the state-court decision "'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of

the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)) (citations omitted)).

A state court's decision is contrary to federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or when "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an "opposite" result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An unreasonable application of federal law occurs when the state court, having invoked the correct governing legal principle, "unreasonably applies the . . . [principle] to the facts of a prisoner's case." *Id.* at 409.

For purposes of § 2254(d)(2), a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Sixth Circuit construes § 2254(d)(2) in tandem with § 2254(e)(1) to require a presumption that the state court's factual determination is correct in the absence of clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). A state court's factual findings are therefore "only unreasonable where they are 'rebutted by clear and convincing evidence and do not have support in the record.'" *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

Before a federal court will review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To be properly exhausted, a claim must be "fairly presented" through "one

complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999).

The exhaustion requirement works in tandem with the procedural-default rule, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Id.* at 848. A petitioner procedurally defaults his claim where he fails to properly exhaust available remedies (that is, fails to fairly present the claim through one complete round of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed-off any "remaining state court avenue" for review of the claim on the merits. *Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007). Procedural default also occurs where the state court "actually . . . relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935); *Klinger v. Missouri*, 80 U.S. 257, 263 (1871)).

A petitioner will he be entitled to federal court review of the merits of a claim that was procedurally defaulted if he "demonstrate[s] that failure to consider the claim[] will result in a fundamental miscarriage of justice," *Id.* at 750. A fundamental miscarriage of justice involves "a prisoner['s] assert[ion of] a claim of actual innocence based upon new reliable evidence." *Bechtol v. Prelesnik*, 568 F. App'x 441, 448 (6th Cir. 2014).

A procedural default will also be excused where the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Id.* The ineffectiveness of counsel at the initial post-conviction stage may be cause to excuse the default

of an ineffective-assistance-of-trial-counsel claim. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. 1, 14, 16-17 (2012)). To establish cause in that context, a petitioner must show that his post-conviction counsel "was ineffective under the standards of *Strickland*." *Martinez*, 566 U.S. at 14. He must therefore show that post-conviction counsel performed deficiently and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. A petitioner must also establish that the "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that [he] . . . must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. *See also Hall v. Carpenter*, No. 05-1199-JDB-EGB, 2015 WL 1464017, at *16 (W.D. Tenn. Mar. 30, 2015 ("To be 'substantial' under *Martinez,* a claim must have 'some merit' based on the controlling standard for ineffective assistance of counsel stated in *Strickland . . . .*")

### B. Ineffective Assistance of Counsel

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on such a claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was

"within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted).

An attorney's "strategic choices" are "virtually unchallengeable" if based on a "thorough investigation of law and facts relevant to plausible options . . . ." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693) (citations omitted). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

The deference to be accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when a federal court reviews an ineffective assistance claim:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105.

## II.       Discovery and Evidentiary Hearing

A federal habeas court's review of a claim under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner seeking an evidentiary hearing on a claim that was not adjudicated on the merits must demonstrate "that he attempted to develop the factual basis for such claims with requisite diligence, *see Williams v. Taylor,* 529 U.S. 420, 430–37 (2000), or, under the standard described in Section 2254(e)(2)(A)(i)-(ii), show either that a new constitutional rule applies to his claims or that their factual predicate was previously undiscoverable through the exercise of due diligence." *Johnson v. Warden, Lebanon Corr. Inst.*, No. 1:12-CV-00560, 2014 WL 1382147, at *2 (S.D. Ohio Apr. 8, 2014) (citing *Keeling v. Warden, Lebanon Corr. Inst.,* 673 F.3d 452, 464–65 (6th Cir. 2011)).

There is no controlling authority in this Circuit as to whether a petitioner who requests an evidentiary hearing on *Martinez* cause and prejudice must meet § 2254(e)'s requirements. *See Smith v. Carpenter*, No. 3:99-CV-0731, 2018 WL 317429, at *3–4 (M.D. Tenn. Jan. 8, 2018), *cert. of appealability denied sub nom. Smith v. Mays*, No. 18-5133, 2018 WL 7247244 (6th Cir. Aug. 22, 2018) (relying on intra-circuit cases for its holding that "petitioner's assertion that he can overcome default pursuant to *Martinez* is simply not a 'claim' to which § 2254(e)(2) would apply"). But even assuming that § 2254(e)(2) does not bar a *Martinez* hearing, a petitioner does not have an absolute right to such a proceeding. *See e.g. Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016) (refusing "to hold that *Martinez* mandates an opportunity for additional fact-finding in support of cause and prejudice," as such a ruling "would effectively guarantee a hearing for every petitioner who raises an unexhausted [ineffective assistance of trial counsel] claim and argues that *Martinez* applies.")

Instead, where factual development is not precluded under § 2254(e)(2), the decision to hold a hearing is within the court's sound discretion. *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007) ("In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e) (2), the decision to grant such a hearing rests in the discretion of the district court."); *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011) (same); *see also generally* Habeas Rule 8, Rules Governing Section 2254 Cases in the United States District Courts (individually, "Habeas Rule") (federal habeas court "must . . . determine whether an evidentiary hearing is warranted."). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474.

A habeas court also retains discretion to decide whether to allow discovery. Under Habeas Rule 6, "[a] court may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Habeas Rule 6(a). "Good cause exists where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000) (citing *Harris v. Nelson,* 394 U.S. 286, 300 (1969); *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991)). The "[p]etitioner need not show that the additional discovery would definitely lead to relief." *Id.*

Neither discovery nor an evidentiary hearing is warranted if the issues are resolvable on the state court record. *See Schriro*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Davis v. Bradshaw*, 900 F.3d 315, 334 n.13 (6th Cir. 2018) ("further fact

development" is not required where "the record refute[s] [petitioner's] factual allegations or otherwise precludes ... relief.") (quoting *Turner v. Romanowski*, 409 F. App'x 922, 930 (6th Cir. 2011) (citation and internal quotation marks omitted)). Discovery and a hearing will also not be granted where the requests for such are not supported by specific allegations. *Stanford v. Parker*, 266 F.3d 442, 459-60 (6th Cir. 2001) (quoting *Zettlemoyer v. Fulcomer,* 923 F.2d 284, 301 (3d Cir. 1991) ("Bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the State to respond to discovery requests or to require an evidentiary hearing."); *Payne*, 89 F. Supp. 2d at 970 ("[A] petitioner may not embark on a fishing expedition intended to develop claims for which there is no factual basis.") (citing *Calderon v. U.S. Dist. Ct. for N.D. Cal.,* 98 F.3d 1102, 1106 (9th Cir. 1996)).

The Court has considered the "new" evidence which Miller believes credibly points to probative evidence that could be developed through discovery or an evidentiary hearing. The Court has also taken into account the entire state court record, the parties' arguments, and the relevant case law. For the reasons provided in Part IV, *infra*, the Court finds that Petitioner is not entitled to discovery or an evidentiary hearing as to any of the claims for which he seeks those procedures. The requests for discovery and an evidentiary hearing are therefore **DENIED**.

### III.     Claims Adjudicated on the Merits in State Court: Claims 47 to 52

Petitioner asserts that certain determinations by the Tennessee Court of Criminal Appeals do not survive AEDPA review. (ECF No. 1 at 27-28.) Specifically, he argues that the appellate court unreasonably concluded that counsel was not ineffective by failing to call three witnesses to testify on his behalf (Claims 47 and 48); unreasonably determined that the trial court did not err in refusing to grant a mistrial after the bomb threat (Claims 49 and 50); and unreasonably held that the trial court did not err in admitting the testimonies of Nina Champion and Kathy

Blackwell (Claims 51 and 52). In his Answer, Respondent argues that all of the determinations meet the AEDPA's deferential review. (ECF No. 23 at 31-50.) In his supplemental brief, he argues for the first time that the claim relating to Kathy Blackwell is procedurally defaulted. (ECF No. 49 at 1.)

### A. Claims 47 and 48

Petitioner asserts that the determination by the Tennessee Court of Criminals that counsel was not ineffective in failing to call George Liggons, Rosa Carney, and Lucille Miller to testify at the second trial was contrary to and based on an unreasonable application of clearly established Supreme Court law (Claim 47), and was based on an unreasonable determination of the facts (Claim 48). (ECF No. 1 at 27.) He argues that counsel's "fail[ure] to call [these] exculpatory alibi eyewitnesses . . . was deficient, and prejudicial because had these witnesses been called no reasonable juror would have convicted [him] of the murder of Donald Rice." (ECF No. 1-3 at 60.) Respondent maintains that the appellate court's decision was not unreasonable in any respect. (ECF No. 23 at 34.) The Court agrees.

Carney testified at the post-conviction hearing that Miller had come to her home in Stanton, Tennessee, in the early evening prior to the shooting, around "dusk dark," which was "roughly about the time the sun was going down." (ECF No. 24-35 at 10.) She recalled that she was not feeling well and was in bed when Petitioner came and asked her to get up and whether she wanted a snack. (*Id.*) When she explained that she was sick, he took her kids to get some snacks, brought them back, and then went across the street. (*Id.* at 9, 15.) When asked on cross-examination whether Miller was at her home "after twelve o'clock or twelve at night" or whether she was "in bed by then," she answered "I was in bed." (*Id.* at 15.) She confirmed that Stanton is "roughly" twelve or thirteen miles from Brownsville. (*Id.* at 10.)

Liggons testified that "he was with petitioner at work all day on [the day before the murder], until petitioner drove him home," *Miller IV*, 2015 WL 3881597, at *5, at "about five or six o'clock" in the evening (ECF No. 24-35 at 24.)  At that time, "[t]he sun was still up." (*Id.*)  Liggons could not "say what [Miller] did after he dropped [him] off that evening." (*Id.* at 28.)  He further confirmed that he was at the courthouse during the second trial when everyone was evacuated for the bomb threat. (*Id.* at 27.)  He recalls that he did not testify at that trial. (*Id.*)

Counsel Houghton testified that she "had been employed with the district public defender's office and had been appointed to represent petitioner before his 2001 trial." *Miller IV*, 2015 WL 3881597, at *2.  She explained that she and her office "knew what the State's theories would be" because "they had the transcript of the 1996 trial." *Id.*  "Collectively, the office staff thought that the State's case depended largely on the testimony of Clement Harris, the eyewitness who saw petitioner shoot the victim." *Id.*  Because "Harris held fast to his story, they tried to develop an alibi" defense. *Id.*  "In doing so, they spoke with [Rosa] Carney and others." *Id.*  Although "Petitioner was well-liked, and many people wanted to help him," counsel and her office "'just never could pin down anyone who could say that they saw [Miller] at the time that this shooting was to have occurred,' which was 1:00 to 2:00 a.m. on April 20." *Id.*

Counsel testified "that she called Nina Champion as a witness at the preliminary hearing," and that "Champion [had] testified that she saw a shotgun in petitioner's trunk and shells in his back seat on the day in question." *Id.* at *3.  Because Champion was murdered prior to the first trial, "her testimony from the preliminary hearing was entered into evidence." *Id.*

Counsel stated that "Liggons was served . . . for the second trial," and "was initially there and then it was pandemonium" because of the bomb threat. (*Id.*)  She "recalled that following the bomb threat, the trial court assured her that if necessary, it would send someone to retrieve

Mr. Liggons," but "[t]he following day . . . the court told her that they did not 'have that kind of time." *Miller IV*, 2015 WL 3881597, at *3. She explained that "there was some wiggle room" between Liggons's testimony that he saw no gun or shells in Miller's car the day before the murder and Champion's testimony that she saw a gun and shells in Miller's car "later on," which "would have given Dwight opportunity to have put items in his car." (ECF No. 24-35 at 35.) "Faced with the decision whether to read Mr. Liggons' prior testimony into the record, trial counsel decided against it because his testimony had not been very 'persuasive'" *Miller IV*, 2015 WL 3881597, at *3. "She could not 'rule out that both' Mr. Liggons and Ms. Champion could have been correct." *Id.*

Counsel further "testified that she considered calling petitioner's mother, Lucille Miller, as a witness but that Ms. Miller's memory had declined substantially between the 1996 trial and the 2001 trial." *Id.* She acknowledged that "Ms. Miller could have testified that petitioner lived with her and painted a room for her on the night in question." *Id.* As to Carney, counsel explained that "she did not call [her] as a witness because the timeline she provided allowed enough time for petitioner to have committed the murder." *Id.*

Investigator Shawn Williams testified that he had interviewed Miller as part of his investigation into the murder of Donald Rice. *Id.* "In his statement, [Miller] indicated that he visited the projects in Stanton, left around 12:20 a.m., and went home." *Id.* The post-conviction court denied relief in a written order. *Id.*

On appeal, the Tennessee Court of Criminal Appeals identified *Strickland*'s two-part test, *id.* at *4, and applied the test to the trial and post-conviction records, *id.* at *406. Regarding Carney, the appellate court found that,

> [i]f she had been called as a witness at trial, Ms. Carney could have established
> petitioner's whereabouts around "dusk dark" on the evening preceding the early

morning murder of the victim. However, by her post-conviction testimony, it is evident that she could not have provided an alibi for petitioner during the time of the murder because she was in bed asleep.

\* \* \*

Trial counsel investigated Ms. Carney as a possible alibi witness, interviewed her, and then chose as a matter of strategy not to call her as a witness. Because Ms. Carney could offer no assistance as an alibi witness at the time of the murder, trial counsel's failure to call Ms. Carney as a witness at trial was not deficient, and petitioner suffered no prejudice therefrom.

*Id.* at *5.

The appellate court reached the same conclusion as to counsel's decision not to call

Liggons to testify after the bomb threat:

At the post-conviction hearing, Mr. Liggons testified . . . . [that] he was in and around petitioner's vehicle all . . . day [on April 19 but] observed no weapon or shotgun shells inside of it, [and] several hours elapsed between that time and the murder the following morning. Speaking to any discrepancy between Mr. Liggons' testimony and that of Nina Champion, trial counsel surmised that the lapse in time did not foreclose the possibility that both Mr. Liggons and Ms. Champion were correct in their testimony. For that reason, trial counsel elected not to read in Mr. Liggons' testimony from the first trial when he failed to return to the courtroom on the day following the bomb threat. She characterized his testimony as not "persuasive."

\* \* \*

Again, trial counsel investigated Mr. Liggons as a possible alibi witness simply to refute petitioner's possession of a shotgun and ammunition. Mr. Liggons testified at the first trial, which resulted in a conviction. We must surmise that as trial counsel opined, his testimony was not "persuasive" in this regard. Moreover, trial counsel's strategic decision not to read in Mr. Liggons' prior testimony was considered and reasoned. Her performance was not deficient, and petitioner suffered no prejudice as a result.

*Id.*

Finally, the Tennessee Court of Criminal Appeals found that Miller had failed to show

that counsel was ineffective in failing to call his mother to testify:

The post-conviction court stated that petitioner's mother, Lucille Miller, could have testified that petitioner was at her home earlier in the day and that he had

painted a room for her. The court noted, "Again, this event was many hours before the shooting and would not have served as an alibi. Her testimony, if presented, would not have changed the outcome."

Trial counsel testified that while Ms. Miller might have been able to provide some alibi information, her memory had declined substantially between the first trial and the second trial. Trial counsel exercised the strategic decision not to call her as a witness. Moreover, we note that Ms. Miller did not testify at the post-conviction hearing. When a post-conviction petitioner alleges ineffective assistance of counsel for failure to investigate or present a certain witness in support of his defense, the petitioner should present that witness at the evidentiary hearing. *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

*Id.* at *6.

Because the appellate court correctly identified *Strickland*'s standards, its determination that counsel did not provide ineffective assistance is not "contrary to" controlling Supreme Court law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

Petitioner also has not shown that the appellate court's factual determinations are unreasonable. The post-conviction transcript supports the findings that Liggons's testimony did not contradict Champion's testimony, that neither Carney nor Lucille Miller would have provided an alibi for the time of the murder, and that Lucille's memory had faded between the first and second trials. Petitioner has not pointed to any clear and convincing evidence to undermine those determinations.

Based on the facts adduced, the appellate court's conclusion that counsel did not perform deficiently in failing to call those witnesses to testify at the second trial, and that Petitioner was not prejudiced by counsel's decisions, was not an unreasonable application of *Strickland*'s standards to the facts of Miller's case. Claims 47 and 48 are **DENIED**.

### B.  Claims 49 and 50

Petitioner asserts that his due process rights were violated when the court at his second trial denied his motion for a mistrial following the bomb threat.  (ECF No. 1 at 27; ECF No. 1-3 at 55-56.)  He argues that the state appellate court's affirmance of the trial court's decision was contrary to, and an unreasonable application of, clearly established Supreme Court law requiring "a fair trial by a panel of impartial, indifferent jurors" (Claim 49).  (ECF No. 1-3 at 56 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); ECF No. 1 at 27.)  He also asserts that the decision was based on an unreasonable determination of the facts (Claim 50).  (ECF No. 1 at 27.)  Respondent argues that the decision of the Tennessee Court of Criminal Appeals passes muster under the AEDPA.  (ECF No. 23 at 41.)

A criminal defendant's Sixth Amendment right to a jury trial requires a fair trial by a panel of impartial jurors.  *Irvin*, 366 U.S. at 722; *see also Smith v. Phillips,* 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.").  Under the principle of "manifest necessity," "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial.  *Illinois v. Somerville*, 410 U.S. 458, 462, 464 (1973).  "A state court's factual findings concerning jury impartiality are presumed correct and may only be overcome by clear and convincing evidence."  *McNoriell v. Warren*, No. 06-CV-11832, 2007 WL 3124663, at *6 (E.D. Mich. Oct. 25, 2007); *see also DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) ("[W]e may only overturn a state court's findings of juror impartiality if those findings were manifestly erroneous")).

On appeal, Miller argued that the trial court erred by not granting a mistrial because "the jurors were tainted and potentially unwilling to return and pay real attention to the facts and evidence presented at trial," and "[i]t is understandable that a reasonable juror would have concerns for their own safety in a building that had been threatened by a bomb and would have difficulty in continuing to serve with a clear mind." *Id.* at *7. Addressing Miller's argument, the Tennessee Court of Appeals invoked the following legal standards:

> The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State,* 563 S.W.2d 792, 794 (Tenn.Crim.App.1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." *State v. McPherson,* 882 S.W.2d 365, 370 (Tenn.Crim.App.1994). "Generally[,] a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks,* 819 S.W.2d 441, 443 (Tenn.Crim.App.1991) (quoting *Arnold,* 563 S.W.2d at 794). The party seeking a mistrial bears the burden of establishing its necessity. *State v. Williams,* 929 S.W.2d 385, 388 (Tenn.Crim.App.1996). We will not overturn a trial court's refusal to grant a mistrial absent a clear abuse of discretion. *See State v. Hall,* 976 S.W.2d 121, app. 147 (Tenn.1998).

*Miller III*, 2013 WL 324401, at *2.

> Upon review of the record, the court made the following factual determinations:

> "[D]uring the testimony of the State's first witness, one of the deputies approached the bench and informed the trial court that "[t]here's been a bomb threat to the courthouse." In response to the judge's question about the appropriate response, the deputy stated that "[t]he procedure is to clear the courthouse." The judge told the deputy to "[a]ssign a couple of deputies to take [the jurors] out" and then informed the jury that there was "a probable emergency situation." The court told the jurors that "we'll just leave the courthouse" and that there would be "a couple of deputies with you all." The judge also told the jury that "we'll come back as soon as they resolve any problems." The court issued no other instructions to the jurors.

*Id.*

The court of appeals further found that, after the evacuation, and by virtue of a "miscommunication," the jurors were not brought back to the courthouse, but were, instead,

"released by parties unknown," and "ordered to be back [in court] at 8:30 [the following] morning." *Id.* at \*3. The next day, at defense counsel's suggestion, the court conducted an individual voir dire of each juror. *Id.* The trial judge

> told juror number one that there was 'no information or evidence' that the Defendant had been involved in the events leading to the evacuation. *Id.* The court then asked the juror if his ability to serve on the trial had been affected. Juror number one stated, 'It would not affect me at all.'" *Id.* The juror also stated that he had heard no allegations or inferences that the trial was the reason for the evacuation. The juror told Trial Counsel that he had not heard or seen news reports "about this." In response to Trial Counsel's question about what the deputies had told the jury the day before, he stated, "I wasn't told anything by the Deputies. I heard maybe one of the fellow jurors say they thought they heard somebody say there was a bomb threat, but the Deputies told us nothing about it. At least, I didn't hear anything about it." Juror number one also assured Trial Counsel that "this event" had not changed his ability to keep an open mind.

*Id.*

Voir dire of each of the remaining jurors, individually, was undertaken, and the jurors gave answers similar to those given by juror number one. *Id.* at \*4-6. "Following these conversations with the jurors, Trial Counsel moved for a mistrial." *Id.* at \*6. "The trial court denied the defense motion. *Id.*

 The Tennessee Court of Criminal Appeals rejected Miller's argument that the trial court should have declared a mistrial. *Id.* at \*7. The court "recognize[d] that it would have been preferable for the trial court to have had an opportunity to admonish the jury prior to its being separated and the jurors allowed to return to their homes." *Id.* It found, however, "that the record reflect[ed] that the trial court had already admonished the jurors at least three times [during the proceedings] that they were not to discuss the case amongst themselves or with anyone else." *Id.* The appellate court held "that none of the jurors was tainted by any outside influence during the separation[,] . . . that the jurors did not discuss the case amongst themselves after they were evacuated," and that "the bomb threat did not, in and of itself, so taint the jury as

to create a manifest necessity for the declaration of a mistrial." *Id.* The court also ruled that "the record [did not] reflect that a miscarriage of justice would result upon the continuation of the trial after the bomb threat." *Id.* Specifically, the record showed "that the trial court carefully questioned each juror to ensure that the bomb threat had had no impact on each juror's ability to continue to serve as a fair and impartial juror," and that " [t]he jurors' responses to these questions establish[ed] that each one had remained untainted by outside information or influence; each one remained committed to serving as a fair and impartial juror; none had allowed the bomb threat to influence their opinion about the Defendant; and none was distracted or concerned about the heightened security measures." *Id.* The appellate court, therefore, upheld the trial court's denial of the motion for a mistrial. *Id.*

Petitioner has not shown that the state appellate court's decision is contrary to clearly established United States Supreme Court law. Although citing to state cases, the court applied the manifest necessity standard, recognizing that the trial court was charged with ensuring an "impartial verdict." *Miller III*, 2013 WL 324401, at *2 (citing *Arnold*, 563 S.W.2d at 794; *McPherson*, 882 S.W.2d at 370; *Millbrooks*, 819 S.W. 2d at 443).

Miller also has not demonstrated that the decision was based on unreasonable factual determinations or an unreasonable application of Supreme Court law to the facts of his case. The record shows that the trial judge conducted individual voir dire of the jurors, and heard each juror's reassurance that he or she did not attribute the bomb threat to Miller, and that the threat would not affect his or her opinion of the defendant or ability to fairly and impartially serve on the jury. (ECF No. 24-13 at 95-140.) Petitioner has not identified any clear and convincing contrary evidence. Based on this record, the Tennessee Court of Criminal Appeals did not unreasonably conclude that a mistrial was not a manifest necessity. *See e.g., Moore v.*

*Brunsman*, No. 3:08 CV 2895, 2010 WL 425055, at *19 (N.D. Ohio Jan. 26, 2010) (state appellate court's affirmance of trial court's denial of mistrial after bomb threat was not an unreasonable application of clearly established Supreme Court law where "there was no evidence . . . that the jury could not reach an impartial verdict," and the record contained "direct evidence that the jury affirmatively believed its abilities in this area were unimpeded."); *McNoriell* , 2007 WL 3124663, at *7 (denying habeas relief where "[p]etitioner [did] not demonstrate[] that the trial court's response to the [bomb threat] was inappropriate or inadequate," and did not "allege[] a credible claim of extraneous influence upon the jury [or] provide[] any evidence to support his allegation of jury bias or taint").

For these reasons, Claims 49 and 50 are **DENIED**.

### C.  Claims 51 and 52

Petitioner asserts that "[t]he Court of Criminal Appeals reached a decision that was both contrary to, and involved an unreasonable application of clearly established [Supreme Court] law . . . when it found that the trial court did not err in allowing the prior testimony[ies]" of Nina Champion and Kathy Blackwell (Claim 51).  (ECF No. 1 at 27-28.)  He argues, specifically, that the admission of the testimonies violated his Sixth Amendment right to confront the witnesses. (ECF No. 1-3 at 58.)  He further maintains that the decisions were based on unreasonable factual determinations (Claim 52).  (*Id.* at 28.)  Respondent argues that the state appellate court's determinations survives AEDPA review.  (ECF No. 23 at 48, 50.)  Insofar as the claim relates to Blackwell's testimony, Respondent also argues that it is procedurally defaulted.   (ECF No. 49 at 2-3.)

### i. Champion's Testimony

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. VI). The "guarantee applies to both federal and state prosecutions." *Id.* (citing *Pointer v. Texas,* 380 U.S. 400, 406 (1965)). In *Ohio v. Roberts*, the Supreme Court announced that the Clause allows "an unavailable witness's out-of-court statement [to] be admitted so long as it has adequate indicia of reliability—*i.e.,* falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Id.* at 40 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)). In *Roberts*, the witness was unavailable to testify at trial because her "whereabouts were unknown even to her family, and the . . . prosecutor had made reasonable efforts to locate and subpoena her." *Bailey v. Mitchell*, 271 F.3d 652, 657 (6th Cir. 2001) (citing *Roberts*, 488 U.S. at 74). The witness's preliminary hearing testimony was held to be reliable because defense counsel had "tested [the] testimony with the equivalent of significant cross-examination." *Roberts*, 448 U.S. at 70.

In 2004, the Supreme Court abrogated the rule in *Roberts*, rejecting "reliability" as a rationale for the admission prior testimony. *Crawford*, 541 U.S. at 63. The Court held, instead, that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. The Court explained that,

> [t]o be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Crawford*, 541 U.S. at 61.

In his direct appeal after the first trial, Miller challenged the admissibility of Champion's testimony under the Confrontation Clause. *Miller I*, 1998 WL 902592, at *7. He did not, however, present the issue in his appeal following his second trial. Petitioner's argument relating to Champion is therefore procedurally defaulted. *See e.g. McEnany v. DiGuglielmo*, No. CIV. 3:CV-05-1160, 2007 WL 1217864, at *5 (M.D. Pa. Apr. 24, 2007) (petitioner procedurally defaulted claim which, although presented in appeal following first trial, was not presented on appeal after retrial). Respondent, however, has not raised the default as an affirmative defense.

Federal courts may raise a petitioner's procedural default *sua sponte*. *See Mason v. Brunsman,* 483 F. A'ppx 122, 129 (6th Cir. 2012). Where a court proposes to decide an issue on a ground that was not previously raised, it is appropriate to give the parties a chance to respond. *See Trest v. Cain*, 522 U.S. 87 92 (1997) ; *see also Day v. McDonough,* 547 U.S. 198, 209–10 (2006). Because it is clear that the claim as it relates to Champion is without merit, the Court will not raise the procedural default defense *sua sponte*. *See Moore v. Steward*, 948 F. Supp. 2d 826, 839 (W.D. Tenn. 2013).

The record shows that law enforcement officers had tried several times over a year to locate Champion, but were unable to do so. (ECF No. 24-5 at 18-25.) In addition, Champion had been subject at the preliminary hearing to examination by defense counsel. (ECF No. 24-3 at 118-123, 127-29.) Indeed, the state court record shows that it was defense counsel who called Champion to testify at the preliminary hearing (ECF No. 24-35 at 33), and that she vigorously examined her about when she saw the gun in Miller's car trunk and how she was able to see into the trunk (ECF No. 24-3 at 127-30). Petitioner's right of confrontation was not violated by the admission of Champion's testimony.

As previously discussed, the judge in Miller's first trial incarcerated witness Kathy Blackwell for her reticence to testify.  *See Miller* I, 1998 WL 902592, at *12.  When recalled to the stand as the court's witness, "[h]er testimony placed the defendant with the victim around 1:00 a.m. on the night of the murder."  *Id.*  She testified that "the defendant and another man came to the house where [she] was living and argued with [her] roommate about whether the men could come inside."  *Id.*  That statement was "contrary to the defendant's statement to the police the he was not in Brownsville on the night of the murder."  *Id.*  Blackwell further recalled that, "prior to the discovery of the victim's body," Miller "told her about the victim's death."  *Id.*  She stated that "she had been assaulted after talking to the T.B.I. and offered the possibility of a causal connection between the two events."  *Id.*

The Tennessee Court of Criminal Appeals held that the admission of Blackwell's testimony violated state law, as it was prejudicial to the defendant and "to the judicial process."  *Id.*  At the second trial, Blackwell was unavailable to testify.  *Miller III*, 2013 WL 324401, at *8.  The trial court therefore allowed the admission of Blackwell's prior testimony.  *Id.*  The transcript was read to the jury at the second trial, however, "without any reference [to] incarceration . . . or anything by [sic] her being a court witness."  (ECF No. 24-13 at 52.)  Among the portions redacted was her statement during her cross-examination that her memory improved because she did not "want to go to jail."  (*See* ECF No. 24-4 at 55 (Q: "How did your recollection of your memory improve over the last couple of hours, Ms. Blackwell?" A: "Because I don't want to go to jail."); ECF No. 24-15 at 53 (question and answer not read to the jury at second trial); ECF No. 24-27 at 14 (cataloguing portions admitted).)  *See also Miller III*, 2013 WL 324401, at *12.

In his delayed direct appeal after the second trial, Miller "contend[ed] that the reversible taint surrounding Blackwell's prior testimony persisted and that her testimony was unfairly prejudicial" under state law. *Miller III*, 2013 WL at *12. Before addressing that argument, the Tennessee Court of Criminal Appeals considered whether Miller's confrontation rights had been violated:

> The Defendant's constitutional right of confrontation was not violated at his second trial because, after a hearing at the beginning of the second trial, the court determined that Blackwell was unavailable, and the Defendant had a prior opportunity to cross-examine her. *See State v. Cannon,* 254 S.W.3d 287, 303 (Tenn. 2008). Indeed, the Defendant does not challenge on appeal the admission of Blackwell's prior testimony on confrontation grounds.

*Miller III*, 2013 WL 324401, at *12.

As noted earlier, this Court directed the parties to submit additional briefing on the merits of Petitioner's argument that the admission of Blackwell's testimony violated his constitutional right to confront the witness. (ECF No. 47.) The Court did not invite Respondent to raise new defenses. In his supplemental brief, however, Respondent not only presents a merits argument, he also raises for the first time the affirmative defense that the Confrontation Clause claim was procedurally defaulted by Petitioner's failure to fairly present the federal constitutional issue to the state appellate court.[4] (ECF No. 49 at 1-3.) Although the State raised the Confrontation Clause issue in its brief to the Tennessee Court of Criminal Appeals (*see* ECF No. 24-27 at 25-26 (citing *State v. Summers*, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004), *perm. appeal denied* (Tenn. Jan. 18, 2005) (setting forth test under *Crawford*)), Petitioner did not challenge the admission of Blackwell's prior testimony at the second trial on the basis of that federal

---

[4] Respondent does not argue that the procedural default was the result of the application of an independent and adequate state procedural rule.

constitutional provision.  (*See* ECF No. 24-26 at 7-10.)  The Court concludes, however, that Respondent has waived the procedural-default affirmative defense.

"[P]rocedural default 'is not a jurisdictional matter' and the state is therefore normally 'obligated to raise and preserve' any procedural-default defense 'if it is not to lose the right to assert the defense thereafter.'"  *Maslonka v. Hoffner*, 900 F.3d 269, 277 (6th Cir. 2018) (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks, citation, and alteration omitted) and citing *Gumm v. Mitchell*, 775 F.3d 345, 376–77 (6th Cir. 2014)).  Respondent, here, concedes that he did not raise the defense in his Answer, and he also "acknowledges that his [A]nswer indicated that this claim was properly exhausted and without merit."  (ECF No. 49 at 1; *see also* Answer (ECF No. 23 at 2 ("With the exception of Claims [47-52], the petitioner did not present any of the allegations in his petition to the higher state court in satisfaction of § 2254(b)'s exhaustion requirement."), 31, 42 ("Properly Exhausted Claims")).)  And although the Court is aware that many of the arguments contained in Petitioner's submissions are at times confusing, Respondent does not argue that the federal-law contours of Miller's claim relating to Blackwell were not apparent from Miller's initial submissions.[5]  In fact, in his Answer, Respondent summarily and without elaboration argues that Miller's "right of confrontation was not violated." (ECF No. 23 at 50.)  *See Maslonka*, 900 F.3d at 277 & n. 1 (respondent waived procedural-default affirmative defense when it "explicitly and deliberately waived th[e] argument in its initial answer," raised the defense for the first time in its supplemental answer, and did not seek leave to amend its answer to assert the defense); *Brooks v. Eberlin*, No. 4:07-CV-02162, 2008 WL 5455382, at *4 (N.D. Ohio Sept. 8, 2008), *report and recommendation adopted in part,*

---

[5]  In his supplemental brief, Respondent makes no attempt to explain why he failued to raise the affirmative defense in his Answer, nor does he present an argument that his characterization of the claim as having been "[p]roperly [e]xhausted" (Answer, ECF No. 23 at 31) does not amount to an explicit waiver of the defense.

*rejected in part on other grounds*, No. 4:07CV2162, 2008 WL 5455383 (N.D. Ohio Dec. 31, 2008) (respondent waived procedural-default defense by raising it for the first time in supplemental answer after court's direction to file supplemental answer addressing *merits* of claim). The Court will therefore review the state appellate court's Confrontation Clause ruling under the AEDPA's deferential standards. *See e.g. Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008) (state appellate court's "alternative merits ruling" was entitled to "AEDPA deference").

Petitioner insists that the state appellate court's ruling is contrary to, or an unreasonable application of, clearly established Supreme Court law, and is based on an unreasonable determination of the facts. (ECF No. 1 at 27-28; 1-3 at 59; *see also* ECF No. 48 at 3.) He complains that the testimony was "coerced" by the trial judge, and was, therefore, "by no means reliable." (ECF No. 1-3 at 59.) And although he acknowledges in his supplemental brief that, under *Crawford*, the "[o]nly indicium of reliability" is a "prior opportunity to cross-examine the witness," (ECF No. 48 at 3), he maintains that the admission of the testimony at his second trial violated his constitutional right to confront the witness (*id.*). In the alternative to its procedural default argument, Respondent argues that the Tennessee Court of Criminal Appeals did not unreasonably apply *Crawford*'s requirements. (ECF No. 49 at 3-4.)

Citing to a Tennessee Supreme Court decision, the state appellate court identified *Crawford*'s two-part test, and applied it to the facts of Petitioner's case. *See Miller III*, 2013 WL 324401, at *12 (citing *Cannon*, 254 S.W.3d at 303 (citing *Crawford*)). The court found that Blackwell was unavailable to testify at the second trial and that Miller's attorneys at the first trial had the opportunity to cross-examine her. *Id.* Petitioner has not identified clear and convincing evidence to undermine those factual determinations. Indeed, this Court's review of the record

confirms that law enforcement made numerous unsuccessful attempts to locate Blackwell (ECF No. 24-13 at 14-47), and the defense cross-examined her at the time she gave the testimony (ECF No. 24-3 at 147-49; ECF No. 24-4 at 52-55.)  Faced with those facts, the state appellate court applied *Crawford*'s test in a straightforward manner to reach the conclusion that Miller's right of confrontation was not abridged.  *Miller III*, 2013 WL 324401, at *12.  The decision is therefore not contrary to, or an unreasonable application of, clearly established Supreme Court law, and is not based on unreasonable factual determinations.

The Court nevertheless recognizes that there could be "room for reasonable debate," *Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014), as to whether Petitioner's confrontation rights were violated by the admission of Blackwell's redacted testimony.  As noted, the Supreme Court in *Crawford* held that the "reliability" of a witness's testimony is to "be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford,* 541 U.S. at 61. The Sixth Circuit has read *Crawford*'s command as requiring cross-examination for the particular purpose of "ensur[ing] that the defendant can attack the reliability of the particular statements that his accuser has made." *Williams*, 759 F.3d at 637 (citing *Crawford*, 541 U.S. at 62).  The redactions to Blackwell's testimony arguably denied Miller the ability to do just that.

As the Tennessee Court of Criminal Appeals found, certain portions of Blackwell's cross-examination testimony were submitted to the jury at the second trial, to wit, the witness's admission that her memory suffered from her prior drug use.  *Miller III*, 2013 WL 324401, at *9. However, the decision of the judge at the second trial to redact the portion of Blackwell's testimony regarding her motivation to avoid jail-time, together with any reference to the threat of incarceration, arguably rendered the prior opportunity for cross-examination a nullity.  Stated differently, it could be concluded that little was left of the procedure of cross-examination after

the redactions. Arguably, therefore, the defendant was "denied the ability to attack the reliability of the particular statements that his accuser . . . made." [6] *Williams*, 759 F.3d at 637. *Cf. Vasquez v. Jones*, 496 F.3d 564, 571 (6th Cir. 2007) ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias....") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (2008) and citing *Davis v. Alaska,* 415 U.S. 308, 318 (1974)); *Miller v. MacLaren*, 737 F. App'x 269, 276 (6th Cir. 2018) (trial judge's admission of unavailable witness's prior testimony did not violate petitioner's confrontation rights where the "defense was permitted to read [the witness's subsequent] recantation letter into the record")); *Blackston v. Rapelje*, 780 F.3d 340 (6th Cir. 2015) (petitioner's right of confrontation was violated where state court refused to allow defense to supplement unavailable witnesses' prior testimony with their subsequent recantations).

All that being said, Petitioner is not entitled to relief. "If there is room for reasonable debate on this issue, the state court's decision . . . is necessarily beyond th[e] court's power to remedy under § 2254, even if it turns out to be wrong." *Williams*, 759 F.3d at 636.

For these reasons, Claims 51 and 52 are **DENIED**. However, the Court will grant a limited certificate of appealability as to the reasonableness of the state appellate court's determination that Miller's right to confront Blackwell was not abridged by the admission of Blackwell's redacted testimony.

---

[6] The dissenting judge in Miller's delayed direct appeal remarked that the judge at Miller's first trial incarcerated Blackwell "in order to get [her] to testify in accordance with what the *trial judge* believed to be the truth." *Miller III*, 2013 WL 324401, at *13 (Woodall, J., dissenting) (emphasis in original).

## IV.     Procedurally Defaulted Claims

Miller does not dispute that his remaining claims are procedurally defaulted.  He asserts, however, that all of the defaults should be excused because he is actually innocent of first degree murder (ECF No. 1 at 16), and because the claims were defaulted through the ineffective assistance of post-conviction counsel (*id.* at 16-27).

He further insists that he is entitled to discovery and an evidentiary hearing as to ten of the procedurally defaulted claims for the purpose of establishing that post-conviction counsel was ineffective for not raising the claims, or to show that the claims are "substantial" under *Martinez.* [7] (*See* ECF No. 33; ECF No. 34; ECF No. 43.)  He seeks to subpoena and compel the testimonies of his attorney at the second trial, as well as the following individuals: Investigator Clifford Worden, George White, Jimmy Ballard, Lucille Miller, Dave C. Williams, James Priddy, Mary Louise Taylor, Sam Ethel Williams, Ted Neuman, TT Boyd, Marvin Grandberry, Jennifer Praitt, Mose Comage, and Harold Booker.  (ECF No. 34 at 6, 13, 17.)  He also requests discovery from the "Haywood County D.A.'s office," by which the office "should be made to answer specifically why and how Clement Harris and Sheila Bernil were given favorable treatment" (*id.* at 19), and production of "Harris' guilty plea transcripts and any memos . . . revealing such statement or agreement entered into between the prosecution and . . . Harris" (*id.*

---

[7]  Although the Petition asserts that an expansion of the record and an evidentiary hearing are necessary as to all of the procedurally defaulted claims and the claim of actual innocence (*see e.g.*, ECF No. 1 at 2-3), Miller's motion for discovery (ECF No.  33) and supporting arguments (ECF No. 34), as well as the pending motion for a *Martinez* hearing (ECF No. 43), seek discovery and a hearing on ten of the defaulted claims.  (*See* ECF No. 34 at 4-17 (Claims 2A, 2B, 2C), 28 (Claim 8), 17-22 (Claims 10, 12, and 14), 22-27 (Claims 18, 20, 22), 29 (Claim 28), 27-28 (Claim 30); ECF No. 43 at 2-3 (seeking an evidentiary hearing under *Martinez* on the ground "that the claims he is raising under *Martinez* to show 'cause' . . . were not exhausted *because the very evidence that he is attempting to develop through discovery*, is the very same evidence that his post-conviction counsel failed to present to the State courts—indeed this is the essence of why said claims are not exhausted"), 5-6 (Claims 2, 8, 10, 12, 14, 18, 20, 22, 28, 30) (emphasis supplied).)

at 22). Petitioner also seeks "factual development" of why a trial court judge would have been required to give an instruction on facilitation. (*Id.* at 27.)

Respondent argues that discovery and an evidentiary hearing are not warranted, that Petitioner has not established a gateway claim of actual innocence, and that *Martinez* does not apply to excuse the procedural defaults because none of the claims are substantial. For the reasons stated in the Court's discussion of Petitioner's free-standing actual innocence claim (Claim 53), *infra*, the Court finds that Miller has not met the lesser standard for a gateway claim to excuse the procedural defaults. Accordingly, the Court's discussion of the procedurally defaulted claims will only address Petitioner's cause and prejudice arguments under *Martinez*.[8]

## A. Alibi Witnesses and "Third Party Guilt": Claims 2 to 8

In Claims 2 through 8, Petitioner asserts that trial counsel provided ineffective assistance by failing to call certain witnesses to testify that he had an alibi at the time of the offense and to show that other individuals killed the victim, and by failing to properly cross-examine Clement Harris. (ECF No. 17-19.) Respondent argues that the procedurally defaulted claims are not substantial, as required by *Martinez*.

### *Claim 2A*

Miller maintains that trial counsel was ineffective by "fail[ing] to properly subpoena and present the eyewitness testimony of . . . George White and . . . Jimmy Ballard, in order to . . . support the theory of 3rd party guilt of Clement Harris, Tracey Taylor and Slouch and . . . to prove Petitioner Miller's actual innocence."[9] (ECF No. 1 at 17.) He alleges, based on the

---

[8] With the exception of Claim 26, which the Court addresses last, all other claims are analyzed in numeric order.

[9] Petitioner does not indicate Slouch's real name.

purported transcript, that White told defense investigator Clifford Worden that he overheard Slouch say to Taylor "Well, you the one that pulled the trigger," and that Taylor drove a small "orange or . . . grey" or "[b]rownish" car. (ECF No. 2-22 at 3, 4.) He also alleges that White's further comments to Worden "clearly establish[] a continuing business relationship between Clement Harris, Mr. Taylor, Slouch, and [the victim]." (ECF No. 1 at 47.) Miller has submitted the alleged interview transcript as an exhibit. (*See* ECF No. 2-22.) He further asserts that Jimmy Ballard would have "corroborated both Mr. Jones and Mr. White's testimony " that the car that had been driven behind the victim's vehicle when it was abandoned after the murder belonged to Taylor. (ECF No. 1 at 60.) Petitioner insists that "he needs the ability to subpoena and compel the testimony of . . . [c]ounsel . . . in order to specifically cross examine her about her lack of preparation and knowledge of the highly exculpatory testimony of . . . White and . . . Ballard regarding the theory" that Harris, Taylor, and Slouch killed the victim. (ECF No. 34 at 6.) He also contends that "he needs the ability to subpoena and compel the testimony of . . . Worden, in order to specifically examine him about [the] reliability and credibility of the highly exculpatory testimony of . . . White and . . . Ballard." (*Id.*)

The purported interview transcript does not support Petitioner's claim that counsel was ineffective in failing to call White and Ballard to testify in support of a theory that Harris, Slouch, and Taylor killed the victim. The transcript is unsigned, and does not identify the interviewer or the person who prepared the document. There is, moreover, no certification that White or Worden made the statements reflected in the transcript, or that the transcript is a true and accurate account of the alleged interview. Respondent pointed out all of these deficiencies in his Answer (*see* ECF No. 23 at 15), but Petitioner did not provide any additional details in his Reply. Moreover, although he alleges that the document is "newly discovered" (ECF No. 1 at

45), he has not explained when and how he obtained it—*a fact fully within his knowledge*. These deficiencies, alone, are sufficient to conclude that no hearing is warranted, and that the claim is not substantial.

But even if the transcript accurately reflects what White told Worden, White's testimony at trial regarding Slouch's statement to Taylor would have been inadmissible hearsay—a point that counsel certainly would have understood. Accordingly, her failure to call White for that purpose does not reflect deficient performance, and did not prejudice Miller. *See e.g., Fluellen v. Kerestes*, No. CIV.A. 12-6751, 2013 WL 395500, at *6 (E.D. Pa. Jan. 14, 2013), *report and recommendation adopted*, No. CIV.A .12-6751, 2013 WL 706062 (E.D. Pa. Feb. 27, 2013) ("[Petitioner] cannot show he was prejudiced by counsel's failure to call Brown because Brown's purported testimony would have been inadmissible.")

Moreover, Petitioner's argument that counsel could have gotten the hearsay statement admitted under Tennessee Rule of Evidence 803(1.2)(E) as an admission of co-conspirators (ECF No. 1 at 54), is without merit. In Tennessee, the hearsay statement of a co-conspirator "is admissible if it constitutes 'a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy.'" *State v. Carruthers*, 35 S.W.3d 516, 555 (Tenn. 2000) (quoting Tenn. R. Evid. 803(1.2)(E)). As Respondent correctly notes, counsel could not have successfully sought the admission of White's testimony under the co-conspirator exception because the State did not charge Taylor or Slouch as co-conspirators. Moreover, because the statements were allegedly made well after the murder, they were not made during or in furtherance a conspiracy. *See id.* at 556-57 (statements made after murder was committed were inadmissible under the co-conspirator exception).

43

Finally, even if counsel was ineffective in failing to call White to testify, Petitioner would still have to show that *post-conviction* counsel was ineffective in failing to raise that argument. In the absence of details regarding where and when he obtained the transcript, Petitioner has failed to demonstrate that post-conviction counsel knew of the document's existence. Indeed, he alleges that the document is "newly discovered" evidence. What is more, if Petitioner did, in fact, have the document at the time of his post-conviction proceedings, he has "not assert[ed] that he mentioned [the transcript] to his post-conviction counsel but that counsel refused or simply failed to include the issue in the amended petition." *D'Antonio v. Carpenter*, No. 3:13-CV-0355, 2014 WL 3015874, at *19–20 (M.D. Tenn. July 3, 2014) (finding "the petitioner[did] not carr[y] his burden of establishing any failure on the part of post-conviction counsel").

Regarding Jimmy Ballard, Petitioner argues that counsel should have called him to testify in order to "flesh out" a theory that Taylor was involved in the murder. (ECF No. 1 at 57.) He maintains, specifically, that Ballard would have supported the testimony of Jesse Jones. (*Id.*) According to Miller's characterization of Jones's testimony, the witness "testified that . . . neither" the driver of the victim's maroon-colored car, nor the driver of the small, light-colored car, "were Petitioner Miller." (ECF No. 1 at 56-57.). Ballard, he argues, would have testified that Taylor was the owner of the light-colored car. (ECF No. 1 at 58.) The state court record belies a need for discovery and a hearing regarding counsel's decision not to call Ballard to testify, and also shows that the claim is not substantial.

Jones testified that, early in the morning on April 20, 1995, he observed "a maroon color car" and a "little light color car" drive past him. (ECF No. 24-16 at 38.) Although Petitioner is correct that Jones further testified that the driver of the maroon vehicle was not Miller, (*id.* at 43), he incorrectly contends that Jones also stated that Miller was not the driver of the light-

colored car. Jones actually testified, on both direct and cross examination, that he could not identify the driver of the light-colored vehicle. (*Id.* at 41 ("I never did see who was driving that light colored car."); 43 ("I don't know who was driving the other car.").) Accordingly, both Jones's testimony and Ballard's expected testimony do not eliminate the possibility that Miller was driving the light-colored vehicle. Moreover, neither testimony is inconsistent with Harris's testimony, which suggested that there was a second person involved in the murder. Finally, Jones testified at the first trial that his friend Ballard told him that the light-colored car belonged to Taylor (ECF No. 24-4 at 144-45), but the jury nevertheless returned a guilty verdict. Given the marginal value of Ballard's testimony, counsel's decision not to call him to testify was not deficient performance, and Petitioner was not prejudiced by it.

For all of these reasons, Claim 2A is **DISMISSED**.

### *Claims 2B and 2C*

Petitioner asserts that trial counsel was ineffective for failing "to properly subpoena and/or present" the following individuals as witnesses at the second trial in order to establish "third-party" guilt or an alibi defense: Lucille Miller, David C. Williams, James Priddy, Mary Louise Taylor, Mrs. Sam Ethel Williams, Clifford Worden, T.T. Boyd, Jennifer Praitt, former Assistant District Attorney Ted Neuman, Marvin Grandberry, Mose Comage, Harold Booker, and "other witnesses with relevant exculpatory testimony" (Claim 2C). [10] (ECF No. 1 at 18) He alleges that the testimonies of all these individuals would have supported a theory that Harris, Taylor, and Slouch killed the victim. (*Id.*) Miller further maintains that counsel was ineffective

---

[10] Petitioner's mother, Lucille Miller, testified at the first trial. Counsel's failure to call her at the second trial was litigated at the post-conviction hearing and on appeal. *See Miller IV*, 2015 WL 3881597, at *3. Therefore, this portion of Claim 2B is not procedurally defaulted. The Court reviewed the merits of Petitioner's assertion regarding his mother's testimony under the AEDPA's deferential standards in Part III, *supra*.

by "fail[ing] to properly present the full exculpatory extent of Jess James Jones' eyewitness testimony in order to . . . support the theory of 3rd party guilt . . . and . . . prove Petitioner['s] . . . actual innocence" (Claim 2B).  (*Id.* at 17.)  He seeks discovery and an evidentiary hearing.  (ECF No. 34 at 17.)  Because the state court record shows that the claims are not substantial, these procedures are not warranted and the procedural defaults are not excused.

Counsel testified that her "assessment and [her] office's assessment . . . were benefited by the fact that [they] had the transcript from the [first] trial."  (ECF No. 24-35 at 31.)  She therefore "knew what the State's proof was going to be," and what its "theories were."  (*Id.*)  She explained that, because "Dwight had always insisted that he was not there," she and her office "tried to develop as best as [they] could an . . . alibi defense."  (*Id.* at 32.)  She stated that she and her team investigated all alibi theories and potential witnesses, but "never could pin down anyone who could say that they saw [Miller] at the time that th[e] shooting was to have occurred."  (*Id.* at 33.)

With regard to David C. Williams, James Priddy, Mary Louise Taylor, Sam Ethel Williams, Clifford Worden, and T.T. Boyd, those individuals testified at Miller's first trial, which ended in a guilty verdict.  Having had the benefit of the transcript from the first trial, and having investigated and interviewed potential witnesses in support of an alibi defense, the record suggests that counsel made a strategic decision not to call those individuals to testify at the second trial.  Furthermore, prejudice flowing from that decision is elusive, as their testimonies did not prevent a guilty verdict at the first trial.

As to Praitt and Grandberry, Petitioner alleges that Praitt would have "buttressed Petitioner Miller's other witnesses such as Mrs. Rosa Carney who would have testified that Petitioner Miller was in Stanton projects specifically around 12 a.m. period when he left and

went home," (ECF No. 1 at 73), and that Grandberry would have testified that he saw Miller "in [the] Stanton projects shortly after he left his mother's house, after painting her den, until around 12 a.m. when he left and went home." (ECF No. 1 at 72, 73.) He argues that the testimonies would have given him an alibi for the time of the murder, and also "would have directly refuted/impeached the testimony of Clement Harris . . . that he saw Petitioner's Miller at the Brownsville Fairground projects earlier in the day." (*Id.* at 72.) The record belies the assertion that counsel provided ineffective assistance by failing to call these witnesses.

The record shows that the murder took place between 1:00 to 2:00 a.m. on April 20, 1995 (ECF No. 24-35 at 33), and that Brownsville is approximately a twenty- to thirty-minute drive from Stanton (*id.* at 21). Pruitt and Grandberry, thus, could not have provided an alibi for the murder had they testified that they saw Miller in Stanton until midnight.

To the extent Petitioner alleges that these individuals could have rebutted Harris's statement that Miller was in Brownsville around 6:00 or 7:00 p.m., and thus corroborate Carney's statement that she saw Miller in Stanton around "dusk dark," *Miller IV*, 2015 WL 3881597, at *2, counsel was not ineffective in failing to call them as witnesses and post-conviction counsel was not ineffective in failing to raise the claim. Counsel testified that, despite the cooperation of people in Stanton and their desire to help Miller, she and her team had tried, but were unable, to locate other witnesses who could verify that he was in Stanton at the times that Harris said he was in Brownsville. (ECF No. 24-35 at 33.) When asked what individuals he had "requested" that his attorney call as witnesses (ECF No. 24-25 at 43), Petitioner did not mention Praitt or Grandberry (*id.* at 43-60). [11] In addition, because the state appellate court did

_____

[11] Petitioner's post-conviction testimony is contained in the transcript from the hearing that took place before the delayed appeal. (ECF No. 24-25 at 32-60.) Miller did not testify at the hearing that was held after the appeal. (ECF No. 24-35.)

not unreasonably determine that counsel was not ineffective for declining to call Carney, *see supra* Part I, it follows that post-conviction counsel's failure to pursue similar claims as to Praitt and Grandberry did not prejudice Petitioner.

Petitioner asserts that counsel should have called Mose Comage for the purpose of "directly refut[ing]/impeach[ing] the testimony of Clement Harris" that Harris visited Comage the evening of April 19, 1995. (ECF No. 1 at 74.) He alleges that "Investigator Worden, had testimony and evidence, that . . . not only did . . . Comage not stay where . . . Harris testified he lived, but that . . . Comage would have testified that . . . Harris never visited him that evening, and [that Harris] would not have been welcomed to do so, had he tried." (*Id.*) He also cites to the testimony of Curtis Johnson, who was called to testify on behalf of the defense at the second trial. (*Id.* (citing ECF No. 24-16 at 66-67.) Johnson testified that Comage "didn't like nobody hanging over at his house" and did not live where Harris had testified he lived. (*Id.* at 67.)

The argument is not supported. Petitioner does not identify any document indicating that Worden "had testimony and evidence" about what Comage, himself, would have said had he testified. Moreover, to the extent Curtis Johnson's testimony suggests that Harris lied about having visited Comage, the jury heard that evidence. Petitioner thus has not shown that counsel's performance in failing to call Comage to testify was deficient, or that there is a reasonable likelihood that his testimony would have changed the outcome of the trial.

Petitioner asserts that counsel should have called "Harold Booker and several other witnesses" to testify "to exculpatory facts regarding statements that he had taken and facts that he observed which completely and totally [would have] impeached the testimony of . . . Harris." (ECF No. 1 at 74-75.) He alleges "that these statements and exculpatory evidence are contained

in the Haywood County D.A.'s case file, and were never turned over to the Defense." (*Id.* at 75 n. 5.)

The allegations do not support Miller's request for discovery and an evidentiary hearing, or his argument that the claim is substantial. Petitioner does not explain what exculpatory evidence Booker and the other individuals would provide, or what specifically they would say if called to testify. He also does not identify the other individuals. Finally, his allegations that the information is "contained" in the district attorney's files, and was never disclosed to the defense, are wholly conclusory.

Lastly, Petitioner asserts that counsel rendered ineffective assistance by failing to call former Assistant District Attorney Ted Nueman to testify about what he knew regarding other individuals who might have been involved in the victim's murder. (ECF No. 1 at 68-69.) As will be discussed in the Court's review of Claim 4, *infra*, the record shows that counsel investigated the information from Nueman and determined that nothing useful for the defense resulted from the investigation. Miller has therefore not shown that he is entitled to discovery and an evidentiary hearing on this issue, or that counsel performed deficiently.

For all of these reasons, Claim 2 in its entirety is **DISMISSED**.

### *Claims 4 and 6*

Petitioner asserts that trial counsel provided ineffective assistance by failing to obtain evidence that third-parties were responsible for the victim's death. (ECF No. 1 at 18.) He alleges that a memorandum and field notes from Assistant District Attorney Ted Nueman indicated that "men from Memphis" had been arguing with the victim "over money and drugs" the evening of the shooting (Claim 4). (ECF No. 1 at 69.) He argues that counsel, therefore, should have secured "[r]ecords of the Brownsville police department which irrefutably supported

the guilt of . . . Harris . . . and his associates." (*Id.*)  He has submitted the motion of his attorney at the first trial seeking a continuance in order to investigate Nueman's information.  (ECF No. 2-1.)  Miller also alleges that counsel should have obtained evidence of the identity of the person who reported the victim's body through a 911 call (Claim 6).  (*Id.* at 18.)

At the post-conviction hearing, counsel stated that she did not remember Nueman's notes (ECF No. 24-35 at 40), but did recall the continuance motion and defense efforts to flesh-out the information they had received that someone else may have had a motive to kill the victim:

> Q.      Y'all had gotten some information about a related incident about [the victim] about the possibility of somebody else being angry at [him] in this matter; is that correct?
>
> A.      That's right.
>
> Q.      And I'm going to pass a document to you and ask if this is a document from your office . . . asking for a continuance to investigate this allegation.
>
> A.      I think this was something that was filed in relation to the first trial.  I didn't file it but I was certainly aware of it.  We had the benefit of having the first file in my office when we tried the second one and I was aware that [the defense attorney at the first trial] had tried his best to flesh that out.
>
> Q.      Did anything ever come of it?
>
> A.      Absolutely not.
>
> Q.      But your office did act on that once you got that information.
>
> A.      They did the first time and we attempted to the second time and just was not able to make any headway on that.

(ECF No. 24-35 at 44-45.)

Because the record shows that counsel investigated the information from Nueman and determined that nothing useful for the defense resulted from the investigation, Miller has not shown that counsel's conduct was deficient.  Claim 4 is therefore not substantial.

With regard to the 911 call, Petitioner alleges that counsel should have sought to ascertain the identity of the caller because that individual's "intimate knowledge of the location" of the body suggests that Harris "was directly responsible for the murder." (ECF No. 1 at 69-70.) The allegation that the caller's identity would have supported an alibi or third-party-guilt defense is mere speculation. In addition, Miller acknowledges that his attorney from the first trial "filed a motion specifically requesting" the caller's identity (*id.* at 70), and he does not suggest that the State did not provide the information, or that counsel at the second trial did not have it. (ECF No. 1 at 70.) Accordingly, Miller has not shown that counsel performed deficiently or that he was prejudiced by her conduct. Claim 6 is not substantial.

As Petitioner has not overcome the procedural defaults, Claims 4 and 6 are **DISMISSED**.

### *Claim 8*

Petitioner asserts that trial counsel provided ineffective assistance by failing to ask Harris whether he killed the victim or was otherwise involved in the murder. (ECF No. 1 at PageID 19.) He alleges that, had counsel done so, she could then have impeached Harris with statements Nina Champion made to her mother. (*Id.*) There is no need for discovery and an evidentiary hearing on the claim, as the state court record demonstrates that the claim is without merit.

"Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim." *Crawford v. United States*, No. CIV. 04-CV-71543, 2008 WL 2948055, at *7 (E.D. Mich. July 31, 2008) (quoting *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir. 2002) (inner quotation marks and alteration omitted)). *See also United States v. Steele,* 727 F.2d 580, 591 (6th Cir. 1984) (holding that cross-examination falls "within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight" by the court).

In Miller's first trial, the proffered testimony of Champion's mother, Sam Ethel Williams, was ruled inadmissible on the ground that it was irrelevant. (ECF No. 24-5 at 18.) Williams would have testified that her daughter told her on one occasion that she knew who killed the victim, and on a later occasion that she did not know who the perpetrator was. (*Id.* at 16-17.)

Given that Williams would not have testified that Champion told her that Harris committed the murder or that Miller was not the perpetrator, her testimony would not have served to impeach Harris had counsel asked him if he killed the victim. Counsel's performance was therefore not deficient and did not prejudice Petitioner. As the procedural default is unexcused, Claim 8 is **DISMISSED**.

### B. Non-prosecution Agreement: Claims 10, 12, and 14

Petitioner asserts that counsel rendered ineffective assistance by failing to present proof that "there was a non-prosecutorial agreement entered into with [S]tate star witnesses [C]lement Harris and She[ila] Bernil," which would "show their motive to testify." (ECF No. 34 at 17; ECF No. 1 at 19-20.) Petitioner also insists that counsel was ineffective by failing to raise claims under *Brady*, 373 U.S. at 83; *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), for the State's alleged failure to provide the non-prosecution agreement to the defense, and for using the allegedly false testimonies of Bernil and Harris that they did not have such agreements with the State. (ECF No. 1 at 19-20.) He requests discovery of law enforcement files relating to those individuals. (ECF No. 34 at 19.)

A prosecutor commits misconduct in violation of the Due Process Clause if he or she knowingly presents false testimony or fails to correct testimony he or she knows to be false. *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 153. A *Brady* violation occurs when the prosecution

fails to disclose "evidence . . . favorable to the accused[,] . . . either willfully or inadvertently[,] and prejudice . . . ensue[s]." *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999) (citing *Brady*, cite.)

As previously discussed, the court in the first trial directed the T.B.I. to "find out if there [was] sufficient evidence to take [Bernil] to trial" regarding her check forging scheme with Barbara Blade, and "to find out why it was not relayed to the defense counsel when they asked about it." (ECF No. 24-6 at 14.) The trial court subsequently reviewed the completed T.B.I. report *in camera* without disclosing its contents to the defense, and determined that no *Brady* violation had occurred. *Miller I*, 1998 WL 902592, at *4. In his direct appeal following the first trial, Miller raised a claim under *Brady* that the prosecution had failed to disclose non-prosecution agreements with Bernil and Harris, and further argued that the trial court erred in withholding the T.B.I. report from the defense. *Miller* I, 1998 WL 902592, at *1. The Tennessee Court of Criminal Appeals agreed that the trial court committed reversible error, but concluded that it was "unable to address the *Brady* concern" because the defense had not had an opportunity to fully argue all elements of the claim due to the withholding of portions of the T.B.I. report. *Id.* at *5 & n.7. In light of the fact that it was remanding the case on other grounds, the appellate court found that "the defendant w[ould] receive appropriate relief by the prosecution providing the T.B.I. report during pre-trial discovery in the proceedings which will take place on remand." *Id.* at *6.

Miller's claims are not substantial. He has not alleged that counsel did not receive the T.B.I. report in pre-trial discovery after remand, or that information in the report would have supported a motion pursuant to *Brady*, *Giglio*, or *Napue*. Moreover, as Respondent observes (ECF No. 23 at 20), Petitioner's allegation that Bernil and Harris had non-prosecution

agreements with the State is speculative. Miller's response to that observation only highlights the hypothetical nature of his allegation. In his Reply, he insists that the allegation is not speculative because "[b]y sheer force of reason, based on nothing other than [Bernil and Harris's] collective criminal histories[,] which would have subjected the[m] to no less than 7 decades a piece for their respective, 1995 and 1996 crime sprees, *it['[]s beyond question* that there was a *defacto* or even explicit non-prosecution agreement with the[m] in exchange for their testimony against Petitioner Miller." (ECF No. 34 at 18 (emphasis in original).)

Petitioner further believes that Harris's guilty plea transcripts and "the internal 28th Judicial D.A. Office memos and case files dealing specifically with . . . Bernil and . . . Harris," will provide the proof that he needs. (*Id.*) However, he has offered nothing but "[g]eneralized statements about the possible or speculative existence of evidence," which "do[es] not constitute 'good cause'" for discovery. *Long v. Morrow*, No. 3:10-01010, 2014 WL 3865382, at *3 (M.D. Tenn. Apr. 16, 2014), *aff'd sub nom. Long v. Qualls*, 627 F. App'x 492 (6th Cir. 2015) (quoting *Munoz v. Keane,* 777 F. Supp. 282, 287 (S.D.N.Y. 1991). Accordingly, because his allegation that Bernil and Harris had non-prosecution agreements is mere speculation, and because he has submitted nothing specific suggesting that the documents he seeks will yield evidence of non-prosecution agreements, discovery would amount to a fishing expedition. Discovery and an evidentiary hearing on Claims 10, 12, and 14 are therefore not warranted.

Because the claims are based on speculation, they are not substantial. Petitioner's argument that post-conviction counsel was ineffective in failing to raise the claims is also unsupported, as counsel cannot be faulted for failing to raise claims that depend on conjecture. Claims 10, 12, and 14 are **DISMISSED**.

### C. District Attorney Recusal: Claim 16

Petitioner asserts that trial counsel rendered ineffective assistance by failing to argue that the trial court erred in denying her motion to disqualify the district attorney's office from prosecuting Miller's case. (ECF No. 1 at 16.) He argues, specifically, that counsel performed deficiently by failing to cite to *State v. Phillips*, 672 S.W.2d 427 (Tenn. Crim. App. 1984), in support her argument that Miller's due process rights were violated by the district attorney's employment of lawyer William Bowen, who had worked on Miller's case during the first trial and appeal. (ECF No. 1-2 at 8.)

In the pre-trial phase of the second trial, counsel filed a motion to disqualify the district attorney's office on the ground that Bowen had worked on Miller's first trial and appeal. (ECF No. 24-12 at 55-58.) The motion did not cite to *Phillips*. The trial court, however, quoted extensively from that case in its seven-page order denying the motion. (*Id.* at 63-64.) Unlike in *Phillips*, where the attorney in question "worked on the [defendant's case] for the prosecution," 672 S.W.2d at 428, Bowen was not assigned as a prosecutor for Miller's second trial and, as the trial court found, "did not confer or advise his prosecution colleagues of any aspect of the Defendant's case." (ECF No. 24-12 at 66.)

Because the trial court considered *Phillips* and found its facts to be distinguishable from the facts in Miller's case, counsel cannot be said to have performed deficiently by failing to make the futile argument. For the same reason, Petitioner was not prejudiced by counsel's omission. Claim 16 is **DISMISSED**.

### D. Jury Instructions on Lesser Included Offenses: Claims 18, 20, and 22

Petitioner asserts that trial counsel rendered ineffective assistance by failing to argue in favor of jury instructions on the lesser-included-offenses of criminal responsibility and

faciliation.  (ECF No. 1 at 21-22.)  He acknowledges that the trial judge considered, but declined to issue, a jury instruction on criminal responsibility.  (*See* ECF No. 1-2 at 40 (referencing ECF No. 24-16 at 84 (finding that Harris's testimony "didn't leave any doubt in anybody's mind that . . . it was . . . the defendant" who shot the victim)).  Petitioner argues that instructions on criminal responsibility and facilitation were warranted, however, because Harris did not testify as to who actually pulled the trigger.  (ECF No. 1-2 at 40.)  He requests "[f]actual development" of why a trial court judge would have been required to give an instruction on facilitation. (ECF No. 34 at 27.)  As the assertions of attorney ineffective assistance are belied by the state court record, there is no good cause for discovery or an evidentiary hearing.  The claims are also not substantial.

Under Tennessee law, "a person may be criminally responsible for an offense committed by another person where he or she '[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.'"  *State v. Jordan*, No. W1999-01693-CCA-R3CD, 2000 WL 1840076, at *6 (Tenn. Crim. App. Dec. 6, 2000) (quoting Tenn. Code Ann. § 39-11-402(2)).  "A person 'is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.'"  *State v. Howard*, No. M1999-02473-CCA-R3-CD, 2000 WL 1731287, at *4 (Tenn. Crim. App. Nov. 22, 2000) (quoting Tenn.Code Ann. § 39-11-403(a) (1997)).

As Respondent points out, the evidence did not support criminal responsibility or facilitation instructions.  Although, as Petitioner argues, Harris did not see the gun in Miller's hand, he testified that the shot clearly came from the driver's side window and that Miller was in

the driver's seat. (ECF No. 24-14 at 42-43.) Miller then left his vehicle, pushed the victim over, and drove away. (*Id.*) The passenger then moved over to the driver's side of the car that Miller had been driving, and followed him. (*Id.*) There was no evidence, or reasonable inferences arising from the evidence, that anyone other Miller shot the victim. In addition, there was no evidence that Petitioner knowingly furnished substantial assistance in the commission of the murder without the intent required for criminal responsibility.

But even if there were evidence to support criminal responsibility or facilitation instructions, requesting the instructions would have been inconsistent with defense counsel's strategy to create a reasonable doubt that defendant was the murderer. As discussed, counsel testified that her decision to pursue an alibi defense was strategic based on her review of the evidence and the transcript from the first trial, as well as the fact that "that "Dwight had always insisted that he was not there." (ECF No. 24-35 at 32.) This "[C]ourt must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and there is no suggestion that Miller's attorney acted outside the scope of reasonable trial strategies by not requesting lesser-included-offense instructions. *See generally Harrop v. Sheets* 430 F. App'x 500, 506-07 (6th Cir. 2011) (the failure to request instructions on lesser included offenses is ordinarily a matter of trial strategy).

What is more, to demonstrate that he was prejudiced by counsel's failure to seek the instructions, Petitioner "would have to show not only that such . . . instruction[s] would have been given if requested, but a substantial likelihood that the jury would have acquitted the defendant of more serious charges had the jury been allowed to consider the lesser-included offense[s]." *Robinson v. Warden, Mansfield Corr. Inst.*, No. 2:10-CV-0503, 2012 WL 668776, at *10 (S.D. Ohio Feb. 29, 2012), *report and recommendation adopted*, No. 2:10-CV-503, 2012

WL 1195093 (S.D. Ohio Apr. 10, 2012) (citing *Harrop*, 430 F. App'x at 500). Given the fact that the trial judge refused to give a criminal responsibility instruction, Petitioner would be hard pressed to show that the judge would have given such an instruction, or one on facilitation, had counsel argued for them. In addition, in light of the evidence presented to the jury, Miller cannot make the showing that the jury would have acquitted him of the first degree murder charge had the instructions been given.

For these reasons, there is no justification for discovery or an evidentiary hearing on the claims relating to lesser-included-offenses, and the claims are not substantial. Claims 18, 20, and 22 are **DISMISSED**.

### E. Second Degree Murder: Claim 24

Miller asserts that trial counsel was ineffective for failing to argue that the evidence supported a verdict of second degree, rather than first degree, murder. (ECF No. 1 at 22.) The Tennessee Court of Criminal Appeals concluded that the evidence was sufficient to convict Miller of first-degree premeditated murder. *See Miller II*, 2004 WL 115374, at *4. Because the argument Miller believes counsel should have advanced would not have been meritorious, he has not been prejudiced by her conduct. The claim is, thus, not substantial.

### F. Prior Bad Acts: Claim 28

Petitioner asserts that counsel "was ineffective for failing to put on adequate supporting evidence and properly argue that [the] admission of prior bad acts, was done in direct violation of Tenn. R. Evid. Rule 404(b) and therefore violated [his] due process rights." (ECF No. 1 at 23.) He argues that counsel should have objected to those portions of Kathy Blackwell's testimony where she stated that she met Miller for the purpose of buying cocaine, that he stole

money from her, and that he gave her crack cocaine.[12]  (ECF No. 1-2 at 62-63.)  He insists that he is entitled to discovery and an evidentiary hearing.  (ECF No. 34 at 29, 32.)  Specifically, he believes he "would need the ability to subpoena and compel the testimony of [c]ounsel . . . to show her lack of adequate preparation and diligence."  (*Id.* at 32.)

In general, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."  Tenn. R. Evid. 404(b).  As Respondent points out, Blackwell's statements were not admitted to prove Miller's character, but rather, for impeachment purposes.  The State was granted permission to treat Blackwell as a hostile witness after she claimed not to remember the statement she had previously given to law enforcement.   (ECF No. 24-15 at 44.)  The prosecutor cross-examined her about portions of that statement, including that she had purchased cocaine from Miller and that he stole money from her.  (*Id.* at 46, 49.)   Under these circumstances, counsel was not ineffective for failing to raise an objection under Tenn. R. Evid. 406(b).  *See State v. Clayton,* No. W2018-00386-CCA-R3-CD, 2019 WL 3453288, at *13 (Tenn. Crim. App. July 31, 2019) ("[A] prior statement about events that a witness claims at trial to be unable to remember is "inconsistent" with the witness'[s] trial testimony.") (quoting *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015)); *State v. Wilson*, No. W2014-01054-CCA-R3-CD, 2015 WL 8555599, at *24 (Tenn. Crim. App. Dec. 11, 2015), *perm. appeal denied* (Tenn. Mar. 23, 2016) ("[W]hen [the witness] asserted that he could not remember making the police statement, it was appropriate for the State to impeach him with his prior statement.").

Accordingly, as the state court record refutes Petitioner's allegation that his "prior bad acts" were admitted in violation of the state evidentiary rule, discovery and a hearing are not

---

[12]    Petitioner also alleges that Bernil and Harris testified to "prior bad acts" (ECF No. 1-2 at 62), but he does not flesh-out the argument as to these two witnesses.

warranted, and the claim of attorney ineffective assistance is not substantial. Claim 28 is **DISMISSED**.

### G. Plea Offer: Claim 30

Petitioner argues that counsel provided ineffective assistance by failing to communicate a plea offer from the State. (ECF No. 1 at 23.) He alleges that the prosecution offered a twenty-five-year sentence, to be served at thirty-percent release eligibility, in exchange for his guilty plea. (ECF No. 1-2 at 71.)

Petitioner provides no factual support for the allegation that a plea offer was made. He does not, for example, allege when, specifically, the offer was made or to what lesser charge he would have had to plead guilty. Mere speculation about the existence of an offer does not entitle Petitioner to discovery or an evidentiary hearing on this issue, and, without more, the claim of attorney ineffective assistance is not substantial. Claim 30 is therefore **DISMISSED**.

### H. Videographer and Crime Scene Reconstructionist: Claims 32 and 34

Petitioner asserts that counsel was ineffective for failing to "properly request funding" for (Claim 32), or otherwise "properly obtain" and admit as evidence (Claim 34), a video of the crime scene produced by "a videographer/crime scene reconstructionist in order to prove the physical and scientific impossibility of state [s]tar witness Clement Harris' testimony." (ECF No. 1 at 24 (emphasis omitted).) He alleges that "it would, as a matter of strict physical law, have been impossible for Mr. Harris to have visually observed" the murder "from the vantage point he alleges he was sitting at." (ECF No. 1-3 at 8.) The claims are not substantial.

Prior to the first trial, the defense obtained a nighttime video through Investigator Clifford Worden. (ECF No. 24-5 at 26.) Out of the jury's presence, Worden testified that he had taken a video of the crime scene at night, while standing at the spot Harris said he was when the

murder occurred. (*Id.* at 28.) He explained that the video showed that people standing in the parking lot where the murder took place could not be identified. (*Id.*) Worden admitted on cross-examination that he was not a video "technician," and that "every camera and every film reduces the amount of light . . . that is seen by the human eye." (*Id.* at 30.) The trial court viewed the video, and determined that it would not be admitted into evidence because it did not "approximate[] what Mr. Harris could have seen." (*Id.* at 34.) Worden was, however, allowed to testify before the jury that he "was unable to identify individuals standing outside some parked cars while standing at less of a distance than Harris had testified he was from the location of the murder." *Miller I*, 1998 WL 902592, at *8. "The investigator [also] sketched a diagram, which was admitted into evidence," and "[p]hotographs of the scene were admitted." *Id.* On direct appeal, the Tennessee Court of Criminal Appeals affirmed the trial court's exclusion of the video. *Id.*

Petitioner now argues that counsel at his second trial "was specifically put on notice that the court's primary concern dealt with the lack of reliability of P.I. Worden's [video recording] methodology." (ECF No. 1-3 at 10.) He maintains that counsel should, therefore, have sought funding for, and should have procured, an expert videographer to record the crime scene. (ECF No. 1-3 at 18.) As Respondent points out, however, the "second trial took place seven years after the murder, and there is no evidence that the crime scene looked the same as it did the night of the murder." (ECF No. 23 at 27.) In addition, the photographs of the crime scene were again admitted into evidence at the second trial. (ECF No. 24-16 at 135-39.) Accordingly, Petitioner has not shown that there is "some merit" to his charge that counsel for the second trial was deficient in failing to secure funding for, or otherwise obtain and admit into evidence, a video of the crime scene, or that he was prejudiced by her failure.

Claims 32 and 34 are **DISMISSED**.

### I.   Expert Testimony: Claims 36 and 38

Petitioner asserts that trial counsel was ineffective "when she failed to properly request, obtain and present *exculpatory* expert witness testimony of a qualified blood splatter expert in order to prove the physical and scientific impossibility of state [s]tar witness Clement Harris' testimony" (Claim 36).   (ECF No. 1 at PageID 25 (emphasis in original).)   He also insists that counsel should have called "a pathologist in order to prove the physical and scientific impossibility of . . . Harris' testimony . . . with regard to the . . . [t]ime of [d]eath[,] condition of the body[,] and . . . range of gun shot wounds" (Claim 38).   (*Id.*)

The claims are not substantial.   The allegation that expert testimony would have contradicted Harris's testimony in the ways alleged is conclusory and speculative.   In addition, there is no factual support, but only speculation, that expert testimony would likely have changed the outcome of the trial.    Claims 36 to 38 are therefore **DISMISSED**.

### J.   Court's Witness: Claims 40 and 42

Petitioner asserts that trial counsel was ineffective by failing to argue that state law prohibited the use of Blackwell's testimony.   (ECF No. 1 at 26; ECF No. 1-3 at 32-38.)   He argues that the testimony should have been excluded at the second trial because the judge in the first trial had no authority under Tenn. R. Evid. 614 to call her as the court's witness.[13]   (ECF No. 1-3 at 33-35.)   He also asserts that the trial court impermissibly used the Rule 614 procedure as a means to "comment on the evidence," in violation of *Montesi v. State*, 417 S.W.2d 554, 561 (Tenn. 1967), and "overstepped the lawful and permissible bounds of witness admonishment as

---

[13]    Rule 614 provides that a "court may not call witnesses except in extraordinary circumstances or except as provided for court-appointed experts in Rule 706, and all parties are entitled to cross-examine witnesses thus called."  Tenn. R. Evid. 614(a).

established in *State v. Schafer*, 973 S.W.2d 269, 278 (Tenn. Crim. App. 1997)." [14] (ECF No. 1-3 at 35, 36-37.) The claim is not substantial.

On appeal after the first trial, the Tennessee Court of Criminal Appeals, relying on *Montesi*, acknowledged that a "trial court[ has] discretion to call its own witnesses," but admonished that the "discretion must be exercised carefully and cautiously so that it does not amount to a comment on the evidence." *Miller I*, 1998 WL 902592, at *11 (citing *Montesi*, 417 S.W.2d at 561). Citing *Schafer*, the court also stated that a "trial court may not declare its belief the witness is being untruthful and threaten the witness with prosecution for perjury to such a degree that the witness changes his testimony to the detriment of the defendant." *Id.* at *12 (citing *Schafer*, 973 S.W.2d at 278). As previously noted, the appellate court went on to hold that the judge's questioning of Blackwell and his incarceration of her was reversible error because it prejudiced both the defendant and the judicial process. *Id.* at *12-13.

At the second trial, counsel argued that the prejudicial taint that had prompted the retrial had not been removed by the redaction of portions of Blackwell's testimony. (ECF No. 24-13 at 51.) The trial court admitted the testimony under counsel's objection. *Miller III*, 2013 WL 324401, at *8. In the delayed direct appeal, appellate counsel argued that the testimony was impermissibly admitted, and quoted those portions of the Tennessee Court of Criminal Appeals' earlier decision which evaluated the trial judge's conduct in light of *Montesi* and *Schafer*. (ECF No. 24-26 at 8-9.) The Tennessee Court of Criminal Appeals nevertheless found that the redacted version of the testimony was properly admitted under state law. *Miller III*, at *12-13.

---

[14] Petitioner's arguments (*see* ECF No. 1-3 at 32-38) are somewhat confusing, and do not completely align with the way Claims 40 and 42 are expressed in the Petition (*see* ECF No. 1 at 26.) The Court has liberally construed the submissions.

Petitioner has not explained why an argument under Rule 614 had a greater chance of success than the argument that counsel did make in seeking to exclude the testimony at the second trial. He also cannot show that he is prejudiced by counsel's failure to argue *Montesi* and *Schafer*, as those cases were cited to the appellate court but the court determined that the redacted testimony was properly admitted. Miller, thus, has failed to establish that his assertions of deficient performance and prejudice have "some merit." Claims 40 and 42 are **DISMISSED**.

### K. Preliminary Hearing Testimony: Claim 44

Petitioner asserts that trial counsel trial provided ineffective assistance by failing to argue for the exclusion of Nina Champion's preliminary hearing testimony at the second trial on the ground that the testimony was improperly admitted during the first trial. (ECF No. 1 at PageID 26.) As already discussed, the underlying issue of the testimony's admissibility was raised on direct appeal after the first trial. *See Miller I*, 1998 WL 902592, at *7-8. The Tennessee Court of Criminal Appeals held that the testimony was properly admitted, *see id.* at *8, and this Court has found that the decision was not unreasonable. Counsel at the second trial was not ineffective for failing to raise a futile argument. Claim 44 is **DISMISSED**.

### L. Alternate Juror: Claim 46

Miller asserts that trial counsel was ineffective by failing to object that the use of an alternate juror violated his right to due process. (ECF No. 1 at 27.) He alleges that the juror was not present for the entire second trial. (*Id.*)

Petitioner has not provided any proof that the alternate juror was not present for all of the evidence. In fact, at the first post-conviction hearing, he was asked about the allegation, but could not substantiate it. (*See* ECF No. 24-25 at 58.) The claim that trial counsel was ineffective

for failing to challenge the use of the alternate juror is therefore not substantial. Claim 46 is **DISMISSED**.

### M. Actual Innocence (Claim 53)

Petitioner asserts a free-standing claim of actual innocence (Claim 53 (ECF No. 1 at 28)), as well as a gateway claim of actual innocence to excuse his numerous procedural defaults (Claim 1 (ECF No. 1 at 16.).) For the following reasons, the Court finds that Petitioner is not entitled to relief under either theory.

A § 2254 habeas petitioner may establish a gateway claim of actual innocence to excuse a procedural default. *Schlup v. Delo*, 513 U.S. 298, 315 (1995). Such a claim "requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. The petitioner must show that, in light of the new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327.

As the Sixth Circuit recently noted, however, "the Supreme Court has yet to answer whether" a federal habeas court may entertain a "*freestanding* innocence claim[]." *Stojetz v. Ishee*, 892 F.3d 175, 208 (6th Cir. 2018) (emphasis added) (finding no clear Supreme Court pronouncement that free-standing actual innocence claims "are cognizable in habeas corpus") (citing *House v. Bell*, 547 U.S. 518, 55455 (2006)). If such a claim were cognizable, "the showing required for such a hypothetical claim would be greater than that required for a gateway-innocence claim." *Id.* (citing *House*, 547 U.S. at 555). It therefore stands to reason "that if [a petitioner] cannot meet the standard for a gateway-innocence claim—viz., establishing that 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a

reasonable doubt[,]'—he cannot meet the [greater] burden" for a free-standing claim. *Id.* (quoting *Schlup*, 513 U.S. at 327) (citation omitted)).

According to Petitioner, the testimony of the witnesses he believes counsel should have called to testify at his second trial would show that Harris's testimony that he saw Petitioner shoot the victim was a lie. (ECF No. 1 at 28; ECF No. 1-3 at 61.) Among those witnesses is George White, whose alleged interview by Investigator Worden is purportedly reflected in a transcript. (*See* ECF No. 2-22.) Miller contends that the evidence would establish that he is actually innocent of the crime of first degree murder. (ECF No. 1-3 at 61.)

As Respondent points out, Miller does not explain why any of this evidence is newly discovered. Petitioner does not suggest that any of the individuals were not available at the time of the second trial, and he does not describe when and how he obtained the purported interview transcript. And even assuming that the transcript is newly discovered, it is not wholly reliable because it contains hearsay evidence. *See Schlup*, 513 U.S. at 328 (in assessing a gateway claim of actual innocence, a court must consider all evidence, regardless of its admissibility, but nevertheless must give "due regard to any unreliability of it") (quotation marks omitted).

In addition Miller's purportedly "new" evidentiary materials tend, at best, to undermine Harris's eyewitness testimony, but they are not, even in combination, "substantial evidence pointing to a different suspect." *House*, 547 U.S. at 554 (petitioner established gateway claim of actual innocence where he submitted the testimony of two witnesses who stated that the victim's husband confessed to the murder, and new forensic evidence that "called into question" the prosecution's "central forensic proof connecting [the petitioner] to the crime"). Petitioner has,

therefore, failed to show that, in light of the "new" evidence, it is more likely than not that no reasonable juror would have convicted him. [15]

Because Miller has failed to meet the lesser standard of a gateway claim of actual innocence, his free-standing claim of actual innocence, even if cognizable in this federal habeas proceeding, is necessarily without merit. Claim 53 is therefore **DENIED**.

### N. Opening Statement and Closing Argument: Claim 26

Petitioner asserts that "[c]ounsel . . . was ineffective for failing to give fact based and logically consistent closing and opening arguments based on the thirty significant points which thoroughly proved and persuasively supported [his] innocence . . . and [the] third party guilt which focused on Clement Harris, Tracey Taylor, and Slouch."  (ECF No. 1 at 23.)  He maintains, in other words, that counsel should have presented argument about his innocence and third-party guilt based on the evidence which he has insisted, in his other claims, counsel should have submitted or developed.

The Court has found that all other claims of attorney ineffective assistance are not substantial, and that Petitioner has not met even the lower, gateway standard for actual innocence.  Therefore, because counsel was not ineffective in failing to introduce or develop the purported evidence of actual innocence or third-party guilt, the claim that she rendered ineffective assistance in her opening statement and closing argument is not substantial.  Claim 26 is **DISMISSED**.

For all of these reasons, the Petition is **DENIED**.

---

[15]  Petitioner's argument in Claims 18, 20, and 22—*i.e.*, that counsel should have advocated for a facilitation instruction—undermines his claim that he is actually innocent of the murder of Donald Rice.  *See Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.")

## APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)-(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists could debate the Court's determination that the state appellate court's ruling that the admission of Blackwell's testimony at the second trial did not violate Miller's right of confrontation was not unreasonable. The Court therefore **GRANTS** a limited COA on that issue. As to all other issues, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition.

The Court **CERTIFIES**, pursuant to Fed. R. App. P. 24 (a), that an appeal in this matter would be taken in good faith to the extent the appeal addresses the Tennessee Court of Appeals' determination that Miller's right to confront witnesses was not violated by the admission of Blackwell's testimony. An appeal that does not address that issue is not certified as taken in

good faith, and Petitioner should, in that instance follow the procedures of Rule 24(a)(5) to obtain *in forma pauperis* status.

      **IT IS SO ORDERED**.

                                               **s/ S. Thomas Anderson**
                                             S. THOMAS ANDERSON
                                             CHIEF UNITED STATES DISTRICT JUDGE

                                             Date: September 26, 2019.