**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: April 19, 2021

Mr. Andrew Daniel Barr
Cooley, 380 Interlocken Crescent, Suite 900
Broomfield, CO 80021

Mr. Richard Davison Douglas
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207

Mr. Adam Gershenson
Cooley LLP, 500 Boylston Street, 14th Floor
Boston, MA 02116

          Re:  Case No. 19-6214, *Dwight Miller v. Kevin Genovese*
               Originating Case No. : 1:15-cv-01281

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                         Yours very truly,

                         Deborah S. Hunt, Clerk

                         Cathryn Lovely
                         Deputy Clerk

cc:  Mr. Thomas M. Gould

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0086p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DWIGHT MILLER,

    *Petitioner-Appellant*,

    *v.*

KEVIN GENOVESE, Warden,

    *Respondent-Appellee*.

No. 19-6214

---

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:15-cv-01281—S. Thomas Anderson, District Judge.

Argued: March 10, 2021

Decided and Filed: April 19, 2021

Before: BATCHELDER, MOORE, and BUSH, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Andrew Barr, COOLEY LLP, Broomfield, Colorado, for Appellant. Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Andrew Barr, COOLEY LLP, Broomfield, Colorado, Elizabeth Prelogar, COOLEY LLP, Washington, D.C., Adam Gershenson, COOLEY LLP, Boston, Massachusetts, for Appellant. Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge. When the English Crown sentenced Sir Walter Raleigh to death for treason without allowing him to cross-examine the key witness against him, Lord Cobham, it sparked a public outcry. *Crawford v. Washington*, 541 U.S. 36, 44, 50 (2004). That

controversy culminated in English law developing a right to confront witnesses. *Id.* at 44. Almost two centuries later, the American Founders enshrined that right in the Confrontation Clause of the Sixth Amendment.

This case presents a wrinkle on Raleigh's trial. What if Raleigh had, in fact, been allowed to cross-examine Cobham and uncover his motive to lie but—and here's the catch—Raleigh was not allowed to reveal to the jury the portion of Cobham's testimony disclosing that motive? Would that scenario have been any less offensive to principles of justice than an outright denial of Raleigh's right to cross-examine Cobham? To ask those questions is to answer them. Confrontation of an adverse witness necessarily entails that the trier of fact be allowed to learn the material results of that confrontation. That did not happen with respect to a key witness in the murder trial of Dwight Miller. For that reason and others explained below, the Tennessee Court of Criminal Appeals's application of clearly established law (namely, the Supreme Court's Confrontation Clause jurisprudence) was objectively unreasonable. We therefore reverse the district court's denial of habeas corpus and remand for it to grant Miller a conditional writ of habeas corpus.

I.

A. The First Trial

In April of 1995, Donald Rice was murdered. *Miller v. Genovese*, No. 1:15-cv-01281-STA-jay, 2019 WL 4724304, at *4 (W.D. Tenn. Sept. 26, 2019) (*Miller Habeas*). A jury convicted Dwight Miller of the crime, in part because of Kathy Blackwell's testimony that the morning after the murder, she saw Miller in a car that looked like Rice's and that Miller knew and told her that Rice was dead before anyone else could have known about the death. *State v. Miller*, No. 02C01-9708-CC-00300, 1998 WL 902592, at *11 (Tenn. Crim. App. Dec. 29, 1998) (*Miller I*). But that testimony only came after the trial court engaged in an "unusual procedure." *Id.* at *12. When the State initially called Blackwell to testify, she claimed that she could not remember anything about the day in question, even after the trial court allowed the State to treat her as a hostile witness. She explained her memory loss: "I used to smoke a lot of crack and it burns your brain up. You don't remember anything." The trial court thought she was lying about her memory problems. So, out of the jury's presence, the judge sent Blackwell to jail, and

to help her remember, gave her reading material from both parties: the State offered statements that she had given to police shortly after the murder, and Miller offered notes that his investigator took when speaking with her just before trial.

After the State finished presenting the rest of its evidence, the trial court called Blackwell back to testify as the court's own witness. The judge told the jury, "I asked her to take her statements and go back and-and try to remember what happened and see if her memory improved any." The judge then directed Blackwell to "turn and face that jury and tell them what happened, and I want you to tell them the truth." She testified exactly in line with the statements the State had provided for her to read while she was in jail. During cross-examination, Miller's attorney asked Blackwell how she had regained her memory. Blackwell replied: "I don't want to go to jail."

On direct appeal, the Tennessee Court of Criminal Appeals determined that "the trial court's actions influenced testimony which was damaging to the defense," and that the error "mandates reversal." *Miller I*, 1998 WL 902592, at *12. So the State prepared to try Miller again.

B. THE SECOND TRIAL

1. *The Truncation of Blackwell's Testimony*

A problem arose for the State, however, as it prepared for the second trial: it could not find Kathy Blackwell. Because Blackwell was missing, the State sought to introduce her testimony from the first trial under the Confrontation Clause's exception for unavailable witnesses whom the defendant has already cross-examined. To determine whether the exception applied, the trial court held a hearing, with testimony from a police officer, an office investigator for the District Attorney, a Tennessee Bureau of Investigation agent, and a Sheriff's Office investigator, all of whom detailed their failed efforts to find Blackwell. Their testimony persuaded the trial court that Blackwell was unavailable.

So far, so good—from the State's perspective. But the trial court then made what Miller argues was an objectively unreasonable decision—the issue that gives rise to this habeas appeal. The judge determined that, rather than allow all of Blackwell's testimony to be read to the jury,

he would omit part of it.  In particular, in an effort to ensure that the taint of the procedure at the first trial did not reach the second, the court carved "any reference of incarceration or intimidation or anything by her being a court witness" from the transcript.  The harmful result, Miller argues, is that part of the testimony that the jury never heard was Blackwell's statement that she had testified differently on her return to the courtroom because she did not want to go to jail.  That omission, according to Miller, deprived the jury of information that called into question the credibility of Blackwell's testimony in support of Miller's murder conviction.

### 2. The Proof

Before addressing the substance of Miller's argument, we review the proof from the second trial.  The alleged murder occurred in Brownsville, Tennessee around 1 AM on April 20, 1995.  Police did not find Rice's body until the early evening that day.  Officers found the body, with a lethal head injury, dumped outside of town near Allen King Road.  On the side of another road in town, the police located Rice's car, with blood splattered all over the inside, the apparent result of a wound inflicted by a shotgun blast.

According to the State's theory of the case, Miller murdered Rice in the parking lot of an apartment complex.  The State contends that Miller, accompanied by a never-identified passenger, was sitting in his car, backed into his parking space.  Then Rice drove up and pulled just far enough into the space next to Miller's for the driver's-side windows of both cars to be next to each other.  At that point, according to the State, each man rolled down his window.  Conversation soon escalated into a heated argument, which in turn (according to the State) caused Miller to fire a twelve-gauge shotgun blast at Rice through the open car windows.  Miller then allegedly jumped out of his car, opened the driver's door of Rice's car, pushed Rice's body over from the driver's seat, claimed the wheel, and drove off in Rice's vehicle.  Meanwhile, the State says, the unidentified passenger in Miller's car moved over to the driver's side and followed Miller, now in Rice's car, out of the lot.

The State's theory relied heavily on the testimony of a single eyewitness to the events in the parking lot, Clement Harris.  That testimony was not airtight.  For one thing, the alleged shooting occurred in darkness—as noted, it was around 1 AM.  No lights illuminated the lot, and Harris acknowledged under cross examination that the cars' headlights were off.  Harris testified

that, as he sat outside an apartment, he saw Miller and Rice pull into the lot. After he heard the two argue, Harris claims he heard and saw the flash of a shot from Miller's car into Rice's. Then, according to Harris, he saw Miller jump into Rice's car, push Rice's body over in the front seat, and drive off in the vehicle. Harris also testified that he recognized Miller's car and knew Miller's voice. But, in addition to the darkness issue, Harris had other credibility problems. During his direct examination, Harris acknowledged that he used crack at the time, including on that day; had been convicted of robbery, forgery, and a drug crime; and at the time of the second trial was in jail for theft of a lawnmower. Then, during cross-examination, he admitted that he could not remember whether he had been drinking that night, and that he did not have an especially close vantage point.

Later in the trial, Miller introduced additional evidence to undermine Harris's testimony. First, during cross examination, a police investigator acknowledged that Harris had also been a suspect at one point in the investigation. Second, a police officer testified that Harris had once disposed of evidence (forged checks) in a ditch off the same road where the police found Rice's body. And third, a man named Curtis Johnson testified that he had been smoking crack with Harris until 3:30 AM that night.

The jury also heard the non-excised parts of Blackwell's prior testimony. That portion included the initial colloquies when Blackwell repeatedly said that she could not remember anything and Blackwell's statement that she "used to smoke a lot of crack and it burns your brain up." But, as noted, the edited transcript skipped over her time in jail and her return as the court's witness and went straight to her more lucid-seeming post-jail testimony that she saw Miller around 2:00 AM that night and that Miller told her about Rice's death the following day before anyone else could have known about it. Thus, the jury never heard her response under cross-examination that her memory had returned because she wanted to avoid being returned to jail for again asserting her inability to remember.

The rest of the State's evidence was weak. A couple witnesses testified that they saw Miller in the area the night of the murder. Two investigators testified that, after Miller told them where to find the shotgun he had inherited from his grandfather, they smelled it and surmised that it might have been fired recently. But they also admitted that they did not perform a test that

would have verified whether the gun had in fact been fired recently.  Those investigators also found two shotgun shells in Miller's room, one live and one spent, of the same common brand as the shell used to kill Rice.  And the jury heard testimony from one witness that she had seen a shotgun and shells in Miller's trunk the day before the murder, and another who said that Miller came to her house in the early-morning hours after the murder and urgently demanded entry.

During the State's case, one investigator also introduced elements of Miller's defense. He read a statement Miller had offered at his first interrogation in which Miller claimed that he had been near his home in Stanton, a town about fifteen miles away, that entire evening.  And he testified that at Miller's preliminary hearing, he had overheard Miller tell his mother that the shotgun was his father's and that he had not fired it for about seven years.

Miller directed his evidence at undermining the prosecution's case.  First, a Tennessee Bureau of Investigation technician testified that none of the fingerprints in Rice's car matched Miller.  Another technician testified that she found no blood on Miller's clothes or the shotgun. And a family friend testified that just before the police found Miller's gun, it "was sitting in the corner dirty and looked like hadn't nobody bothered it in some time" and that it "didn't smell like it had been shot."

The jury convicted Miller, and the trial court imposed a life sentence.  *Miller Habeas*, 2019 WL 4724304, at *6.  In the appeal relevant here,[1] the Tennessee Court of Criminal Appeals, over a dissent, rejected Miller's claim that the trial court erred in admitting Blackwell's transcribed and redacted testimony.[2]  *State v. Miller*, No. W2011-00447-CCA-R3-CD, 2013 WL 324401, at *12 (Tenn. Crim. App. Jan. 28, 2013) (*Miller III*); *id.* at *13–14 (Woodall, J., dissenting).

---

[1]Miller's first appeal was untimely, but a post-conviction court held that the untimeliness resulted from ineffective assistance of counsel and granted a delayed direct appeal.  *Miller Habeas*, 2019 WL 4724304, at *6. That is the appeal we are reviewing.

[2]Miller's argument to the Tennessee Court of Criminal Appeals was not based on the Confrontation Clause. *Id.* at *12. But the court briefly discussed the issue all the same, *id.*, and the State waived the argument that Miller's failure to raise the Confrontation Clause before the state court constituted procedural default, *Miller Habeas*, 2019 WL 4724304, at *19.  When the state makes an "explicit and deliberate waiver" of a procedural-default defense, we cannot revisit the issue. *Maslonka v. Hoffner*, 900 F.3d 269, 276 n.1 (6th Cir. 2018).

Miller filed a petition for habeas corpus in federal court. The district court denied Miller habeas relief but granted him a certificate of appealability for his Confrontation Clause claim. *Miller Habeas*, 2019 WL 4724304, at *35.

## II.

### A. THE MERITS

#### 1. Standard of Review

We review the district court's legal conclusions de novo and its factual findings for clear error. *Reiner v. Woods*, 955 F.3d 549, 554 (6th Cir. 2020). Because neither party contests the issue, we will assume that the Antiterrorism and Effective Death Penalty Act's restrictions on habeas review apply to Miller's case.[3] Under AEDPA, a federal court can grant habeas relief for a state court's legal error only if it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Supreme Court has clarified that a state-court decision was an unreasonable application of clearly established federal law when it was "objectively unreasonable" in light of the Supreme Court's holdings, not merely "erroneous" or "incorrect." *Williams v. Taylor*, 529 U.S. 362, 409, 411–12. Objective unreasonableness requires that the error be "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). That standard is "difficult to meet," but it "stops short of imposing a complete bar" on granting habeas. *Id.* at 102. Some "principles are fundamental enough that when new factual permutations arise," the correct answer is clear. *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). This case offers just such a factual permutation.

---

[3]AEDPA applies only to a claim that "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). If the state court did not adjudicate a claim on the merits, we conduct plenary review. *Jackson v. Smith*, 745 F.3d 206, 209 (6th Cir. 2014). In *Miller III*, the court specifically noted that Miller "does not challenge on appeal the admission of Blackwell's prior testimony on confrontation grounds." 2013 WL 324401, at *12. It seems unlikely that a court can adjudicate an issue on the merits if the appellant does not raise it. But because neither party questions AEDPA's applicability, and because Miller prevails even under AEDPA, we need not decide the issue.

### 2. The Confrontation Clause

The Supreme Court has divided its Confrontation Clause jurisprudence into two categories: cases about the admissibility of out-of-court statements and cases involving restrictions on the scope of cross-examination.  *See Kentucky v. Stincer*, 482 U.S. 730, 737 (1987).  The former, which we will call the applicability cases, address when the right applies; the latter, which we will call the substance cases, address how much cross-examination the right requires.  Most Confrontation Clause cases are one of the two.  This case, however, sits squarely at their intersection.  We must therefore determine what was clearly established in 2013, when the Tennessee Court of Criminal Appeals ruled on Miller's case, about how the two lines of precedent interact.

Remember that Miller had the opportunity to cross-examine Blackwell at his first trial.  Then, at his second, the trial court admitted the transcript of her testimony but excised the part of that cross-examination where Blackwell answered that she "remember[ed]" her testimony because she did not want to go to jail.  How does that excision stack up against the Supreme Court's precedents?

First, applicability.  Since 2003, the applicability rule for the admission of prior testimony has been clear.  The State can introduce prior testimony only if the witness is unavailable and the defendant had a prior opportunity to cross-examine her.  *Crawford*, 541 U.S. at 53–54.  That lone exception exists because the opportunity to cross-examine the witness at the first trial ensures that "the substance of the constitutional protection is preserved."  *Id.* at 57 (quoting *Mattox v. United States*, 156 U.S. 237, 244 (1895)).  When, at the second trial, the testimony includes the admissions that the defendant elicited in the first cross-examination, it gives "the trier of fact a satisfactory basis for evaluating the truth of the prior statement."  *Mancusi v. Stubbs*, 408 U.S. 204, 213 (1972) (quoting *California v. Green*, 399 U.S. 149, 161 (1970)).[4]  Because the

---

[4]*See also California v. Green*, 339 U.S. 149, 166 (1970) (explaining that the prior cross-examination "provides substantial compliance with the purposes behind the confrontation requirement"); *Barber v. Page*, 390 U.S. 719, 722 (1968) ("This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement.").

Tennessee trial court relied on the prior-cross-examination exception, it had to fully preserve Miller's confrontation rights.

Second, substance. "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).[5] After all, the confrontation right "means more than being allowed to confront the witness physically." *Davis*, 415 U.S. at 315. And one of those prototypical forms of bias is "fear or favor growing out of" incarceration. *Alford v. United States*, 282 U.S. 687, 693 (1931); *see also Davis*, 415 U.S. at 317–18; *Van Arsdall*, 475 U.S. at 679. So if, at the first trial, the court kept Miller's counsel from asking whether Blackwell's brief incarceration motivated her testimony, it would have been a paradigmatic Confrontation Clause violation.

The Tennessee Court of Criminal Appeals seemed to assume that the substance precedents did not apply to Miller's case. Its analysis consisted of this statement: "The Defendant's constitutional right of confrontation was not violated at his second trial because, after a hearing at the beginning of the second trial, the court determined that Blackwell was unavailable, and the Defendant had a prior opportunity to cross-examine her." *Miller III*, 2013 WL 324401, at *12. That is a correct application of *Crawford*'s applicability requirement. But Miller had a confrontation right, not a *Crawford* right.

Take an extreme example. A year before Tennessee first prosecuted Miller, California sought to use DNA evidence to convict a man named John Kocak of rape. *Williams v. Illinois*, 567 U.S. 50, 118 (2012) (Kagan, J., dissenting).[6] On direct examination, the state's DNA analyst testified that blood on a sweatshirt matched only Kocak's DNA. *Id.* On cross-

---

[5] *See also Olden v. Kentucky*, 488 U.S. 227, 231–32 (1988) (per curiam) (applying that rule); *Davis v. Alaska*, 415 U.S. 308, 318 (1974) ("On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.").

[6] As we do here, Justice Kagan used Kocak's case only as an illustrative example. *Williams* addressed an applicability question that has no bearing on this case. *See* 567 U.S. at 56 (plurality opinion) ("[D]oes *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?").

examination, she "realized she had made a mortifying error" and admitted that the DNA on the sweatshirt actually came from the victim. *Id.* Justice Kagan noted that "[i]n trying Kocak, the State would have to look elsewhere for its evidence." *Id.* at 119. But under the Tennessee Court of Criminal Appeals's logic, Justice Kagan would be wrong. Instead, if that analyst was unavailable when California tried Kocak again, the Tennessee court's approach would mean that California could just omit her testimony under cross-examination and introduce the part of the analyst's testimony where she said the DNA matched Kocak. That is objectively unreasonable.

The state court's error in this case differs in degree, but not in kind, from that California court's hypothetical mistake. The Supreme Court's precedents clearly establish that a defendant does not lose the right to present the jury with reasons for bias that he uncovered in the "crucible of cross-examination" just because he entered that crucible in a prior trial. *See Crawford*, 541 U.S. at 61. At his first trial, Miller had the right to present to the jury Blackwell's statement that she had suddenly remembered her damning testimony because she did not want to return to jail. At his second trial, he retained that same right.

The State's argument to the contrary mostly reiterates the Tennessee court's logic. It contends that, because only *Crawford* was presented to the Tennessee court, so we can review only the court's rote application of *Crawford*'s prior-cross-examination rule. But that is not how habeas review works. We review the Tennessee court's decision based on the claim before it, not the particular cases the parties cited or the specific arguments they made. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *Carter v. Bell*, 218 F.3d 581, 606 (6th Cir. 2000). And Miller raises a Confrontation Clause claim, so the Supreme Court's full panoply of Confrontation Clause cases applies.

The State also argues that because the jury learned of Blackwell's memory problems and crack addiction, excluding her statement that she remembered her testimony to avoid additional jail time did not violate Miller's confrontation right. But that argument goes to the error's harmfulness, not its existence. *See Van Arsdall*, 475 U.S. at 679–80. We turn now to that harmfulness inquiry.

B.  HARMLESS ERROR

We grant habeas only when a constitutional violation caused "actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). We find prejudice when we have "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 267–68 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Although that standard is not as strict as normal harmless error, *Brecht* review is significantly more rigorous than, say, sufficiency-of-the-evidence analysis. *See O'Neal*, 513 U.S. at 438 ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."). For one, we do not defer to the jury's possible credibility determinations in our harmless-error analysis; instead, we make our own. *Vasquez v. Jones*, 496 F.3d 564, 577 n.12 (6th Cir. 2007). That aspect is especially important in a case like this one, where the State's key witness had significant credibility issues. *See id.* at 576–77. More generally, although the harmless-error standard is diluted in habeas cases, *Ayala*, 576 U.S. at 267, it remains tilted in favor of the party who suffered a constitutional violation—"an uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal*, 513 U.S. at 435. In other words, a tie goes to the petitioner.

For Confrontation Clause violations, we ask whether the defendant's inability to fully cross-examine the relevant witness harmed the defendant's case. *Van Arsdall*, 475 U.S. at 684. That inquiry depends on a "host of factors," which include the witness's importance to the State's case, whether her testimony was cumulative of or corroborated by other testimony, other cross-examination the defendant conducted, and "of course, the overall strength of the prosecutor's case." *Id.* Those factors invariably overlap. For example, a witness's testimony is important when the rest of the State's case is weak. *Reiner*, 955 F.3d at 557. And cumulativeness and corroboration are two sides of the same coin. *Id.* at 559. That is why at day's end harmlessness is a holistic inquiry. Here, we cannot conclude that the violation of Miller's confrontation right was harmless.

We have found inadequately confronted testimony harmful when the State refers to it in opening and closing statements, and otherwise indicates its importance to the State's case; when

the witness weighs in on a factual point that State and defense witnesses dispute; when it bolsters other witnesses' testimony; and when there is limited other evidence (and especially no physical evidence). *Reiner*, 955 F.3d at 557–61; *McCarley v. Kelly*, 801 F.3d 652, 666–68 (6th Cir. 2015); *Vasquez v. Jones*, 496 F.3d at 576–78. By contrast, we have found a Confrontation Clause violation harmless when the State introduced two pieces of "substantially identical testimony" from the same person, only one of which was not cross-examined. *Williams v. Bauman*, 759 F.3d 630, 638 (6th Cir. 2014).

Applying that standard here, the error was not harmless for many reasons. To start, the State made clear its view that Blackwell's testimony mattered. It called four witnesses for a hearing about Blackwell's unavailability to ensure that it could use her prior testimony. It seems unlikely that the State would go to such lengths for minor testimony. Moreover, in its opening statement, the State specifically cited Blackwell's testimony that Miller knew of Rice's death before the police did.

The State was right about Blackwell's importance to its case. No physical evidence tied Miller to the crime, and the State's other evidence—beyond Clement Harris's testimony—was weak. Harris testified that he saw Miller commit the murder. But there was ample reason to question his testimony's accuracy and veracity: the night was dark, with no light shone on the events Harris claims he witnessed in the parking lot; Harris had been smoking crack the day of the murder, possibly only hours before; he had been a suspect in the initial investigation; the police found the body in the same place Harris had discarded evidence in the past; he had a lengthy criminal record; and a defense witness testified that he had been with Harris all night, and that witness did not say that he saw the murder. As we have noted, "drunk witnesses are generally not reliable ones," *Blackston v. Rapelje*, 780 F.3d 340, 361 (6th Cir. 2015); witnesses on crack are certainly no more trustworthy. Given Harris's credibility problems, the State had to bolster his testimony. Of all the evidence the State offered, only Blackwell's testimony that Miller knew of Rice's death seven hours before the police found Rice's body did so effectively. Beyond eyewitness testimony like Harris's, few pieces of testimony are more incriminating than the statement that someone knew of a murder long before anyone else could. And Blackwell alone said that Miller knew of the murder first—no one corroborated her testimony on that point.

Blackwell also bolstered Sheila Bernil's testimony that Miller came to her house around 2:00 AM the night of the murder. Bernil, like Harris and Blackwell, used crack heavily, and Bernil had numerous criminal convictions and had been Harris's partner in discarding evidence along the same road where the police found Rice's body. So she, too, had credibility problems. But when Blackwell also spoke to Miller's early-morning visit, it made Bernil's testimony more believable. *See O'Neal v. Balcarcel,* 933 F.3d 618, 627 (6th Cir. 2019) ("[T]estimony that mirrors the content of other testimony presented at trial can still have considerable impact by bolstering the credibility of the other testimony.").

The rest of the State's evidence focused on tying Miller to a shotgun to indicate that Harris's story was true. Harris and another witness testified to seeing a shotgun and shells in Miller's car on the day of the murder. And the police testified that they found a shotgun and an empty shotgun shell at Miller's house, and that the empty shell matched the brand and size of the shot found in Rice's body. But Miller is the one who told the police that he had a shotgun and where to find it, which would seem a spectacularly foolish disclosure if he had just used the gun to murder Rice. Plus, the shell brand was quite common, one that Miller could have bought at any Walmart. Finally, the investigators testified that their "sniff test" indicated that the gun had been fired recently. That, too, is less than compelling, especially in light of their failure to perform a forensic test that would have actually tested whether the shotgun had been fired.

Set against that evidence, the State found no fingerprints in the car or blood on Miller's clothes. That makes the State's theory seem even more unlikely—if Miller had jumped into Rice's car immediately after firing a shotgun into Rice's head at point-blank range, we would expect at least some blood on his clothes. But there was none. So without Blackwell, the State's case came down to Harris's unreliable eyewitness testimony, Bernil's uncorroborated testimony that Miller had been nearby on the night in question, and the gun testimony. That is not much evidence, especially when there were reasons to question much of it.

Finally, that Miller could present the jury with the parts of the cross-examination that revealed Blackwell's memory problems and drug addiction does not render harmless the excision of her desire to avoid jail. It is true that Miller presented the jury with more cross-examination than we have seen in other Confrontation Clause habeas cases. *See Reiner*, 955 F.3d at 560

(none at all); *Vasquez,* 496 F.3d at 577 (admitting "little *effective* cross-examination"). That gave the jury a reason to question Blackwell's testimony's accuracy. But Blackwell's excised statement went directly to her credibility, for it could be read to disclose a strong motive to testify in accord with the statements the prosecution had provided because she feared that the trial court would send her back to jail if she did not.

### III.

Maybe, as the State believed and the trial judge suspected, Kathy Blackwell was lying when she claimed that she could not remember anything that she had told the police in her prior statements. Or perhaps, as Miller believes, Blackwell was lying during her second appearance when she claimed that she suddenly could remember and then testified consistently with her prior statements to the police. For our purposes, and for purposes of applying the Confrontation Clause generally, it does not matter which testimony was true. Instead, what matters is that the jury had the opportunity to decide for itself whether to believe Blackwell. By redacting her testimony, the trial court denied the jury in Miller's second trial that chance and violated Miller's confrontation right.

The Tennessee Court of Criminal Appeals's application of the Confrontation Clause's protections to that decision to redact Blackwell's testimony was objectively unreasonable. The trial court justified the admission of Blackwell's prior testimony based on her unavailability. But it could not justify redacting the products of Miller's cross-examination. The confrontation guarantee that Sir Raleigh's trial inspired is not just the right to cross-examine; equally important, it is the right to share with the jury the information the cross-examination reveals. We therefore reverse and remand for the district court to grant Miller a conditional writ of habeas corpus.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-6214

DWIGHT MILLER,

    Petitioner - Appellant,

v.

KEVIN GENOVESE, Warden,

    Respondent - Appellee.

```
FILED
Apr 19, 2021
DEBORAH S. HUNT, Clerk
```

Before: BATCHELDER, MOORE, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Tennessee at Jackson.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Dwight Miller's petition for a writ of habeas corpus is REVERSED and REMANDED for the issuance of a conditional writ of habeas corpus consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk